# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICIA R. BELTZ, JOSEPH S. SULLIVAN, and ANITA SULLIVAN, individually and on behalf of all others similarly situated, and derivatively on behalf of Nominal Defendant ERIE INSURANCE EXCHANGE, ) ) ) ) ) | Civil Action 1:16-cv-179 |
| Plaintiffs, ) ) | |
| v. ) ) | **VERIFIED DERIVATIVE AND CLASS ACTION COMPLAINT** |
| ERIE INDEMNITY COMPANY, KAJ AHLMANN, JOHN T. BAILY, SAMUEL P. BLACK, III, J. RALPH BORNEMAN, JR., TERRENCE W. CAVANAUGH, WILSON C. COONEY, LUANN DATESH, PATRICIA A. GOLDMAN, JONATHAN HIRT HAGEN, THOMAS B. HAGEN,  C. SCOTT HARTZ, SAMUEL P. KATZ, GWENDOLYN KING, CLAUDE C. LILLY, III, MARTIN J. LIPPERT, GEORGE R. LUCORE, JEFFREY A. LUDROF, EDMUND J. MEHL, HENRY N. NASSAU, THOMAS W. PALMER, MARTIN P. SHEFFIELD, SETH E. SCHOFIELD, RICHARD L. STOVER, JAN R. VAN GORDER, ELIZABETH A. HIRT  VORSHECK, HARRY H. WEIL AND ROBERT C. WILBURN, ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants, ) ) | |
| and ) ) | |
| ERIE INSURANCE EXCHANGE, ) ) | |
| Nominal Defendant. ) | |

Plaintiffs, Patricia R. Beltz, Joseph S. Sullivan and Anita Sullivan (collectively "Plaintiffs"), by and through their attorneys, on behalf of themselves and all others similarly situated and derivatively on behalf of Erie Insurance Exchange, based upon personal knowledge with respect to their own circumstances and based upon information and belief or the investigation of their counsel as to all other allegations, allege the following:

<u>INTRODUCTION</u>

1.      In 1925, H.O. Hirt founded the Erie Insurance Exchange ("Exchange" or the "Exchange") and Erie Indemnity Company ("Indemnity") with the express intent that the Exchange is "organized and exists primarily *for the benefit of its subscribers* or policyholders and that therefore the interests of the people who put their trust in the Exchange for the protection of their personal business affairs must come first."[1]  Unfortunately, as time passed, priorities were inverted, and the interests of the subscribers of Exchange became subservient to those of a conflicted and self-interested board of directors of Indemnity (the "Board") and its controlling stockholders.

2.      The Exchange is not structured as a traditional insurance company.  Instead, Exchange is a subscriber-owned reciprocal insurer wherein every policyholder (each, a "Subscriber" and, together, "Subscribers") agrees to pool risk by acknowledging a reciprocal agreement of indemnity.  This type of organizational structure is "of interest to individuals wanting to participate in a not-for-profit insurance environment focused on the policyholder."[2]  As a reciprocal insurer, the Exchange is an unincorporated association with no board of directors or employees of its own.  Accordingly, every Subscriber executes a "Subscriber's Agreement" appointing Indemnity as their attorney-in-fact to manage and conduct the business and affairs of the Exchange.  *See* a true and correct copy of the Subscriber's Agreement, attached hereto as Exhibit A.

---

[1]  *See* In re Trust of Hirt, 832 A.2d 438, 441 (Pa. Super 2003) (citing to Subparagraph 4.03(B) of the Hirt Trust Agreement, discussed *infra*.) (emphasis added).

[2]     *See* Alex Burke, *What Is a Reciprocal Insurance Company?,* ZACKS, http://finance.zacks.com/reciprocal-insurance-company-7135.html (last visited July 7, 2016).

3.     As the attorney-in-fact, Indemnity, through the Board, serves as a fiduciary to Exchange and the Subscribers and is obligated to act with the utmost loyalty, honesty and integrity and at all times in the best interests of Exchange and the Subscribers.

4.     In addition to Indemnity and the Board's core fiduciary obligations, Indemnity is also contractually obligated to the Subscribers to adhere to the terms of the Subscriber's Agreement.  The Subscriber's Agreement specifically provides that Indemnity's compensation for serving as attorney-in-fact for and managing and conducting the business and affairs of Exchange, including the payment of general administrative expenses, will be no more than 25% of the premiums written or assumed by Exchange.  *See* Exhibit A.

5.     As detailed below, instead of acting with undivided loyalty and integrity and in compliance with the Subscriber's Agreement, the Defendants have operated with hopelessly conflicted interests and abused their position of absolute power so as to benefit themselves at the expense of Exchange and the Subscribers.  In particular, subsequent to Indemnity becoming a publicly traded company on NASDAQ in or around 1995, the interests of the shareholders of Indemnity, and specifically the majority shareholders who dominate the Board, have taken priority over the interests of the Exchange and the Subscribers.  Since 1997, Defendants have misappropriated hundreds of millions of dollars from Exchange and the Class (hereinafter defined).  During that time, Indemnity's controlling stockholders, who are among the Defendants, have reaped *hundreds of millions of dollars* in dividends from Indemnity stock, based in large part on amounts wrongfully taken from Exchange and the Class.

6.     Plaintiffs now seek to recover for themselves and all similarly situated Subscribers who are members of the proposed class defined below (the "Class") for harm suffered as a result of the Defendants' utter disregard of their fiduciary duties and breach of

contractual obligations while serving as the attorney-in-fact for the Class.  Plaintiffs also bring derivative claims on behalf of nominal defendant Exchange to remedy Defendants' breaches of fiduciary duties and to recover the losses that Exchange has suffered as a result of Defendants' self-interested misconduct.

7.     In addition, Plaintiffs request injunctive relief to bring to a halt Defendants' ongoing unlawful practices.

### JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) because one or more members of the Class are citizens of states different from the states of which some Defendants are citizens, there are well in excess of one hundred (100) Class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.  This Court also has supplemental subject matter jurisdiction over the claims of Plaintiffs and the proposed Class pursuant to 28 U.S.C. § 1367(a).

9.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district, and Plaintiffs reside within this district.

### PARTIES

10.     Plaintiff Patricia R. Beltz has been a Subscriber of Exchange since before 1997 and is a citizen of Pennsylvania.

11.     Plaintiff Joseph S. Sullivan has been a Subscriber of Exchange since approximately 2006 and is a citizen of Pennsylvania.

12.     Plaintiff Anita Sullivan has been a Subscriber of Exchange since before 1997 and is a citizen of Pennsylvania.

13.     The nominal defendant Exchange is a reciprocal insurance exchange - an unincorporated association through which individuals, or "Subscribers," may exchange contracts to indemnify each other for losses - organized under the laws of the Commonwealth of Pennsylvania.[3]  Exchange functions as a type of insurance company and, in that capacity, issues policies of insurance to Subscribers located in Pennsylvania and at least eleven (11) other states, as well as the District of Columbia.  Because Exchange is a reciprocal insurance exchange with no employees, officers, board of directors, bylaws or organizing documents, the Exchange is operated and managed by Indemnity.

14.     Defendant Indemnity is a publicly traded corporation organized under the laws of the Commonwealth of Pennsylvania and doing business throughout the United States.  Both Exchange and Indemnity and their subsidiaries and affiliates operate, collectively, under the name "Erie Insurance Group."

15.     Defendant Kaj Ahlmann ("Ahlmann") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 2003 until 2007.  Ahlmann served on several of Indemnity's committees, including the Executive Compensation Committee from 2004 through 2007, the Nominating Committee from 2004 through 2007, the Technology Committee from 2005 through 2007, the Strategy Committee in 2006 and the Executive Committee from 2006 through 2007.  Ahlmann is a citizen of California.

16.     Defendant John T. Baily ("Baily") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 2003 until 2007.  Baily served on several of Indemnity's committees, including the Executive Committee from 2004 through 2006, the Audit

---

[3]   *See* 40 Pa. Stat. § 961 (authorizing the exchange of reciprocal or inter-insurance contracts amongst individuals, partnerships, and corporations of the Commonwealth of Pennsylvania).

Committee from 2004 through 2006, the Investment Committee from 2004 through 2006 and the Strategy Committee from 2005 through 2006.  Baily is a citizen of Connecticut.

17.     Defendant Samuel P. Black, III ("Black") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 1997 until 2004.  Black served on several of Indemnity's committees, including the Executive Committee in 2002, the Audit Committee from 1998 through 2001, the Charitable Giving Committee from 1997 through 2001, the Nominating Committee from 1999 through 2001, the Investment Committee in 2000 and the Executive Compensation Committee from 1999 through 2001.   Between 1997 and 2004, Black served as the managing general partner and a limited partner of the Black Interests Limited Partnership, Erie Pennsylvania ("BILP").  During such time, Black held the right to vote the Class B shares held by BILP.  Between 1997 and 2004, Black additionally served as President of Samuel P. Black & Associates, Inc.  During such time, he held the right to vote the Class B shares held by Samuel P. Black & Associates, Inc.  From 1997 to 2001, Black held a durable power of attorney for his father Samuel P. Black, Jr. and had voting power of the Class B shares owned by his father.  He later had voting power over such shares in his capacity as executor of his father's estate.  In addition, from approximately 1997 through 2003, Black owned approximately 13% of the outstanding Class A stock and from 2003 through 2006, owned approximately 9% of the Class A stock.  Black is a citizen of Pennsylvania.

18.     Defendant J. Ralph Borneman, Jr. ("Borneman") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 1992.  He has served on several of Indemnity's committees, including the Executive Compensation Committee from 1997 through 1999, the Nominating Committee from 1997 through 2004, the Charitable Giving Committee from 2005 through 2012, the Technology Committee from 2005 through 2008, the

Strategy Committee from 2005 through 2008, the Strategy and Technology Committee from 2009 through 2012, the Executive Committee in 2009 and the Exchange Relationship Committee from 2009 through 2012.  Borneman is a citizen of Florida.

19.     Defendant Terrence W. Cavanaugh ("Cavanaugh") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2008.  He has served on the Charitable Giving Committee, the Investment Committee and the Strategy and Technology Committee from 2009 through 2016.  Cavanaugh served as the President and Chief Executive Officer of Indemnity from July 2008 through May 31, 2016.  Cavanaugh is a citizen of Pennsylvania.

20.     Defendant Wilson C. Cooney ("Cooney") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 2003 until 2006.  He served on several of Indemnity's committees, including the Executive Compensation Committee from 2004 through 2006, the Nominating Committee from 2004 through 2006, the Technology Committee from 2005 through 2006 and the Executive Committee in 2006.  Cooney is a citizen of Texas.

21.     Defendant LuAnn Datesh ("Datesh") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2016.  She serves on the Audit Committee.  Datesh is a citizen of Pennsylvania.

22.     Defendant Patricia A. Goldman (Goldman") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 1994 until 2000.  Goldman served on the Audit Committee from 1997 through 2000 and the Nominating Committee from 1997 through 2000.  Goldman is a citizen of Washington, D.C.

23.     Defendant Jonathan Hirt Hagen ("J. Hagen") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2005 and as Vice-Chair of the

-7-

Board since 2013.  During such time, he served on several of Indemnity's committees, including the Strategy Committee from 2006 through 2008, the Audit Committee from 2011 through 2016, the Executive Compensation Committee from 2007 through 2016, the Nominating Committee from 2006 through 2016, the Strategy and Technology Committee from 2009 through 2016, the Exchange Relationship Committee from 2009 through 2016 and the Executive Committee in 2010 and 2016.  In addition to the foregoing, J. Hagen has served as one of the three trustees for the three H.O. Hirt Trusts (the "H.O. Trusts") since 2015.   J. Hagen is also a beneficiary of the H.O. Trusts which control a majority of the voting stock of Indemnity.  J. Hagen is the grandson of H.O. Hirt, the late co-founder of Indemnity, and son of the late Susan Hirt Hagen, a former director of Indemnity, and defendant Thomas B. Hagen, the Chairman of the Board.  J. Hagen is a citizen of Pennsylvania.

24.     Defendant Thomas B. Hagen ("T. Hagen") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 1979 until 1998 and since 2007.  He has served as the Chairman of the Board of Indemnity since 2007.   T. Hagen has served on several of Indemnity's committees, including the Charitable Giving Committee in 1997 and the Executive Committee from 2008 through 2016.  Since 2008, T. Hagen has served as an *Ex-officio* member of all of the committees of Indemnity.   He served as an employee of Indemnity from 1953 to 1995, and during such time, he served as President of Indemnity from 1982 to 1990 and as the Chairman and Chief Executive Officer of Indemnity from 1990 to 1993.   T. Hagen is a beneficiary of the H.O. Trusts.  He served as the general partner of the Hagen Family Limited Partnership since 1989.   As general partner, T. Hagen has sole voting power and investment power over the shares of Class B common stock held by the Hagen Family Limited Partnership. T. Hagen is the father of defendant J. Hagen.  According to Indemnity's public filings, T.  Hagen

"is the son-in-law and close associate of [the] late founder and longtime leader of [Indemnity]" H.O. Hirt.  T. Hagen is a citizen of New York.

25.     Defendant C. Scott Hartz ("Hartz") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2003.  Hartz has served on several of Indemnity's committees, including the Audit Committee from 2004 through 2009, the Investment Committee from 2004 through 2016, the Technology Committee from 2005 through 2008, the Executive Committee from 2005 through 2008 and in 2010 and the Strategy and Technology Committee from 2009 through 2016.  Hartz is a citizen of Pennsylvania.

26.     Defendant Samuel P. Katz ("Katz") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 2001 until 2004.  He served on the Audit Committee and Executive Compensation Committee from 2001 through 2004.  Katz is a citizen of Pennsylvania.

27.     Defendant Gwendolyn King ("King") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 1999 until 2000.  She served on the Nominating Committee in 2000.  King is a citizen of Washington, D.C.

28.     Defendant Claude C. Lilly, III ("Lilly") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2000.  Lilly has served on several of Indemnity's committees, including the Audit Committee from 2001 through 2016, the Investment Committee from 2004 through 2016, the Strategy Committee from 2005 through 2008, the Executive Committee in 2008 and 2011, the Strategy and Technology Committee from 2009 through 2016 and the Exchange Relationship Committee from 2009 through 2016.  Lilly is a citizen of South Carolina.

29.     Defendant Martin J. Lippert ("Lippert") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 1999 until 2000 during which time he served on the Audit Committee.  Lippert is a citizen of New York.

30.     Defendant George R. Lucore ("Lucore") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2016.  He serves on the Charitable Giving Committee and the Strategy Committee.  Lucore is a citizen of Florida.

31.     Defendant Jeffrey A. Ludrof ("Ludrof") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 2002 until 2007.  During such time, he served on several of Indemnity's committees, including the Executive Committee from 2003 through 2007, the Investment Committee in 2003, the Charitable Giving Committee from 2004 through 2007, the Technology Committee from 2005 through 2007 and the Strategy Committee from 2005 through 2007.  Ludrof also served in various executive officer roles at Indemnity including serving as Senior Vice President from 1994 to 1999, as Executive Vice President of Insurance Operations from 1999 to 2002 and as President and Chief Executive Officer from 2002 until August 2007.  Ludrof is a citizen of North Carolina.

32.     Defendant Edmund J. Mehl ("Mehl") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 1969 until 1999.  He has served on several of Indemnity's committees, including the Executive Committee from 1997 through 1999, the Audit Committee from 1997 through 1999 and the Nominating Committee from 1997 through 1998.  Mehl is a citizen of Pennsylvania.

33.     Defendant Henry N. Nassau ("Nassau") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 2000 until 2002.  During such time, he served on

several of Indemnity's committees, including the Executive Committee and the Investment Committee from 2001 through 2002.  Nassau is a citizen of Pennsylvania.

34.    Defendant Thomas W. Palmer ("Palmer") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2006.  Palmer has served on several of Indemnity's committees, including the Audit Committee from 2009 through 2015, the Nominating Committee from 2007 through 2015, the Strategy Committee in 2007 and 2008, the Executive Compensation Committee from 2009 through 2015, the Strategy and Technology Committee from 2009 through 2015, the Exchange Relationship Committee in 2016 and the Executive Committee in 2015.   Palmer is a citizen of Ohio.

35.    Defendant Martin P. Sheffield ("Sheffield") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2010.  During such time, he has served on several of Indemnity's committees, including the Audit Committee from 2011 through 2016, the Strategy and Technology Committee from 2011 through 2016, the Exchange Relationship Committee from 2012 through 2016 and the Executive Committee from 2013 through 2016. Sheffield is a citizen of Pennsylvania.

36.    Defendant Seth E. Schofield ("Schofield") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 1991 until 1998.  He served on the Executive Compensation Committee and the Nominating Committee in 1997 and 1998.  Schofield is a citizen of Florida.

37.     Defendant Richard L. Stover ("Stover") has served as a director of Indemnity, and as fiduciary for the Class and Exchange, since 2010.   He has served on several of Indemnity's committees, including the Audit Committee from 2011 through 2016, the

Investment Committee from 2011 through 2016 and the Executive Committee from 2012 through 2013.  Stover is a citizen of Florida.

38.     Defendant Jan R. Van Gorder ("Van Gorder") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 1990 until 2004.  He served on several of Indemnity's committees, including the Executive Committee from 1997 through 2002 and the Investment Committee from 2003 through 2004.  Van Gorder also served as Senior Executive Vice President, Secretary and General Counsel of Indemnity from 1990 through 2004.  Van Gorder is a citizen of Florida.

39.     Defendant Elizabeth A. Hirt Vorsheck ("Vorsheck") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2007.  She has served on several of Indemnity's committees, including the Executive Committee from 2008 through 2016, the Charitable Giving Committee from 2008 through 2016, the Strategy Committee in 2008, the Strategy and Technology Committee from 2009 through 2016, the Exchange Relationship Committee from 2009 through 2016 and the Nominating Committee from 2010 through 2016. Vorsheck has served as one of the three trustees of the H.O. Trusts since 2007.  She also is a beneficiary of the H.O. Trusts which control a majority of the voting stock of Indemnity. According to Indemnity's Proxy Statement, filed with the Securities and Exchange Commission ("SEC") on March 18, 2016, Vorsheck owns 69,516 shares of Class A common stock directly and 4,713,766 shares of Class A common stock indirectly through several trusts which amounts to approximately 10.36% of the outstanding Class A shares. Vorsheck is the first cousin of J. Hagen.  Vorsheck is a citizen of Pennsylvania.

40.     Defendant Harry H. Weil ("Weil") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 1994 until 2000.  He served on the Audit Committee

in 1997 and from 1999 through 2000, the Executive Compensation Committee from 1997 through 2000, the Investment Committee from 1997 through 1999 and the Executive Committee in 1998.  Weil is a citizen of Maryland.

41.    Defendant Robert C. Wilburn ("Wilburn") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 1999.  He has served on several of Indemnity's committees, including the Audit Committee from 2000 through 2010, the Executive Compensation Committee from 2000 through 2016, the Nominating Committee from 2000 through 2003, the Investment Committee in 2003 and from 2009 through 2016, the Executive Committee from 2004 through 2008 and in 2014, and the Charitable Giving Committee from 2011 through 2016.  Wilburn is a citizen of Virginia.

42.    The Director Defendants are collectively hereinafter referred to as the "Directors."  Each of the Directors received and/or receives both monetary and/or non-monetary compensation, including shares of Indemnity stock, for serving on the Board.

## FACTUAL ALLEGATIONS

### History and Relationships

43.    When founding the Exchange in 1925, H.O. Hirt did not structure it as a traditional stock insurance company.  He wanted Exchange to be different, and he wanted its operation to be based on "simple common sense, mixed with just plain decency."[4]  In fact, the guiding principle was:  "Do unto others as you would have them do unto you."[5]

44.    The "founding purpose" of the Exchange was to provide the "[p]olicyholders with as near perfect protection, as near perfect service as is humanly possible and to do so *at the*

---

[4]  *History of Erie Insurance,* Erie Insurance, https://www.erieinsurance.com/about-us/company-profile/history (last visited July 7, 2016).

[5]  *Id.*

*lowest possible cost.*"[6]   H.O. Hirt was President and Chief Executive Officer of Indemnity until

1976 and remained on the Board until 1980.   Through the years, he never forgot the guiding

principles, and when he created the H.O. Trusts, prior to his passing in 1982, as a means of

transferring his controlling interest in Indemnity to his children - F. William Hirt ("F.W. Hirt")

and Susan Hirt Hagen - he specifically reminded them that Exchange "was organized and exists

primarily *for the benefit of its subscribers* or policyholders and that therefore the interests of the

people who put their trust in the Exchange for the protection of their personal business affairs

must come first."[7]

45.    Indemnity was structured with two classes of common stock - Class A and Class

B.  Upon the death of H.O. Hirt in 1982, 50% of all Class A shares and 76.22% of the Class B

shares, which are the only voting shares, were passed to F.W. Hirt and Susan Hirt Hagen by way

of two trusts, each holding equal halves of the shares for their respective benefit.   At that time,

Indemnity stock was not publicly traded.

46.    In May 1994, for the first time, shares of Indemnity stock were made available for

sale to the public through the filing of a Form 10 with the Securities and Exchange Commission

("SEC").   The following year, it became listed on NASDAQ.[8]   Since then, as described below,

the financial interests of Indemnity's shareholders, particularly those of Indemnity's controlling

---

[6]   *Above All Together:   Erie Insurance Group Historic Timeline 1925-2015* at p. 3, Erie
Insurance, https://www.erieinsurance.com/-/media/files/timeline.pdf (last visited July 7, 2016).

[7]   *See In re Trust of Hirt*, 832 A.2d at 441 (citing to Subparagraph 4.03(B) of the Hirt Trust
Agreement) (emphasis added).

[8]   *See Above All Together:  Erie Insurance Group Historic Timeline 1925-2015 1925-2015* at p.
14, Erie Insurance, https://www.erieinsurance.com/-/media/files/timeline.pdf (last visited July 7,
2016).  As reported in Indemnity's current Proxy Statement filed with the SEC on March 18,
2016, Indemnity has two classes of common stock.  Class A stock is non-voting and publicly
traded on the NASDAQ and has approximately 46,189,068 million shares outstanding.  Class B
stock has exclusive voting rights and there are approximately 2,542 shares outstanding.

shareholders, have dominated those of Exchange and the Subscribers - to the point where Indemnity and the Directors are wholly disregarding their fiduciary and contractual obligations to Exchange and the Class.

47.     Prior to Indemnity becoming a publicly traded company, and consistent with the ideals of a reciprocal insurance exchange, Exchange paid dividends to Subscribers even though its total net premiums were just a fraction of what they are today.  For example, in 1975, when Exchange wrote $108 million in premiums, the Subscribers received $10 million in dividends.[9] In contrast, despite the fact that Exchange's premiums have continually grown over the years, and were nearly $6 billion in 2015, the Subscribers have not received any dividends in over 25 years.[10]  Instead, since 1997, *over $1.6 billion* has been funneled from Exchange in the form of dividends to Indemnity's Class A and Class B shareholders.

### The Hirt Descendants Control the Board and Pay Themselves Huge Amounts in Dividends

48.     At all relevant times, Board members have served at the pleasure of the Class B shareholders,[11] and the Board has long been comprised of multiple Hirt family members.  For example, F.W. Hirt, who was H.O Hirt's son, was an executive of several Indemnity subsidiaries and served as a member of the Board from 1965 until his death in 2007, with the exception of a

---

[9]  *Id.* at p. 11.

[10]  *Erie Ins. Exch. v. Erie Indem. Co.,* No. MS14-03-003, Declaratory Opinion and Order, ¶ 43 (Ins. Comm'r of Pa. Apr. 29, 2015).

[11]  Since 2006, J. Hagen has been a member of the Board's Nominating Committee - the Board committee responsible for determining and nominating the candidates for the office of director to be elected by the holders of Class B common stock, and has served as the Chair of the Nominating Committee since 2008.  Since 2010, defendant Vorsheck has also been a member of the Nominating Committee as well as Susan Hirt Hagen until her death in 2015.  Further, T. Hagen is an *ex officio* member of the Nominating Committee.  Thus, with the Nominating Committee comprised of a majority of insiders and/or directors hand-picked by them, there is no "independent" body to select board nominees.

three-year period between 1990 and 1993, having served as Chairman of the Board since at least 1995.  H.O. Hirt's daughter, Susan Hirt Hagen, was a member of the Board from 1980 until her death in 2015.  Defendant J. Hagen, the son of Susan Hirt Hagen and defendant T. Hagen, has served on the Board since 2005 and as Vice-Chairman of the Board since 2013.  T. Hagen, the husband of the late Susan Hirt Hagen and father of defendant J. Hagen, has been a director since 2007, having previously served as a director from 1979 through 2007, and has been Chairman of the Board since 2007.  Defendant Vorsheck is F.W. Hirt's daughter.  The other members of the Board were nominated (and appointed) by the H.O. Trusts' beneficiaries and many of them have had long standing personal relationships with the beneficiaries.[12]

49.     The Class B shares passed down from H.O. Hirt are now held in three trusts, the H.O. Trusts.  Presently, the three trustees are defendant J. Hagen, defendant Vorsheck and Sentinel Trust Company, L.B.A. ("Sentinel") - the corporate trustee since 2006.[13]  As reported in Indemnity's Proxy Statement filed with the SEC on March 18, 2016, the H.O. Trusts collectively own 2,340 shares of Class B common stock, which, because such shares represent 92.05% of the outstanding shares of Class B common stock, is sufficient to determine the outcome of any matter submitted to a vote of the holders of Class B common stock.

---

[12]  For example, as part of a legal proceeding initiated in 1998 by Susan Hirt Hagen to remove Mellon Bank, N.A. ("Mellon Bank") as a trustee of the H.O. Trusts, it was revealed that her brother, F. W. Hirt (then Chairman of the Board), had made a series of gifts of Class A common stock between 1994 and 1997, aggregating $10.3 million (market value at time of gift), to certain Indemnity personnel and/or directors, including defendants Schofield and Van Gorder.  F. W. Hirt also gave $340,097 of Class A stock to Stephen A. Milne, Indemnity's then President, Chief Executive Officer and a director, and $169,438 of Class A stock to John M. Petersen, Indemnity's then-former Chief Executive Officer, consultant and a director.

[13]  Sentinel was named as the corporate trustee after years of legal proceedings initiated by Susan Hirt Hagen who sought to replace Mellon Bank, the former trustee.

50.     The descendants of H.O. Hirt, in addition to controlling the Class B shares, also own approximately 47.7% (around 20 million shares) of Indemnity's Class A stock and benefit substantially from the Indemnity dividends which are distributed to them as income.  Therefore, defendants T. Hagen, J. Hagen and Vorsheck, and certain other Hirt family members who have served on the Board, directly benefit from Indemnity's dividends which are set at the sole discretion of the Hirt-dominated Board.

51.     Since 1997, the Board has consistently and significantly increased the annual dividend amount, to the direct benefit of the Board members who are beneficiaries of the H.O. Trusts, as well as other shareholders of Indemnity, and at the expense of and to the detriment of Exchange and the Subscribers.

**The Subscriber's Agreement Governs Indemnity's Relationship with Exchange and the Subscribers**

52.     Policyholders of the Exchange are known as Subscribers.  Since 1925, each Subscriber, including each Plaintiff, has been required to execute a non-negotiable Subscriber's Agreement drafted by Indemnity.  Every Subscriber of Exchange signs an identical Subscriber's Agreement.   The material language in the Subscriber's Agreement has remained unchanged since 1975.  *See* Exhibit A.

53.     Pursuant to the terms of the Subscriber's Agreement, Indemnity is appointed the attorney-in-fact for the Subscribers and Exchange.  *See id.*  This obligates Indemnity to act with utmost trust and honesty in all dealings concerning the Subscribers and Exchange.

54.     Among other things, the Subscriber's Agreement provides Indemnity with "the power to . . . issue, change, nonrenew or cancel policies . . . collect premiums . . . [and] manage and conduct the business and affairs of [Exchange], its affiliates and subsidiaries." *Id.*

55.    The activities performed by Indemnity as attorney-in-fact for the Exchange include insurance underwriting, policy issuance, policy exchange and cancellation, processing of invoices for premiums, the establishing and monitoring of loss reserves, oversight of reinsurance transactions, investment management, payment of insurance commissions to insurance agents, compliance with rules and regulations of supervisory authorities and monitoring of legal affairs.[14]   Indemnity is obligated to conduct these activities at its own expense.[15]

56.    Pursuant to the Subscriber's Agreement, as compensation for all services performed as attorney-in-fact and for managing and conducting the business of Exchange and paying general administrative expenses, Indemnity is permitted to retain up to 25% of all premiums written or assumed by Exchange.  *See id.*

57.    The Subscriber's Agreement is the sole written agreement authorizing Indemnity to retain or receive compensation for services performed as attorney-in-fact and/or for managing and conducting the business and affairs of Exchange.

58.    The Subscriber's Agreement does not authorize Indemnity to receive any compensation for any services provided for Subscribers or Exchange beyond the maximum amount of 25% of said premiums.  *See id.*

59.    Since at least 2007, Indemnity has retained the maximum amount allowed by the Subscriber's Agreement - 25% of all premiums written or assumed by Exchange - as compensation for services performed pursuant to the Subscriber's Agreement, and since 1997 Indemnity has taken the full 25% of premiums in all but 6 years.

---

[14] Annual Report on Form 10- K filed March 26, 1998.

[15] *Id.*

**Indemnity and the Board Owe Fiduciary Duties to Exchange and the Subscribers**

60.    The Subscribers place their trust and confidence in Indemnity and the Board to serve loyally as attorney-in-fact and to act in the best interests of the Exchange and the Subscribers.

61.    Indemnity and the Board have accepted the trust and confidence of the Subscribers.  Indeed, the fiduciary obligations of Indemnity and the Board to Exchange and the Subscribers have long been memorialized in various corporate documents of Indemnity as well as in Indemnity's filings with the SEC.

62.    For example, until at least 2006, each of the Directors executed an "Acceptance of Trust" upon being appointed to the Board which explicitly acknowledged that as attorney-in-fact for the Subscribers, he/she "shall be deemed to stand in a fiduciary relationship."  *See* a true and correct copy of an Acceptance of Trust, attached hereto as Exhibit B.

63.    Thereafter, in 2007, Indemnity adopted Corporate Governance Guidelines[16], which are in effect to the present, "to set forth a common set of expectations as to how the Board should perform its functions."  In the first section entitled "Role of the Board," the Corporate Governance Guidelines specifically set forth the fiduciary duties of Indemnity and its Directors to Exchange and its Subscribers as it states:

> In discharging their duties, the Directors must also be mindful of the fact that [Indemnity] is appointed to act as the Attorney-in-Fact to [Exchange] . . . by the policyholders of the Exchange under the terms of the Subscriber's Agreement between each policyholder and [Indemnity] that provides generally for the relationship between policyholders and [Indemnity] . . . Directors should treat this responsibility of [Indemnity] as one that is fiduciary in nature and consistent with each Director's Acceptance of Trust, which recognizes the Director's 'fiduciary

---

[16] Indemnity *Corporate Governance Guidelines*: https://www.erieinsurance.com/about-us/investor/governance.

relationship to [Indemnity] in its own right and as Attorney-in-Fact for the Subscribers of [Exchange].'

*See id.* at 2.

64.     The Corporate Governance Guidelines further state that, in discharging their duties to Exchange and the Subscribers, the Directors must do so with the express understanding that "the Company's relationship with the Exchange and its policyholders is the Company's most valuable asset."

65.     Indemnity's filings with the SEC also confirm the fiduciary duties owed to Exchange and the Subscribers by Indemnity and its Board.  For example, Indemnity has stated that "[t]he Company's Board of Directors [] acts in a fiduciary capacity with respect to the operation of the Exchange,"[17] and that "the Board has a fiduciary duty to protect the interests of the policyholders of Exchange."[18]   Further, Indemnity admits that its "primary purpose is to manage the affairs at the Exchange for the benefit of the policyholders,"[19] its "results of operations are tied to the growth and financial condition of the Exchange, and that "Exchange is [its] sole customer and [its] earnings are largely generated from management fees based on the direct and assumed premiums written by the Exchange."[20]   Indeed, as disclosed in Indemnity's 10-Q filed with the SEC on October 29, 2015, "Indemnity has the power to direct the activities of the Exchange that most significantly impact the Exchange's economic performance by acting as the common attorney-in-fact and decision maker for the subscribers (policyholders) at the Exchange."

---

[17] Annual Reports on Form 10-K filed March 12, 2002 and Form 10-K/A filed January 27, 2003.

[18] Annual Reports on Form 10-K filed March 8, 2004 and February 24, 2005.

[19] Annual Report on Form 10-K filed February 25, 2016.

[20] Annual Report on Form 10-K filed February 25, 2016.

66.     Due to the Board's dual fiduciary duties to Exchange and its Subscribers, on one hand, and Indemnity's shareholders, on the other, Indemnity admits that the "Board of Directors must make decisions or take actions that are not solely in the interest of the Company's shareholders. Certain conflicting interests are inherent in these separate fiduciary duties such as: (1) the Company's Board sets the management fee rate paid by the Exchange to the Company, (2) the Company's Board of Directors determines the participation percentages of the intercompany pooling agreement and (3) the Company's Board approves the annual shareholders' dividend."[21]   In actuality, the Board has continuously favored the interests of Indemnity's shareholders, especially its majority shareholders, over those of Exchange and the Subscribers.

67.     As set forth below, Indemnity and the Board have breached their fiduciary duties to Exchange and the Class, and Indemnity has breached the Subscriber's Agreement, by unlawfully diverting to Indemnity hundreds of millions of dollars of revenue that belongs to Exchange.  Instead of this revenue being used for the benefit of Exchange and the Subscribers, the conflicted and self-interested members of the Board have funneled the money to themselves and other shareholders of Indemnity through substantial dividend payments.

**Indemnity Unlawfully Takes Service Charges Belonging to Exchange**

68.     Since at least 1975, Subscribers have been permitted to pay premiums for their insurance policies in multiple installments rather than in a lump sum.  If a Subscriber elects to pay his/her premium in installments, in certain instances, a service charge is added to the amount owed ("Service Charges").

---

[21] Annual Report on Form 10-K filed February 24, 2005.

69.     When Service Charges are paid, the funds are deposited into accounts belonging to Exchange.

70.     Prior to 1997, Exchange retained all of the Service Charges as revenue.  This revenue was available for the ultimate benefit of all Subscribers.

71.     However, beginning in 1997, just a couple of years after Indemnity became a public company traded on NASDAQ, Indemnity decided to take for itself a substantial portion of the Service Charges as additional compensation for the services it provided to Exchange and the Subscribers as attorney-in-fact.

72.     As of September 1, 1997, Indemnity began taking the Service Charges revenue from Exchange's accounts.  Indemnity took these funds as compensation above and beyond the compensation it was authorized to receive as a percentage of the premiums authorized by the Subscriber's Agreement.

73.     The Directors approved the taking of a portion of the Service Charges revenue from Exchange in 1997 without obtaining a fairness opinion or other opinion from an independent person, expert, or entity solely representing Exchange's interests regarding whether Indemnity could retain those Service Charges.

74.     Indemnity continued in 1998 to take a portion of the Service Charges as additional compensation.  In 1999, Indemnity began taking *all* of the Service Charges revenue from Exchange.  This was above and beyond the compensation received as a percentage of the premiums authorized by the Subscriber's Agreement.

75.     The Directors, each year since then, have similarly authorized and/or allowed the taking of all of the Service Charges revenue from Exchange without obtaining a fairness opinion

or other opinion from an independent person, expert, or entity solely representing Exchange's interests regarding whether Indemnity could retain all of those Service Charges.

76.    Indemnity has continued since 1999 to take for itself all of the Service Charges revenue which otherwise would have been retained by Exchange for the ultimate benefit of all Subscribers.

**Indemnity Unlawfully Takes Additional Fees Belonging to Exchange**

77.    Beginning in or around 2008, separate and apart from any Service Charges, Subscribers became subjected to additional fees for checks or other payments returned unpaid, for cancellation notices issued due to non-payment of a policy, and for reinstatements of policies following a lapse in coverage after non-payment cancellations ("Additional Fees").

78.    When Additional Fees are paid, the funds are deposited into accounts belonging to Exchange.

79.    In 2008, and each year since then, Indemnity has taken from Exchange's accounts *all* Additional Fees paid by the Subscribers.  Indemnity takes these funds as compensation above and beyond the compensation received as a percentage of the premiums authorized by the Subscriber's Agreement.  The Directors, each year since 2008, have authorized and/or allowed the taking of the Additional Fees from Exchange.

80.    If Indemnity did not take the Additional Fees as additional compensation, that revenue would be available for the ultimate benefit of Exchange and the Subscribers.

81.    The Directors allowed the taking of all of the Additional Fees revenue from Exchange without first obtaining a fairness opinion or other opinion from an independent person, expert, or entity solely representing Exchange's interests regarding whether Indemnity could retain all of those Additional Fees.  Similarly, the Directors have authorized and/or allowed the taking of the Additional Fees each year since then without obtaining a fairness opinion or other

opinion from an independent person, expert, or entity solely representing Exchange's interests regarding whether Indemnity could retain all of those Additional Fees.

**Service Charges and Additional Fees are Substantial and Belong to Exchange**

82.     At no time since 1997 has Indemnity performed any services for Exchange other than those authorized by the Subscriber's Agreement.

83.     Since 1997, the amount of Service Charges and Additional Fees wrongfully taken by Indemnity as unauthorized compensation, which otherwise would have gone to the benefit of Exchange and the Subscribers, exceeds $400 million.

84.     Further, as set forth above, since at least 2007, Indemnity has retained the maximum amount of 25% allowed by the Subscriber's Agreement of all premiums written or assumed by Exchange.   Indemnity has not disclosed any rationale or justification that it is entitled to the entire 25%, rather, Indemnity has repeatedly taken the full amount allowable pursuant to the Subscriber's Agreement.   The value for the services rendered by Indemnity, as attorney-in-fact, must be reasonable, and any amount taken in excess of that is a breach of fiduciary duty. *See*, e.g., *Fogel v. Farmers Group Inc., et al.*, BC300142 (Cal. Super. Ct. Aug. 1, 2013) (subscriber of reciprocal insurance exchanges, on behalf of other subscribers, sued defendant attorneys-in-fact to recover alleged excessive fees the attorneys-in-fact collected in breach of their fiduciary duty to the subscribers where the attorneys-in-fact took a management fee of between 12 and 13% of the gross premiums under a contract with the subscriber which allowed for the attorneys-in-fact to take a maximum of 20%).

85.     The chart below demonstrates the huge sums that Indemnity has taken from Exchange from the years 1997-2015 both in management fees and in Service Charges and Additional Fees (from 2008-2015):

| Year | Management Fees | Service Charges and Additional Fees |
|------|-----------------|-------------------------------------|
| 1997 | $379,006,249 | $6,004,098 |
| 1998 | $398,711,481 | $6,398,800 |
| 1999 | $419,068,180 | $6,881,860 |
| 2000 | $447,098,523 | $9,497,214 |
| 2001 | $510,757,952 | $12,272,903 |
| 2002 | $629,511,324 | $14,261,900 |
| 2003 | $706,385,018 | $15,684,474 |
| 2004 | $769,318,749 | $16,154,833 |
| 2005 | $766,686,641 | $16,040,781 |
| 2006 | $777,811,701 | $23,866,187 |
| 2007 | $784,686,079 | $23,615,783 |
| 2008 | $786,673,957 | $25,871,009 |
| 2009 | $796,272,801 | $28,021,238 |
| 2010 | $830,086,815 | $27,602,861 |
| 2011 | $874,586,973 | $21,032,575 |
| 2012 | $936,054,969 | $23,414,388 |
| 2013 | $994,592,339 | $24,735,474 |
| 2014 | $1,047,531,629 | $24,205,174 |
| 2015 | $1,091,391,585 | $23,113,416 |
| **TOTAL** | $13,946,232,965 | $348,674,968 |

86.     These enormous sums paid to Indemnity for management fees, combined with the unlawful retention of hundreds of millions of dollars in Service Charges and Additional Fees that belong to Exchange, have allowed Indemnity's shareholders, especially the insiders on the Board who are beneficiaries of the H.O. Trusts, to benefit considerably through the dividends paid by Indemnity to its Class A and Class B shareholders.  Throughout the relevant period, the insider beneficiaries of Indemnity have owned approximately 47.7% of the outstanding Class A stock or about 20 million shares.  Further, the amounts set forth in the above chart reflect management fees calculated based upon only direct premiums written by Exchange as reported in Indemnity's Annual Statements submitted to the Insurance Department of Pennsylvania.  However, the yearly and total amount of management fees taken by Indemnity may be higher, as pursuant to the Subscriber's Agreement, Indemnity's management fee is calculated as a percentage of the direct

*and assumed premiums* written by Exchange, and Exchange assumes the premiums of other Erie affiliated entities.

87.     The chart below reflects the total amount of dividends paid by Indemnity from 1997-2015 and the per share basis to the Class A and Class B shareholders:

| Year | Total $ (in millions) | Class A | Class B |
|------|-----------------------|---------|---------|
| 1997 | $26.5 | $.3925 | $58.875 |
| 1998 | $29.9 | $.4425 | $66.375 |
| 1999 | $32.8 | $.4950 | $74.250 |
| 2000 | $36.1 | $.5575 | $83.625 |
| 2001 | $40.4 | $.6275 | $94.125 |
| 2002 | $45.0 | $.7000 | $105.000 |
| 2003 | $50.6 | $.7850 | $117.750 |
| 2004 | $55.1 | $.9700 | $145.500 |
| 2005 | $81.9 | $1.335 | $200.250 |
| 2006 | $86.1 | $1.480 | $222.000 |
| 2007 | $91.1 | $1.640 | $246.000 |
| 2008 | $92.3 | $1.770 | $265.500 |
| 2009 | $93.0 | $1.830 | $274.500 |
| 2010 | $98.0 | $1.955 | $293.250 |
| 2011 | $102.0 | $2.0975 | $314.625 |
| 2012* | $95.0 | $2.000 | $300.000 |
| 2012 | $229.0 | $4.250 | $637.500 |
| 2013 | $83.6 | $2.4125 | $361.875 |
| 2014 | $118.5 | $2.586 | $387.900 |
| 2015 | $126.9 | $2.773 | $415.950 |
| **TOTAL** | $1,613.8 | | |

* In 2012, in addition to its regular dividend payment, Indemnity made an additional "special" dividend payment to its stockholders.

88.     Since 1997, through the premiums generated by Exchange, Indemnity has paid over $1.6 billion in dividends to its shareholders, with the beneficiaries of the H.O. Trusts reaping *over $640 million* from their ownership of the Class A stock alone.  In 2012, in addition to the regularly quarterly dividend declared in November, the Board also declared a special one-time cash dividend of $2.00 on each Class A share and $300.00 on each Class B share, totaling $95 million. The Board declared the special dividend "due to the potential significant increases

in tax rates on 2013 dividend income" which would have affected those in higher tax brackets such as the Hirt beneficiaries.

<strong>C<small>LASS</small> A<small>CTION</small> S<small>TATEMENT</small></strong>

89.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), (b)(2), and/or (b)(3) on behalf of the following proposed Class:

> All current and former Subscribers of Erie Insurance Exchange between September 1, 1997 and the present.

90.     The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

91.     The Class is so numerous that joinder of all members is impracticable.

92.     The Class can be readily ascertained through the records maintained by Indemnity and Exchange.

93.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

94.     Plaintiffs' claims are typical of the claims of the Class.  As alleged herein, Plaintiffs and members of the Class sustained damages arising out of Defendants' common course of unlawful conduct.

95.     There are questions of law and fact common to the Class, the answers to which will advance the resolution of the claims of all class members, including but not limited to:

a.     Whether Indemnity's retention of Service Charges and/or Additional Fees - in addition to the percentage of premiums it received on behalf of Exchange - constitutes a breach of its Subscriber Agreements.

b.     Whether Indemnity breached its fiduciary duties to Subscribers and Exchange.

-27-

c.      Whether the Directors breached their fiduciary duties to Subscribers and Exchange.

96.    These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual class members.

97.    The same common issues predominate with respect to all members of the Class, regardless of when they were Subscribers.

98.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have no claims antagonistic to those of the Class.  Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation.  Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

99.    Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

100.    Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

101.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making

appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

102.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**DERIVATIVE ALLEGATIONS**

103.    Plaintiffs bring claims derivatively in the right and for the benefit of Exchange to redress the Directors' breaches of fiduciary duties and other violations of law.

104.    Plaintiffs are Subscribers of the Exchange and were Subscribers of the Exchange at all times relevant hereto.

105.    Plaintiffs will adequately and fairly represent the interests of Exchange and the Subscribers in enforcing and prosecuting its rights.

106.    Pa. R.C.P. No. 1506 permits "members of a corporation or similar entity" to file a derivative action when "the corporation or entity refuses or fails to enforce rights which could be asserted by it."

107.    Exchange does not have its own board of directors, thus, there is no board upon which to make a demand.  Rather, the Directors, as attorneys-in-fact for Exchange, are charged with acting as fiduciaries on behalf of Exchange.  Further, Indemnity and the Board have been on notice of Plaintiffs' claims and allegations regarding Indemnity's unlawful retention of the Service Charges and Additional Fees as described herein since at least August 1, 2012, when Plaintiffs initiated a lawsuit against Indemnity in the Court of Common Pleas of Fayette County, Pennsylvania.  However, despite the foregoing, along with other means of notice, the Board has

not taken any action to correct the misconduct as Indemnity continues to unlawfully retain the Services Charges and Additional Fees as of the filing of this complaint.[22]

108.    As discussed herein, pursuant to the Corporate Governance Guidelines, "the Directors should treat this responsibility of the Company as one that is fiduciary in nature and consistent with each Director's Acceptance of Trust . . . to satisfy the obligations of the Company to the Exchange, the Directors should cause the Company to act in a manner they reasonably believe is in the best interests of the Exchange and its policyholders."  There has been a standing subcommittee of the Board which was formed in 2008 entitled the "Exchange Relationship Committee," however, in its public filings, Indemnity has never disclosed the responsibilities of this committee and has never reported that the members of the committee have ever met in the eight years of its existence.

109.    By reason of their positions as attorneys-in-fact for Exchange and because of their ability to control and conduct the business and corporate affairs of Exchange, the Directors owed Exchange the fiduciary obligations of good faith, trust and loyalty and were and are required to use their utmost ability to control and manage the Exchange in a fair, just, honest, and equitable manner.

110.    The Directors were and are required to act in furtherance of the best interests of Exchange so as to benefit Exchange and the Subscribers and not in furtherance of their personal

---

[22] The action is captioned *Erie Insurance Exchange, et al*. v. *Erie Indemnity Company*, No. 1712 of 2012, G.D. (Pa. Ct. Com. Pl. Nov. 5, 2012) and only pleads derivative claims against Indemnity for assumpsit, self-dealing and equity. After being improperly transferred to the Pennsylvania Insurance Department on December 19, 2013, the action was remanded back to the Court of Common Pleas following a January 27, 2016 decision by the Commonwealth Court of Pennsylvania in which the Court determined that Plaintiffs' claims and allegations did not fall within the Pennsylvania Insurance Department's jurisdiction.  On February 26, 2016, defendants filed a Petition for Allowance of Appeal with the Supreme Court of Pennsylvania which has been fully briefed.

interest or benefit and were required to refrain from unduly benefiting themselves and Indemnity insiders at the expense of Exchange.  Each Director owes to Exchange the fiduciary duty to exercise good faith and diligence in the administration of the business and affairs of Exchange and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

111.   The Directors, because of their positions of control and authority as attorneys-in-fact for Exchange, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

112.   The Directors have acted in their own best interests and/or in the best interests of Indemnity and its insiders by unlawfully retaining and misappropriating the Service Charges and the Additional Fees from Exchange.  The Directors' unlawful misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as fiduciaries to Exchange.

113.   The Directors' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, their actions were patently unlawful, and as a direct and proximate result of the Directors' foregoing breaches of fiduciary duties, Exchange has sustained significant damages, including, but not limited to, the misappropriation of over $400 million of Service Charges and Additional Fees as well as the continued retention of such amounts.

## CLAIMS FOR RELIEF

### Count I
### Breach of Contract and Implied Covenant of Good Faith and Fair Dealing
### (Plaintiffs v. Indemnity)

114.   Plaintiffs repeat and re-allege the allegations set forth in the foregoing Paragraphs of this Complaint as if fully set forth herein.

115.    Pursuant to the terms of the Subscriber's Agreements, Indemnity agreed to limit its compensation for serving as attorney-in-fact, managing the business and affairs of Exchange and performing other services to a percentage of all premiums written or assumed by Exchange, with the maximum being 25%.

116.    Within two years of Indemnity becoming a public company traded on NASDAQ, its own self-interest took priority over the best interests of Exchange and the Subscribers, and it began to unlawfully take compensation from Exchange beyond that to which it was permitted under the Subscriber's Agreement.  Beginning in or around 1997 up through the present, in addition to the fixed percentage of premiums it has received on behalf of Exchange in a given year, Indemnity has retained substantial additional compensation in the form of Service Charges and/or Additional Fees.

117.    The taking of this additional compensation by Indemnity is a breach of the Subscriber's Agreements.

118.    As a result of the breach, Plaintiffs and Class have suffered substantial damages, including, but not limited to, monetary losses stemming from Indemnity's unlawful retention of the Service Charges and Additional Fees.

119.    This conduct also constitutes a breach of the implied covenant of good faith and fair dealing by which Indemnity has precluded the Plaintiffs and Class from realizing the full benefits of their bargains under the terms of the Subscriber's Agreements.

120.    Indemnity's intentional and unlawful retention of this additional compensation in addition to the fixed percentage of premiums it receives evidences bad faith, especially in light of Indemnity's role as a fiduciary to the Plaintiffs and Class.

121.    As a result of Indemnity's breach of the implied covenant of good faith and fair dealing inherent to the Subscriber's Agreements, the Plaintiffs and Class have suffered substantial damages, including, but not limited to, significant monetary losses resulting from Indemnity's taking of the additional compensation which should have been used for the benefit of Plaintiffs and the Class.

**Count II**
**Breach of Fiduciary Duty**
**(Plaintiffs v. Indemnity and Directors)**

122.    Plaintiffs repeat and re-allege the allegations set forth in the Paragraphs 1-102 of this Complaint as if fully set forth herein.

123.    At all relevant times, Indemnity agreed to serve as an agent, attorney-in-fact, and fiduciary for the Plaintiffs and Class.

124.    At all relevant times in which they served on the Board of Indemnity, the Directors also agreed to serve as agents, attorneys-in-fact, and fiduciaries for the Plaintiffs and Class.

125.    As fiduciaries, Indemnity and the Directors were obligated to act loyally, with utmost honesty and solely in the best interests of Plaintiffs and the Class.

126.    The Directors have irreconcilable conflicts of interest, exacerbated when Indemnity became a publicly traded company on NASDAQ, in serving the shareholders of Indemnity and the Subscribers of Exchange.

127.    Beginning in or around 1997 and continuing to the present, Indemnity and the Directors deviated from 70 years of prior conduct, and authorized, enabled and/or otherwise permitted Indemnity to retain Service Charges and/or Additional Fees as compensation in addition to a percentage of all premiums written or assumed by Exchange.

128.    The Service Charges and Additional Fees would have been used for the benefit of Plaintiffs and the Class had they not been retained by Indemnity.  Instead, Indemnity and its shareholders directly benefitted from the taking of this additional compensation.

129.    Indemnity and the Directors breached their fiduciary duties to Plaintiffs and the Class by authorizing, enabling and/or otherwise permitting Indemnity to retain the Service Charges and Additional Fees in addition to a percentage of premiums as prescribed in the Subscriber's Agreements.

130.    As a result of Defendants' breach of their respective fiduciary duties, Plaintiffs and the Class have suffered substantial damages, including, but not limited to, monetary losses stemming from Indemnity's unlawful retention of the revenue generated by the Service Charges and Additional Fees.

131.    Because Defendants breached their duties knowingly, willingly, and/or with reckless disregard, the Plaintiffs and Class seek punitive damages.

**Count III**
**Conversion**
**(Plaintiffs and Plaintiffs, derivatively on behalf of Exchange v. Indemnity)**

132.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1-113 of this Complaint as if fully set forth herein.

133.    In taking each year from the accounts of Exchange, the Service Charges and Additional Fees, Indemnity was depriving Exchange and Plaintiffs of the use of the funds.

134.    Indemnity took the funds from the accounts of Exchange without the consent of Exchange and Plaintiffs, to whom the funds belonged, and without legal justification.

135.    Plaintiffs and Exchange have been wrongfully denied the use of the funds to which they had the right of possession.

**Count IV**
**Breach of Fiduciary Duty**
**(Plaintiffs, derivatively on behalf of Exchange v. Indemnity and Directors)**

136.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1-113 of this Complaint as if fully set forth herein.

137.     The Directors owed and owe Exchange fiduciary obligations.  By reason of their fiduciary relationships, the Directors owed and owe Exchange the highest obligation of good faith and loyalty.

138.     The Directors, and each of them, violated and breached their fiduciary duties of loyalty and good faith, as alleged herein.

139.     As a direct and proximate result of the Directors' failure to perform their fiduciary obligations, Exchange has sustained significant damages, as alleged herein.

140.     Plaintiffs, on behalf of Exchange, have no adequate remedy at law.

**Count V**
**Unjust Enrichment**
**(Plaintiffs, derivatively on behalf of Exchange v. J. Hagen, T. Hagen, Vorsheck and Black)**

141.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1-113 of this Complaint as if fully set forth herein.

142.     Defendants J. Hagen, T. Hagen, Vorsheck and Black have received excessive and unwarranted payments or the inequitable transfer of Exchange assets as a result of the misconduct complained of herein.

143.     It would be unconscionable and against the fundamental principles of justice, equity and good conscience for defendants J. Hagen, T. Hagen, Vorsheck and Black to retain the excessive and unwarranted payments or the inequitable transfer of Exchange's assets they have received.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs:

A.    Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class and Plaintiffs' counsel as counsel for the Class;

B.    Declaring, adjudging and decreeing the conduct alleged herein as unlawful including, but not limited to, Defendants' retention of the Service Charges and Additional Fees as compensation;

C.    Enjoining Defendants from continuing to retain the Service Charges and Additional Fees;

D.    Awarding compensatory and punitive damages along with pre- and post-judgment interest;

E.    Granting Plaintiffs the costs of suit, including reasonable attorneys' fees and expenses; and

F.    Affording Plaintiffs with such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated:  July 8, 2016                              Respectfully submitted,

                                                 **KESSLER TOPAZ MELTZER & CHECK, LLP**

                                                 By:  /s/ Joseph H. Meltzer
                                                 Joseph H. Meltzer, Esquire
                                                 PA: 80136
                                                 Peter A. Muhic, Esquire
                                                 PA: 73501
                                                 Robin Winchester, Esquire
                                                 PA: 86590
                                                 280 King of Prussia Road
                                                 Radnor, PA  19087
                                                 Telephone: (610) 667-7706
                                                 Facsimile: (610) 667-7056

**RADCLIFFE & DeHAAS, L.L.P.**
William M. Radcliffe, Esquire
PA: 18148
2 West Main Street, Suite 700
Uniontown, PA 15401
Telephone: (724) 439-3900
Facsimile:  (724) 439-3335

## VERIFICATION

I, Patricia R. Beltz, hereby verify that I have authorized the filing of the attached Verified Derivative and Class Action Complaint, that I have reviewed the Verified Derivative and Class Action Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: July 6, 2016

Patricia R. Beltz

## VERIFICATION

I, Joseph S. Sullivan, hereby verify that I have authorized the filing of the attached Verified Derivative and Class Action Complaint, that I have reviewed the Verified Derivative and Class Action Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 7-7-16

Joseph S. Sullivan

<u>VERIFICATION</u>

I, Anita Sullivan, hereby verify that I have authorized the filing of the attached Verified Derivative and Class Action Complaint, that I have reviewed the Verified Derivative and Class Action Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 7-7-16

Anita Sullivan