## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICIA R. BELTZ, JOSEPH S. SULLIVAN, and ANITA SULLIVAN, individually and on behalf of all others similarly situated, and derivatively on behalf of Nominal Defendant ERIE INSURANCE EXCHANGE, <br><br>Plaintiffs, <br><br>v. <br><br>ERIE INDEMNITY COMPANY; KAJ AHLMANN; JOHN T. BAILY; SAMUEL P. BLACK, III; J. RALPH BORNEMAN, JR.; TERRENCE W. CAVANAUGH; WILSON C. COONEY; LUANN DATESH; PATRICIA A. GOLDMAN; JONATHAN HIRT HAGAN; THOMAS B. HAGAN; C. SCOTT HARTZ; SAMUEL P. KATZ; GWENDOLYN KING; CLAUDE C. LILLY, III; MARTIN J. LIPPERT; GEORGE R. LUCORE; JEFFREY A. LUDROF; EDMUND J. MEHL; HENRY N. NASSAU; THOMAS W. PALMER; MARTIN P. SHEFFIELD; SETH E. SCHOFIELD; RICHARD L. STOVER; JAN R. VAN GORDER; ELIZABETH A. HIRT VORSHECK; HARRY H. WEIL; and ROBERT C. WILBURN, <br><br>Defendants. | Civil Action No. 16-cv-179 <br><br>Hon. Barbara Rothstein |

## MOTION OF ERIE INDEMNITY COMPANY TO DISMISS THE COMPLAINT

Defendant Erie Indemnity Company hereby moves this Honorable Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for the entry of an Order dismissing the Complaint with prejudice.

The grounds supporting this Motion are set forth in the attached Memorandum.

Respectfully submitted,

*/s/ Steven B. Feirson*
Steven B. Feirson (Pa. 21357)
Michael L. Kichline (Pa. 62293)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-4000

*Counsel for Defendant Erie Indemnity Company*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PATRICIA R. BELTZ, JOSEPH S. SULLIVAN, and ANITA SULLIVAN, individually and on behalf of all others similarly situated, and derivatively on behalf of Nominal Defendant ERIE INSURANCE EXCHANGE, <br><br> Plaintiffs, <br><br> v. <br><br> ERIE INDEMNITY COMPANY; KAJ AHLMANN; JOHN T. BAILY; SAMUEL P. BLACK, III; J. RALPH BORNEMAN, JR.; TERRENCE W. CAVANAUGH; WILSON C. COONEY; LUANN DATESH; PATRICIA A. GOLDMAN; JONATHAN HIRT HAGAN; THOMAS B. HAGAN; C. SCOTT HARTZ; SAMUEL P. KATZ; GWENDOLYN KING; CLAUDE C. LILLY, III; MARTIN J. LIPPERT; GEORGE R. LUCORE; JEFFREY A. LUDROF; EDMUND J. MEHL; HENRY N. NASSAU; THOMAS W. PALMER; MARTIN P. SHEFFIELD; SETH E. SCHOFIELD; RICHARD L. STOVER; JAN R. VAN GORDER; ELIZABETH A. HIRT VORSHECK; HARRY H. WEIL; and ROBERT C. WILBURN, <br><br> Defendants. | Civil Action No. 16-cv-179 <br><br> Hon. Barbara Rothstein |

**MEMORANDUM IN SUPPORT OF
MOTION OF ERIE INDEMNITY COMPANY TO DISMISS THE COMPLAINT**

Steven B. Feirson
Michael L. Kichline
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-2489

*Counsel for Defendant Erie Indemnity Company*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND .............................................................................. 5

I.      RECIPROCAL INSURANCE EXCHANGES AND THE RELATIONSHIP
        BETWEEN INDEMNITY AND EXCHANGE. ............................................ 5

II.     THE SUBSCRIBER'S AGREEMENT GOVERNS THE RELATIONSHIP
        BETWEEN INDEMNITY AND THE SUBSCRIBERS CONCERNING
        INSURANCE SERVICES. ............................................................................ 8

III.    INDEMNITY'S RETENTION OF THE SERVICE CHARGES HAS BEEN
        CONTINUOUSLY AND OPENLY DISCLOSED FOR APPROXIMATELY
        TWENTY YEARS. ........................................................................................ 10

        A.      Policy Applications. ........................................................................... 11

        B.      Policyholder Notices. ......................................................................... 11

        C.      Indemnity's SEC Disclosures. ........................................................... 12

        D.      Disclosures To The Pennsylvania Insurance Department. ................. 13

ARGUMENT ...................................................................................................... 14

I.      PLAINTIFFS' ALLEGATIONS ESTABLISH THAT ALL CLAIMS ARE
        BARRED BY THE STATUTES OF LIMITATION. ..................................... 14

        A.      A Court May Dismiss An Action On The Basis Of A Statute Of
                Limitation When The Defense Appears On The Face Of The Complaint. ......... 14

        B.      Plaintiffs' Own Allegations Establish That The Statutes Of Limitation
                Have Expired. .................................................................................... 14

        C.      Plaintiffs Do Not Plead Any Basis For Avoiding The Statutes Of
                Limitation. .......................................................................................... 17

        D.      Plaintiffs' Inexcusable Delay Of More Than Fifteen Years Provides A
                Textbook Example Of Why Statutes Of Limitation Exist And Must Be
                Enforced. ............................................................................................ 20

II.     THE SPECIFIC COUNTS DIRECTED AT INDEMNITY ARE FATALLY
        FLAWED AND SHOULD BE DISMISSED ON NUMEROUS INDEPENDENT
        GROUNDS. ................................................................................................... 22

        A.      Count I For Breach Of Contract Should Be Dismissed. ..................... 22

        B.      Counts II And IV For Breach Of Fiduciary Duty Should Be Dismissed. ......... 31

        C.      Count III For Conversion Should Be Dismissed. ............................... 33

III.    PLAINTIFFS LACK STANDING TO SUE ON BEHALF OF EXCHANGE. .............. 35

CONCLUSION .................................................................................................... 35

## INTRODUCTION

In this action, three of the more than two million policyholders of Erie Insurance Exchange ("Exchange") seek to challenge certain decisions made by Erie Indemnity Company ("Indemnity") almost twenty years ago.

Exchange is a "reciprocal insurance exchange"—a unique creature of Pennsylvania statute that provides the structure through which the more than two million policyholders or "subscribers" exchange insurance contracts among themselves.  Exchange, a regulated "insurer" under Pennsylvania law, does not have (and is not required to have) its own governance or operational structure.  Accordingly, Exchange does not have any directors, officers, or employees.  Rather, each subscriber executes a Subscriber's Agreement appointing Indemnity, a publicly-traded Pennsylvania corporation, to serve as his or her "attorney-in-fact" for the purpose of managing the exchange of insurance obligations among the subscribers.  Together, Indemnity and Exchange operate as members of an "insurance holding company system" known as the Erie Insurance Group ("Erie").

Since the 1970s, Indemnity has offered payment plans allowing subscribers to pay their premiums on an installment basis ("Special Services") in exchange for nominal charges paid with each installment ("Service Charges").  Historically, through the 1970s and into the 1990s, the number of policyholders electing to take advantage of the Special Services was relatively small, the cost to Indemnity of providing these services was not substantial, and Indemnity remitted the Service Charges to Exchange.  By 1997, however, the popularity of the Special Services was exploding and Indemnity was incurring significant additional costs in, among other things, processing millions of additional installment payments.  Offering the Special Services program had enabled Indemnity to both meet subscriber demand and simultaneously increase the premium base of Erie.  Hence, Indemnity, in 1997, continued the Special Services program, but

began to retain a portion of the Service Charges to defray the expense of the program. Thereafter, in 1999, Indemnity began to retain all of the Service Charges as an offset to the still-growing expense of the Special Services program.

Since the late 1990s, Indemnity's practice of retaining these Service Charges year-after-year has been: (a) openly and clearly communicated and disclosed to all Erie policyholders pursuant to documents and disclosures approved by the Pennsylvania Insurance Department (the "Department"); (b) specifically agreed to by the policyholders who have paid for and received the benefits of these Special Services, knowing that the Service Charges were going to Indemnity; (c) subjected to regular oversight and review by the Department, including an official examination in 2000 which focused squarely on the issue of Indemnity's then-recent decision to retain the Service Charges; and (d) disclosed in Indemnity's publicly-available SEC filings. At no time until the initiation of this complex litigation has Indemnity's long-standing and openly disclosed practice been challenged in any fashion by any of the now more than two million Erie policyholders—or by the Department. To the contrary, this long-established practice, incorporated into Indemnity's business model for almost two decades, has been acknowledged and accepted by all.

Now—almost twenty years after Indemnity made these decisions—three individual policyholders purport to bring class action claims on behalf of all Erie policyholders and derivative claims on behalf of Exchange, claiming that Indemnity never should have made those 1990s decisions to use the Service Charge revenue to help cover the costs of the Special Services program. Instead, according to the Complaint, that revenue should have been remitted to Exchange. In their Complaint, Plaintiffs allege that these decades-old business decisions constituted both a breach of the Subscriber's Agreement and a breach of fiduciary duty, as well

as conversion.  The Complaint is facially meritless and should be dismissed for numerous reasons.

*First*, not surprisingly, given the obvious passage of time, all of the claims asserted in the Complaint are barred by the applicable statutes of limitation.  According to Plaintiffs' own allegations, the purported "breaches"—*i.e.*, the decisions in 1997 and 1999—occurred more than fifteen years before Plaintiffs commenced suit.  Thus, on the face of the Complaint, the four-year statute of limitation governing the contract claims and the two-year statute of limitation governing the tort claims expired more than a decade ago.  Plaintiffs do not even attempt to plead a basis for avoiding the bar of these statutes of limitation.  Hence, on the basis of the statutes of limitation alone, the entire Complaint should be dismissed with prejudice.

*Second*, Count I for breach of contract and the implied covenant of good faith and fair dealing should be dismissed for failure to allege an actionable breach of the Subscriber's Agreement:

- **The Special Services and associated Service Charges are not governed by the Subscriber's Agreement.**  The Subscriber's Agreement, which is entered into by all the subscribers, governs only those group insurance services that Indemnity is required to provide to manage the insurance-of-risk operations created by the subscribers' exchange of insurance obligations.  The Subscriber's Agreement does not govern the provision of individual non-insurance-related services to a subset of subscribers who separately request and agree to pay for these distinct services.

- **The Special Services and the associated Service Charges at issue are governed by contracts that are separate from and outside of the Subscriber's Agreement.**  Individual subscribers who request the Special Services, which are not related to the provision of insurance, agree to pay for those services pursuant to separate contract documents and disclosures that are independent of the Subscriber's Agreement.  Adherence to these contracts cannot be a breach of the Subscriber's Agreement.

- **Even if Service Charges were considered to be "premium" payments for insurance services and thus within the ambit of the Subscriber's Agreement, Indemnity alone is empowered to decide how to use those**

> **premiums.** The Subscriber's Agreement does not require any set percentage of premium dollars be sent to Exchange. To the contrary, the Subscriber's Agreement, on its face, states that Indemnity alone has been authorized by each subscriber to "decide" how premium dollars will be used to "to the advantage of" subscribers. In this instance, consistent with the Subscriber's Agreement, Indemnity has exercised that discretion to create the non-insurance-related Special Services programs for the advantage of subscribers. Importantly, Plaintiffs have never alleged that the subscribers were disadvantaged by this program.

(*See infra* at 22–31.) Thus, Plaintiffs have not pled an actionable claim for breach of contract.

*Third,* Count II for breach of fiduciary duty allegedly owed to the subscribers and Count IV for breach of fiduciary duty allegedly owed to Exchange should be dismissed for failure to state a claim. These fiduciary duty claims are predicated solely on the alleged breach of the Subscriber's Agreement. But, under Pennsylvania law, a breach of contract does not constitute a breach of fiduciary duty and, even if it did, Plaintiffs have failed to plead any such breach. Nor do Plaintiffs plead any duty that they believe is imposed on Indemnity above and beyond the contractual duties in the Subscriber's Agreement. Finally, given the subscribers' knowing agreement to pay these Service Charges, Indemnity's open and repeated disclosure to the subscribers and the Department, and the Department's approval of Indemnity's retention of the Service Charges as fair and reasonable, it is impossible to sustain any breach of fiduciary duty. Accordingly, Counts II and IV should be dismissed.

*Finally*, Count III for "conversion" of the Service Charges should be dismissed for failure to state a claim. Plaintiffs contend that "Indemnity took the [Service Charges] from the accounts of the Exchange without the consent of Exchange and Plaintiffs." (Compl. ¶ 134.) First, as a matter of law, there can be no tort liability for conversion where, as here, the asserted claims sound in contract. Second, the notion that Indemnity retained the Service Charges "without . . . consent" is demonstrably false—every subscriber who elected to receive the Special

4

Services did so pursuant to documents (approved by the Department) that clearly state that the "service charge is applied and paid to Erie Indemnity."  Beyond this, the practice has been widely and publicly disclosed to all policyholders and the Department for more than fifteen years, which plainly establishes consent.  Accordingly, Count III should be dismissed.

*        *        *        *        *        *        *

Plaintiffs' attempt to travel back in time and challenge conduct that occurred some twenty years ago should be rejected.  All of these claims are time-barred and, in any event, are meritless on their face.

## **FACTUAL BACKGROUND**[1]

## I.   **RECIPROCAL INSURANCE EXCHANGES AND THE RELATIONSHIP BETWEEN INDEMNITY AND EXCHANGE.**

Exchange is a reciprocal insurance exchange organized pursuant to 40 P.S. §§ 961–71.[2]

Reciprocal insurance is "[a] system of insurance whereby several individuals, partnerships and

---

[1]   The facts set forth in this Factual Background are taken from the allegations of the Complaint.  In addition, relevant facts are contained in a Joint Statement of Undisputed Facts Plaintiffs entered into with Indemnity during the administrative proceeding in the Pennsylvania Insurance Department, which occurred pursuant to this Court's referral of the first Complaint filed in this action on the grounds of primary jurisdiction.  (*See* Ex. 2 [Joint Statement of Undisputed Facts, *Erie Ins. Exch. v. Erie Indem. Co.*, No. MS14-03-003 (Pa. Ins. Comm'r Sept. 3, 2014)].)  *See generally Erie Ins. Exch. v. Stover*, No. 13-37 Erie, 2014 WL 546707 (W.D. Pa. Feb. 10, 2014).  Although the Commonwealth Court of Pennsylvania subsequently vacated the Department's opinion and order on non-substantive, jurisdictional grounds, *see Erie Ins. Exch. v. Erie Indem. Co.*, 133 A.3d 102 (Pa. Commw. Ct. 2016), the Joint Statement of Undisputed Facts remains binding on Plaintiffs and this Court may consider the stipulation in connection with this motion. *Germinaro v. Fid. Nat. Title Ins. Co.*, 107 F. Supp. 3d 439, 449 (W.D. Pa. 2015) ("Courts in this circuit have recognized the propriety of considering public records such as court filings in connection with a Rule 12(b) or 12(c) motion."); *Golden v. Cook*, 293 F. Supp. 2d 546, 551 (W.D. Pa. 2003) (similar).

[2]   Pennsylvania law provides that

> [i]ndividuals, partnerships, and corporations of this Commonwealth, hereby designated subscribers, are hereby authorized to exchange

5

corporations underwrite each other's risks against loss by fire or other hazard, through an attorney-in-fact, common to all, under an agreement that each underwriter acts separately and severally and not jointly with any other." *Neel v. Crittenden*, 44 A.2d 558, 561 (Pa. 1945) (emphasis omitted) (quoting Brennen, *Inter-Insurance—Its Legal Aspects and Business Possibilities*, 58 Cent. L. J. 323 (1904)).[3]

The "Exchange" in the statute was originally conceived as the "place" where the various subscribers "exchange" contracts of insurance through a designated agent—*i.e.*, through the "attorney-in-fact." *See Long v. Sakleson*, 195 A. 416, 418–19 (Pa. 1937) (explaining that although the "fiction" of a "common name" is given to reciprocal insurance exchanges, "the name only designates the place of exchange, or denominates [*sic*] a res or fund"); *accord Underwriters' Exch. v. Ind. State Ry. Co.*, 185 N.E. 504, 506 (Ind. 1933) (reciprocal insurance

---

reciprocal or inter-insurance contracts with each other, or with individuals, partnerships, and corporations of other States and countries, providing indemnity among themselves from any loss which may be insured against under any provision of the insurance laws excepting life insurance.

40 P.S. § 961.

[3]     *See also Commw. v. Exch. Operators, Inc.*, 11 Pa. D. & C. 465, 466 (Pa. Ct. Com. Pl. Dauphin Cnty. 1928) ("A reciprocal is not an insurance company, but may consist of individuals, partnerships and corporations of this Commonwealth who are authorized to exchange reciprocal or inter-insurance contracts with each other or with individuals, partnerships and corporations of other states and countries, providing indemnity among themselves from any loss which may be insured against under any provisions of the insurance laws . . . .  Such contracts may be executed by an attorney, agent or other representative who is, in the insurance laws of Pennsylvania, designated 'attorney,' duly authorized and acting for such subscribers."); Couch on Ins. § 1:31 ("Interindemnity or reciprocal insurance is a plan by which individuals, partnerships, or corporations engaged in a similar line of business undertake to indemnify each other against a certain kind of loss by means of an exchange of insurance contracts, usually through the medium of an attorney in fact appointed for that purpose.  This form of insurance is an obvious departure from the familiar methods or systems of insurance . . . .").

exchanges present "the anomalous situation of an unincorporated association selecting [a] name . . . which is said to be meaningless except that it designates the place where subscribers exchange insurance by the agency of an attorney in fact").  In contrast to a traditional insurance company or corporation, Exchange is not a traditional business "entity" and, accordingly, has no employees, no officers, and no board of directors.  (*See, e.g.*, Compl. ¶ 2.)  The subscribers and Exchange act solely through an attorney-in-fact appointed by each of the subscribers.  (*See, e.g.*, *id.*)

Indemnity serves as the duly-appointed attorney-in-fact for all Erie subscribers.[4]  (*See* Ex. 1 [Subscriber's Agreement].)  Each of the more than two million subscribers appoints Indemnity to act as attorney-in-fact on their behalf pursuant to a Subscriber's Agreement, an identical contract executed by each Erie subscriber.  (*See id.*; *see also* Compl. ¶ 2.)  The individual subscribers and Exchange are, by design, without power to conduct any form of "insurance business."  Rather, Indemnity, as attorney-in-fact, is appointed by the subscribers pursuant to the Subscriber's Agreement to perform the specific insurance-related duties on behalf of the subscribers for a management fee.  (*See* Ex. 1.)  As a direct result of this statutory structure, Indemnity is the only representative that can act on behalf of the subscribers with respect to the business of the reciprocal exchange of insurance obligations.

As explained by the Pennsylvania Supreme Court in *Long v. Sakleson*, in a reciprocal insurance exchange,

> [e]ach member who is a subscriber, by power of attorney, authorizes the attorney in fact to represent him individually in exchanging insurance with others, and to do every act that he could do in relation to suits or other proceedings.  The subscriber contributes a premium,

---

[4]  *See also* 40 P.S. § 963 (providing that "[s]uch contracts [in an insurance exchange] may be executed by an attorney, agent, or other representative, herein designated attorney, duly authorized and acting for such subscribers").

> or membership fee, which is deposited by the attorney in fact for the association to meet expenses and obligations, with deduction of the attorney's fee or compensation. . . . None of the subscribers deal directly with each other, but all exchanges are effectuated through the common representative, the attorney in fact.  He is given broad power to select risks, pass upon claims, and, in general, do all things necessary to the conduct of the enterprise.  For his service he is paid a fixed percentage of the contributions.

195 A. 416, 418.

By statute, Indemnity and Exchange are members of an "insurance holding company system" and, therefore, are subject to extensive regulation under the Insurance Holding Companies Act, 40 P.S. §§ 991.1401 *et seq.* ("IHCA").  In general, the IHCA regulates the "management of an insurer in an insurance holding company system" by establishing a comprehensive scheme for the Pennsylvania Insurance Department to police, review, and remedy potentially harmful transactions between entities *within* an insurance holding company system.  *See, e.g.*, *id.* § 991.1405.  Specifically, the IHCA requires that all "intercompany transactions" between the members of an insurance holding company system be "fair and reasonable."  *Id.* § 991.1405(a)(1)(i).

## II.   THE SUBSCRIBER'S AGREEMENT GOVERNS THE RELATIONSHIP BETWEEN INDEMNITY AND THE SUBSCRIBERS CONCERNING INSURANCE SERVICES.

The Subscriber's Agreement, on its face, makes clear the purpose and nature of the contractual relationship:  that Agreement governs the subscribers' exchange of insurance obligations and Indemnity's management of the insurance obligations arising from that exchange.

The Subscriber's Agreement explicitly identifies the parties to the contract as limited to the subscribers and Indemnity.  (*See* Ex. 1.)  Exchange is neither designated as an independent entity nor as a party to the Agreement.  Rather, Exchange is referred to as the place "at" which

8

the subscribers "exchange" insurance obligations with each other—*i.e.*, the "Subscriber ('you' or 'your') agrees with the other Subscribers at Erie Insurance Exchange ('ERIE') . . . and with their Attorney-in-Fact, the Erie Indemnity Company."  (*Id.*)

The Subscriber's Agreement governs the insurance of risk among the subscribers and the necessary insurance-related services provided by Indemnity to effectuate the subscribers' exchange of insurance policies:

- Paragraph 1 describes the duties of the subscribers as being to "pay [their] policy premiums and to exchange with other ERIE Subscribers policies providing insurance for any insured loss as stated in those policies."  (*Id.*)

- Paragraph 2 states that the "power of attorney [given to Indemnity] is limited to the purposes described in this Agreement"—*i.e.*, to managing the reciprocal exchange of insurance policies among the subscribers and the payment of premiums for those policies.  (*Id.*)

- Paragraph 3, which deals with the compensation to which Indemnity will be entitled—*i.e.*, "up to 25% of all premiums" (premiums being the payments for insurance)—then goes on to state that after compensation is paid from the "premiums" collected, the "rest of the premiums" will be used for a series of specified expenses dealing with the management of the reciprocal exchange of the subscribers' insurance policies and such "other purposes we [*i.e.*, Indemnity] decide are to the advantage of the Subscribers."  (*Id.*)

- Paragraph 4 provides that: "You [*i.e.*, the subscribers] agree that this Agreement, including [Indemnity's] power of attorney, shall have application to all insurance policies for which you apply."  (*Id.*)

Hence, by its own terms, the Subscriber's Agreement applies only to the provision of insurance and insurance-related services.

The Subscriber's Agreement does not govern the provision of non-insurance-related services to some—but not all—subscribers who specifically request and agree to pay for such services.  Specifically, the Special Services at issue here—*i.e.*, the offering of installment payment plans, etc.—do not relate to the provision of insurance.  They deal only, for example, with a sort of financing arrangement permitting subscribers to pay their premiums in installments

over time rather than all at once at the start of their policies.  Moreover, the Service Charges paid for the Special Service are flat fees; and their amounts do not vary with the degree or nature of risk insured or the amount of premiums paid.  Accordingly, Service Charges are not paid for any insurance-related service, but as "consideration for a benefit separate from the insurance."  *In re Installment Fee Cases*, 211 Cal. App. 4th 1395, 1407 (Cal. Ct. App. 2012); *see also Nellis v. Farmers Ins. Co. of Az.*, 272 P.3d 143, 149 (N.M. Ct. App. 2011) ("[I]nstallment fees are not consideration for insurance and . . . such fees are not charged in connection with the procurement of insurance.  Rather . . . the installment fees are associated with the privilege of paying a premium in installments and are not for the actual purchase of insurance itself."); *Cacamo v. Liberty Mut. Fire Ins. Co.*, 885 So. 2d 1248, 1256 (La. Ct. App. 2004) (because "[t]he installment fees paid by insureds choosing that option are not for the insurance or for the procurement of insurance . . . . the installment fees are not included in the definition of 'premium'" (emphasis omitted)).

Whereas the Subscriber's Agreement governs Indemnity's provision of insurance services to ***all*** subscribers who pay "Premiums" to receive their insurance coverage, there are no words in the Subscriber's Agreement that purport to govern Indemnity's provision of non-insurance services on an individual basis to a ***subset*** of subscribers who individually request and agree to pay "Service Charges" for those Special Services.

## III.   INDEMNITY'S RETENTION OF THE SERVICE CHARGES HAS BEEN CONTINUOUSLY AND OPENLY DISCLOSED FOR APPROXIMATELY TWENTY YEARS.

Prior to 1997, Indemnity did not retain the Service Charges paid by Exchange policyholders, instead allowing the Service Charges to be retained by Exchange.  However, beginning on September 1, 1997, Indemnity began to retain a portion of the Service Charges formerly retained by Exchange.  (*See* Ex. 2 ¶ 83 [Joint Statement of Undisputed Facts, *Erie Ins.*

*Exch. v. Erie Indem. Co.*, No. MS14-03-003 (Pa. Ins. Comm'r Sept. 3, 2014)].)  Then, in 1999,

Indemnity began retaining all of the Service Charge revenue associated with installment payment

plans.  (*Id.* ¶ 86.)  Indemnity's retention of this Service Charge revenue has been fully and

openly disclosed.

### A.    Policy Applications.

Policyholders are required to select a payment plan on their application when they apply

for insurance coverage.  (*Id.* ¶ 201.)  Even if a policyholder elects a payment plan not subject to

Service Charges, the policyholder must select that option on the application.  In 2000, policy

applications began to include language, directly in the section used to elect a payment plan,

stating that a "service charge is applied and ***paid to Erie Indemnity*** for the second and

subsequent installments" on certain installment payment plans.  (*Id.* ¶ 202 (emphasis added).)

That language was included on all applications for personal and commercial lines of insurance

by 2002.  (*See id.*)  All such applications are approved by the Department.[5]  Thus, every

policyholder after 2002 received the disclosure that Service Charges would be paid to Indemnity.

(*See id.*)

### B.    Policyholder Notices.

Indemnity also disclosed that it was retaining Service Charges in notices that were sent to

policyholders in 2000.  Policyholders receive Department-approved[6] notices at least annually in

---

[5]    *See* 40 P.S. § 477b (making it unlawful to issue insurance "or use applications, riders, or endorsements, in connection therewith, until the forms of the same have been submitted to and approved by the Insurance Commissioner"); 31 Pa. Code § 89b.3(a) (requiring filing of "[p]olicies, contracts, endorsements, riders, applications and related forms" with Department).  (*See also* Ex. 2 ¶ 200.)

[6]    Like insurance policy applications, these notices were required to have been filed with, reviewed, and approved by the Department.  *See* 40 P.S. § 477b; 31 Pa. Code § 89b.3(a).

connection with policy renewals, as well as when changes are made to a policy.  (See *id.* ¶ 207.)

In 2000, all policyholders received a notice that clearly disclosed that "[t]he service charge

applied and paid to ***Erie Indemnity Company*** for payment plans has increased from $2.00 to

$3.00."  (*Id.* ¶¶ 209, 210 (emphasis added).)  Another notice was sent in 2006 when Service

Charges were increased again, stating unequivocally that "[t]he service charge applied and ***paid***

***to Erie Indemnity Company***" for certain payment plans would increase.  (*See id.* ¶ 212

(emphasis added).)

### C.   Indemnity's SEC Disclosures.

Indemnity's publicly available annual reports filed with the United States Securities and

Exchange Commission also clearly and repeatedly disclosed Indemnity's retention of revenue

from Service Charges.  (*See id.*¶ 190.)  Indemnity's SEC filings for 1997 clearly stated that

Indemnity had begun to retain a portion of the Service Charges previously retained by Exchange:

> Beginning September 1, 1997 the Company was reimbursed by the
> Exchange for a portion of service charges collected by the
> property/casualty insurers of the Group from Policyholders as
> reimbursement for the costs incurred by the Company in providing
> extended payment terms on policies written by them.

(*Id.* ¶ 85.)  Indemnity's annual report for 1999 disclosed that Indemnity "collects service charges

from policyholders" and that "[t]hese charges are included in service agreement revenue."  (*See*

*id.* ¶ 191.)  From 1997 to the present, similar language was included in multiple places in the

annual reports each year:  both in the introduction to the annual report and in notes on either

"Related Party Transactions" or "Significant Accounting Policies" in the attached audited

financials.  (*See id.* ¶¶ 192–194.)[7]

---

[7]   Beginning in 2007, contemporaneously with Indemnity's regulatory filings seeking
approval of what the Complaint calls "Additional Fees," Indemnity's annual reports
disclosed Indemnity's decision to introduce Additional Fees in 2008.  (*See* Ex. 2 ¶ 196.)
When Additional Fees were implemented in 2008, Indemnity's annual report

### D.    Disclosures To The Pennsylvania Insurance Department.

Exchange has also made repeated disclosures of its retention of Service Charges to the Department.  For example, every year, Indemnity files an Annual Statement for Exchange with the Department.  (Ex. 2 ¶ 148.)  The Annual Statements, which are publicly available, provide detailed disclosures about the finances of Exchange, including specific entries for "Finance and Service Charges not Included in Premiums."  These entries, taken collectively, show that while Service Charges continued to be collected from Exchange policyholders after 1999, they were no longer being treated as income to Exchange.  (*Id.* ¶¶ 149–53.)

The Department also conducts statutory examinations of Exchange at least once every five years, focusing specifically, *inter alia*, on the handling and allocation of funds between Exchange and Indemnity.  *See* 40 P.S. § 323.3.  (*See also* Ex. 2 ¶¶ 159–86.)  The Department's examiners completed extensive reviews of Exchange for the five-year periods ending in 1995, 2000, 2005, and 2010.  (*Id.* ¶ 160.)  The Reports of Examination for these periods plainly demonstrate that the Department was aware that Indemnity was retaining all of the Service Charges.  In the Report of Examination for 1995, the Service Charges were recorded as going to Exchange in all five years subject to examination.  (*Id.* ¶ 171.)  The examiners performed that same analysis in 2000 and specifically considered Indemnity's then-recent retention of the Service Charges.  (*Id.* ¶ 174.)  While the Department's examiners reported that Exchange earned millions of dollars of revenue from "Finance and service charges not included in premiums" for 1996, 1997, 1998, and 1999, the Department also specifically noted that Exchange no longer

---

transparently disclosed that Indemnity was retaining the Additional Fees as revenue.  (*See id.* ¶ 197.)  Similar language has appeared in multiple places in every annual report filed by Indemnity since 2008.  (*See id.* ¶¶ 198, 199.)

received such revenue.  (*Id.*)  Thus, the Department acknowledged and found no issue with

Indemnity's retention of the Service Charges.  (*Id.* ¶¶ 182, 183.)

## ARGUMENT[8]

### I.     PLAINTIFFS' ALLEGATIONS ESTABLISH THAT ALL CLAIMS ARE BARRED BY THE STATUTES OF LIMITATION.

#### A.     A Court May Dismiss An Action On The Basis Of A Statute Of Limitation When The Defense Appears On The Face Of The Complaint.

Where a plaintiff's own allegations establish a statute of limitation defense, a complaint

is subject to dismissal for failure to state a claim.  *See Jones v. Bock*, 549 U.S. 199, 215 (2007)

("If the allegations . . . show that relief is barred by the applicable statute of limitations, the

complaint is subject to dismissal for failure to state a claim."); *West Penn Allegheny Health Sys.,*

*Inc. v. UPMC*, 627 F.3d 85, 105 n.13 (3d Cir. 2010) ("[O]ur cases recognize that a defendant

may raise a limitations defense in a motion to dismiss" and "to prevail . . . the plaintiff's

tardiness in bringing the action must be apparent from the face of the complaint."); *accord*

*Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002).[9]

#### B.     Plaintiffs' Own Allegations Establish That The Statutes Of Limitation Have Expired.

The Complaint challenges two specific actions as constituting a breach of the

Subscriber's Agreement:  (1) the decision in 1997 by Indemnity to begin retaining a portion of

the Service Charges; and (2) the decision in 1999 to begin retaining all of the Service Charges:

---

[8]     To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is not just possible but plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[9]     This rule is followed universally across the Federal courts.  *See* Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1357 (3d ed.) (citing cases).

> 72.    As of September 1, 1997, Indemnity began taking the Service Charges revenue from Exchange's accounts.  Indemnity took these funds as compensation above and beyond the compensation it was authorized to receive as a percentage of the premiums authorized by the Subscriber's Agreement.
>
> 73.    The Directors approved the taking of a portion of the Service Charges revenue from Exchange in 1997 without obtaining a fairness opinion or other opinion from an independent person, expert, or entity solely representing Exchange's interests regarding whether Indemnity could retain those Service Charges.
>
> 74.    Indemnity continued in 1998 to take a portion of the Service Charges as additional compensation.  In 1999, Indemnity began taking *all* of the Service Charges revenue from Exchange.  This was above and beyond the compensation received as a percentage of the premiums authorized by the Subscriber's Agreement.

(Compl. ¶¶ 72–74.)[10]

The statute of limitation for breach of contract (Count I) is four years.  *See* 42 Pa. C.S. § 5525 (2013); *Perelman v. Adams*, 945 F. Supp. 2d 607, 614 (E.D. Pa. 2013), *aff'd* 545 F. App'x 142, 149 (3d Cir. 2013).  The statute of limitation begins to run from the time of the breach.  *Romeo & Sons, Inc. v. P.C. Yezbak & Son, Inc.*, 652 A.2d 830, 832 (Pa. 1995).  Plaintiffs allege in their Complaint that Indemnity breached the Subscriber Agreement in 1997 and, again, in 1999.  (Compl. ¶¶ 116–17 ("beginning in or around 1997 up through the present . . . Indemnity has retained substantial additional compensation . . . . [t]he taking of this additional compensation is a breach of the Subscriber's Agreements").)  As a result, on the face of the

---

[10]    All of Plaintiffs' allegations regarding the 2008 decision to impose the Additional Fees are similarly time-barred, since, as soon as Indemnity decided to impose the Additional Fees in March 2008, Indemnity sent to its policyholders a notice that it would begin collecting and retaining the Additional Fees.  (*See* Ex. 2 ¶ 120.)

Complaint, the statute of limitation for the breach of contract claim has expired and Count I should be dismissed.

Second, the statute of limitation for breach of fiduciary duty (Counts II and IV) is two years. *See* 42 Pa. C.S. § 5524(7); *In re O.E.M./Erie, Inc.*, 405 B.R. 779, 784 (Bankr. W.D. Pa. 2009); *Langman v. Keystone Nazareth Bank & Trust Co.*, 502 F. App'x 220, 221 (3d Cir. 2012). The statute of limitation begins to run on a breach of fiduciary duty claim when the alleged fiduciary violates his duties. *Weis-Buy Servs., Inc. v. Paglia*, 411 F.3d 415, 422 (3d Cir. 2005); *see also Stann v. Olander Prop. Mgmt. Co. Inc.*, No. 11-7865, 2015 WL 4505932, at *7 (E.D. Pa. Jul. 24, 2015) ("The limitations period begins to run when the alleged breach of duty occurs."). According to Plaintiffs, Indemnity breached its alleged fiduciary duties in 1997 or 1999 when it "deviated from 70 years of prior conduct" and "authorized, enabled, and/or otherwise permitted Indemnity to retain Service Charges and/or Additional Fees." (Compl. ¶¶ 127, 129.) As a result, the statute of limitation on the breach of fiduciary duty claims has expired and Counts II and IV should be dismissed.

Finally, the statute of limitation for conversion (Count III) is two years. *See* 42 Pa. C.S. § 5524(3); *Kingston Coal Co. v. Felton Min. Co.*, 690 A.2d 284, 288 (Pa. Super. Ct. 1997). The statute of limitation begins to run when the "the first significant event necessary to make the claim suable occurs." *In re River Entm't Co.*, 467 B.R. 808, 815 (Bankr. W.D. Pa. 2012) (internal quotation marks omitted). According to Plaintiffs, the first significant event occurred in 1997 when Indemnity first "took" the Service Charges. (Compl. ¶ 133.) And, even assuming Plaintiffs could stretch the first significant event to 1999, the statute of limitation for the conversion claim has expired and Count III should be dismissed.

**C.**      **Plaintiffs Do Not Plead Any Basis For Avoiding The Statutes Of Limitation.**

Not only do Plaintiffs attempt to bring claims that expired under the statutes—at best—fifteen years ago, but they also do not plead any basis for evading the statutes of limitation.  Nor could they.

**1.**      **Plaintiffs Do Not Plead The Discovery Rule.**

The discovery rule is a narrow exception to the well-established principle that "'lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations.'" *Lang v. Continental Assurance Co.*, 54 F. App'x 72, 74 (3d Cir. 2002).  It applies only "when a plaintiff, despite the exercise of due diligence, is unable to know of the existence of the injury and its cause." *Neff v. Unum Provident Corp.*, No. 14-6696, 2015 WL 5036390, at *3 (E.D. Pa. Aug. 19, 2015).  Pennsylvania's formulation of the discovery rule "places greater burden upon Pennsylvania plaintiffs vis-à-vis the discovery rule than most other jurisdictions." *Wilson v. El–Daief*, 964 A.2d 354, 366 n.12 (Pa. 2009).  Thus, a plaintiff attempting to apply the discovery rule bears the heavy burden of demonstrating that it applies.  *See Mest v. Cabot Corp.*, 449 F.3d 502, 511 (3d Cir. 2006).  That requires, among other things, demonstrating that that he or she exercised reasonable diligence in determining the existence and cause of the injury.  *Id.*

Here, the discovery rule cannot apply because, as set out above, Plaintiffs and other policyholders, the public at large, and the relevant regulator—the Department—were notified of Indemnity's retention of Service Charges in numerous ways beginning in 1997–2002.  (*See supra* 10–14.)  Moreover, Pennsylvania courts have recognized that it is generally inappropriate to apply the discovery rule or any other kind of tolling to a breach of contract claim because a plaintiff has an obligation to monitor the defendant's compliance with its contractual obligations. *See Univ. Patents, Inc. v. Kligman*, Nos. 89-3525, 90-0422, 1991 WL 64652, at *3 (E.D. Pa. Apr. 22, 1991) ("the discovery rule will rarely operate to toll the statute because the plaintiff has

an obligation to monitor the defendant's compliance with its contractual obligations"); *Levert v. Phila. Int'l Records*, No. 04-1489, 2004 WL 2900703, at *1 (E.D. Pa. Dec. 12, 2004 ("the statute of limitations' due diligence requirement imposes a heavy burden on a plaintiff seeking to toll the statute of limitations in a breach of contract action").

In this case, Plaintiffs had actual knowledge sufficient to bring a claim long before the statute expired. Yet, no claim was brought. The discovery rule, thus, is inapplicable.

### 2.     Plaintiffs Do Not Plead The Continuing Violation Doctrine.

As the Third Circuit has recently explained, litigants frequently "overread" the continuing violation doctrine. *Gould v. Borough*, 615 F. App'x 112, 116 (3d Cir. 2015); *Tearpock-Martini v. Borough of Shickshinny*, 756 F.3d 232, 236 (3d Cir. 2014) ("The reach of this doctrine is understandably narrow."). In order to invoke the doctrine, "a plaintiff must make an ***exacting showing***." *Flood v. Nat'l Collegiate Athletic Ass'n*, No. 15-890, 2015 WL 5785801, at *6 (M.D. Pa. Aug. 26, 2015) (emphasis added).

That "exacting showing" must include that the alleged "continuing violation is occasioned by continual unlawful ***acts***, not continual ill ***effects*** from the original violation." *Weis–Buy Servs., Inc.*, 411 F.3d at 423 (emphasis added) (internal quotation marks omitted). And, the fact that additional acts in furtherance of the decision in question may take place is insufficient to reset the statute of limitation clock, since "it is well settled that the continuing conduct of a defendant will not stop the ticking of the limitations." *Flood*, No. 15-890, 2015 WL 5785801, at *6.

Courts have consistently affirmed that breaches of contract, even if they have lasting effects, do not constitute continuing violations. *See, e.g.*, *Yingling v. Unum Life Ins. Co. of Am.*, 959 F. Supp. 251, 259–60 (M.D. Pa. 1997) (insurance company's failure to pay monthly disability benefits to an insured did not constitute a continuing breach of the insurance contract);

18

*Casner v. AFSCME*, 658 A.2d 865, 871 (Pa. Commw. Ct. 1995) (regular receipt of paycheck not a continuing breach of union contract; "[a]dopting th[at] rationale would effectively render the limitation period for any cause of action alleging loss of payment meaningless when the payment is received on a regular basis"); *Pierre-Louis v. Commw.*, No. 48 MD 2010, 2012 WL 8655010, at *3 n.5 (Pa. Commw. Ct. Aug. 14, 2012) (monthly deductions do not constitute a continuing violation); *Saxberg v. Pa. Dep't of Corr. Ct. of Com. Pl. Lancaster Cnty.*, No. 85 MD 2011, 2015 WL 7737000, at *4 (Pa. Commw. Ct. Dec. 1, 2015) (same; the "first deduction from his prison account constituted a discrete and independently actionable act, which triggered his obligation to assert his rights"); *Steudtner v. Duane Reade, Inc.*, 629 F. App'x 389, 392 (3d Cir. 2015) ("Steudtner argues that his contract claims were timely by virtue of the 'continuing violation' doctrine because Duane Reade continued refusing to promote him and pay him what he supposedly deserved up until his departure in 2006 (and to the present day, for that matter).  But the mere fact that the repudiation of a contract has continuing effect does not trigger the continuing violation doctrine.").

Similarly, courts have acknowledged that breaches of fiduciary duties often have continuing effects; but, that does not change the fact that a claim for breach of fiduciary duty arises upon the ***first instance of breach***.  *See, e.g.*, *Adelman v. Neurology Consultants*, 109 F. Supp. 2d 400, 403 (E.D. Pa. 2000) ("It is, of course, the nature of the type of violation here alleged that such violations . . . [have] effects that continue into the future, perhaps indefinitely. The fact that the damages continue to mount for as long as—but only as long as—the status quo is maintained, does not affect the time when the statute of limitations begins to run . . . ." (internal quotation marks omitted)); *McChesney v. Pension Plan of Bethlehem Steel Corp.*, No. 92-7457, 1994 WL 114773, at **12–13 (E.D. Pa. Mar. 29, 1994) (failure to remedy an initial

breach of fiduciary duty does not qualify as a continuing violation recommencing the limitation period).

Here, Plaintiffs allege that the breach of contract and tort violations occurred in 1997 and 1999 when the decisions at issue were made; and they refrain from pleading the continuing violation doctrine.  In fact, what they allege seems to be directly at odds with that doctrine.  They do not allege that new decisions were made, but rather that "[t]he Directors, each year since then" have "authorized and/or allowed" the continued "taking of all the Service Charges." (Compl. ¶ 75.)  This says nothing more than the Directors, by their failure to make a new decision undoing the decisions of 1997 and 1999, have permitted the alleged ill-effects of the original decisions to continue.  Thus, even though Indemnity has continued to retain Service Charges pursuant to these long-past decisions, the continuing violation doctrine has no application.

### D.   Plaintiffs' Inexcusable Delay Of More Than Fifteen Years Provides A Textbook Example Of Why Statutes Of Limitation Exist And Must Be Enforced.

Statutes of limitation exist—and are enforced—for good reasons.  Indeed, Plaintiffs' egregious delay of more than fifteen years before asserting their purported claims in this case is a textbook example for why statutes of limitation exist and are strictly enforced.  "Statutes of limitations are designed to insure fairness to defendants by preventing the revival of stale claims in which the defense is hampered by lost evidence, faded memories, and disappearing witnesses, and to avoid unfair surprise."  *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 473 (1975); *see also Ins. Co. of N. Am. v. Carnahan*, 284 A.2d 728, 729 (Pa. 1971); *see also Nelson v. Cnty. of Allegheny*, 860 F. Supp. 1080, 1082–83 (W.D. Pa. 1994) ("[L]imitations periods ensure that defendants are 'protected against the prejudice of having to defend against stale claims, as well

as the notion that, at some point, claims should be laid to rest so that security and stability can be restored to human affairs.'" (internal citations, quotation marks, and alterations omitted)).

Not surprisingly, Plaintiffs' delay has caused exactly those problems in this case.  For example, two key witnesses—Stephen A. Milne, who served as Indemnity's CEO at the time the decision to retain the Service Charges was made, and Susan Hirt Hagen, who was a board member of Indemnity at all relevant times—have died.  *Cf. Alker v. Phila. Nat. Bank*, 93 A.2d 699, 704 (Pa. 1953).  Moreover, many of the other key witnesses have left the company, making it even more difficult to locate records and documents that may be relevant to this action.  And, memories have no doubt faded.

Additionally, Indemnity has relied on its retention of the Service Charges as part of its established business for nearly twenty years.  The Joint Statement of Undisputed Facts and the public record demonstrate more than fifteen years of open and unquestioned retention of the Service Charges by Indemnity before Plaintiffs filed suit.  Indemnity's retention has been presented to and accepted by policyholders, disclosed to the SEC in public filings, and regularly reviewed and accepted by the Department.  (*See* Ex. 2 ¶¶ 148–227.)  In reliance on that acceptance and the lack of any complaint or challenge from anyone, the retention of the Service Charges has become an established component of Indemnity's business.  It is far too late now to travel back in history.

II.   **THE SPECIFIC COUNTS DIRECTED AT INDEMNITY ARE FATALLY FLAWED AND SHOULD BE DISMISSED ON NUMEROUS INDEPENDENT GROUNDS.**

A.   **Count I For Breach Of Contract Should Be Dismissed.**

1.   **Plaintiffs Fail To Plead A Breach Of The Subscriber's Agreement.**

Plaintiffs fail to plead a breach of the Subscriber's Agreement[11] because the Subscriber's Agreement does not govern the Special Services and Service Charges at issue in the Complaint. Indeed, those Special Services and Service Charges are governed by contracts that are separate from the Subscriber's Agreement.

a.   **The Subscriber's Agreement Governs Only Insurance Services And The Premiums That Are Paid For Those Services.**

The subscribers appoint Indemnity "as Attorney-in-Fact" to "manage and conduct the business and affairs of ERIE"—and "ERIE" is defined as the exchange of insurance obligations "with the other Subscribers at Erie Insurance Exchange." (*See* Ex. 1.) Hence, the business that Indemnity manages under the Subscriber's Agreement is the exchange of insurance contracts among subscribers indemnifying each other from covered losses. *See* 40 P.S. § 961; *see also id.* § 963. Indemnity effectuates the exchange of insurance policies by, among other things, issuing the policies, administering the policies, collecting "premiums" (*i.e.*, the payments made for the insurance) receiving notices and proofs of loss under the policies, and processing insurance claims. (*See* Ex. 1.) These group insurance services are necessary and integral to managing the exchange of insurance contracts for the benefit of all subscribers. The subscribers, in turn, agree to pay "policy premiums and to exchange with other ERIE Subscribers policies providing insurance for any insured loss as stated in those policies." (*Id.*) They also agree that the

---

[11]   The Subscriber's Agreement is the relevant contract at issue in Plaintiffs' Complaint. (*See* Compl. ¶¶ 114–21; *see also* Ex. 1.)

Subscriber's Agreement, "including . . . [Indemnity's] power of attorney, shall have application to all insurance policies."  (*Id.*)  Hence, from the face of the Subscriber's Agreement it is evident that the Agreement deals with "insurance," "premiums," "policies," and "notice and proofs of loss" pursuant to the issued policies, etc.  (*Id.*)  Thus, the Subscriber's Agreement is a contract that deals only with services pertaining to the insurance of risk resulting from the subscribers' reciprocal exchange of insurance policies.

The fact that the Subscriber's Agreement governs only the provision-of-insurance services provided to all subscribers is further demonstrated by the fact that Indemnity's compensation for managing those insurance services comes directly from the collective pot of payments made for the purchased insurance coverage—*i.e.*, the "premiums" paid by all subscribers.  Indemnity is entitled under the Subscriber's Agreement to retain up "25% of all premiums."  (*See id.*)  Thus, each subscriber contributes its proportionate 25% to fund Indemnity's provision of insurance services to all of the subscribers.

The plain language of the Subscriber's Agreement thus governs only those group insurance services that (a) are required to manage the insurance-of-risk business for the benefit of all subscribers and (b) are paid for by all subscribers through their premium payments.

> **b.    The Subscriber's Agreement Does Not Cover Non-Insurance Services Or The Service Charges That Are Paid For Those Services.**

Plaintiffs' attempt to jam individual non-insurance services into the ambit of the Subscriber's Agreement is wholly without merit.  Whereas the Subscriber's Agreement governs Indemnity's provision of insurance services to all subscribers that are paid for by all subscribers through premiums, the Complaint challenges as a breach of the Subscriber's Agreement Indemnity's retention of the Service Charges for the provision of non-insurance services on an individual basis to a subset of subscribers who individually request those non-insurance services.

Hence, the breach of contract claim is predicated on a deliberately blurred distinction between the provision of non-insurance services paid for by "Service Charges"—which are not even mentioned in or contemplated by the Subscriber's Agreement—with the provision of the insurance services described in Subscriber's Agreement and paid for by "premiums."

However, the fundamental distinction between insurance services and premiums on the one hand and non-insurance services and charges on the other is clear and well-established. Charges are not paid as a result of any insurance-related service, but as "consideration for a benefit separate from the insurance." *In re Installment Fee Cases*, 211 Cal. App. at 1407. Indeed, courts around the country have consistently recognized that, unlike premiums, the charges imposed when a subscriber elects to purchase non-insurance-related services (like the Special Services here) serve as "consideration for a benefit separate from . . . insurance." *E.g.*, *id.*; *see also Nellis*, 272 P.3d at 149 ("[I]nstallment fees are not consideration for insurance and . . . such fees are not charged in connection with the procurement of insurance.  Rather . . . the installment fees are associated with the privilege of paying a premium in installments and are not for the actual purchase of insurance itself." (quoting *Nakashima v. State Farm Mut. Auto. Ins. Co.*, 153 P.3d 664 (N.M. App. Ct. 2007))); *Cacamo*, 885 So. 2d at 1256 (because "[t]he installment fees paid by insureds choosing that option are not for the insurance or for the procurement of insurance . . . . the installment fees are not included in the definition of 'premium'" (emphasis omitted)).

Furthermore, Plaintiffs have stipulated that this distinction between "premiums" and "charges" is recognized in insurance accounting practices.  For instance, the National Association of Insurance Commissioners' ("NAIC") Accounting Practices and Procedures treat

insurance premiums (on the one hand) and non-insurance charges (on the other hand) as different animals.  The Manual explains:

> The amount charged [for an installment fee] is primarily intended to compensate the insurer for the additional administrative costs associated with processing more frequent billings and has no relationship to the amount of insurance coverage provided, the period of coverage, or the lost investment income associated with receiving the premium over a period of time rather than in a lump sum.

(Ex. 2 ¶ 158 (citing NAIC Accounting Practices and Procedures Manual, Statement of Statutory Accounting Principles No. 53, Property Casualty Contracts—Premiums, at 53-3n.1).)  For this reason, Exchange's Annual Statements, which are filed with the Department, explicitly separate the Service Charges—income related to the Special Services—from income derived from premiums.  (*See id.* ¶¶ 145, 146.)  And, the Department's examiners apply the same distinction when reporting Exchange's financial information in its Reports of Examination—Service Charges are treated as separate from premiums.  (*See id.* ¶ 147.)

### c.   The Insurance Department Concluded That There Was No Breach Here Because Service Charges Are Not Premiums And Therefore Are "Outside The Subscriber's Agreement."

As discussed above, at the conclusion of the proceeding before the Department (which occurred at the request of this Court upon its referral of the initial complaint filed in this action, *see supra* note 1), the Insurance Commissioner ruled that Indemnity's retention of the Service Charges does not breach the Subscriber's Agreement.  "Service charges are outside the subscriber's agreement, and Indemnity did not breach that agreement by retaining some or all of the revenue from its services."  (*See* Ex. 3 at 78 [Declaratory Opinion and Order, *Erie Ins. Exch. v. Erie Indem. Co.*, No. MS14-03-003 (Pa. Ins. Comm'r Apr. 29, 2015].)[12]  The Commissioner

---

[12]   As discussed above, upon this Court's referral of the original Complaint in this action to the Department on the grounds of primary jurisdiction, *see Erie Ins. Exch.*, No. 13-37

reached these conclusions because Service Charges are fundamentally different from

"premiums" because they are not payments for insurance.  (*See id.* at 21 ("Service Charges are

not premiums which in simple terms are payments to indemnify the policyholders against risk of

loss but rather are payments for a service financing the premium and which are unrelated to

indemnification against loss."); *id.* at 28 ("Added Service Charges are not premiums but rather

are payments triggered by a policyholder's actions which result in additional costs unrelated to

the insurance coverage."); *id.* at 51 ("The existence and amount of the service charges does not

vary with either the nature or magnitude of the insured risk or the amount of premium on a given

policy.  Rather, the charge is a flat amount unrelated to the premium for the privilege of paying

in installments."); *id.* at 54 ("Similarly to the other service charges, the added service charges are

assessed as a predetermined flat fee unrelated to the type of insurance or the amount of coverage.

Nor does the existence and amount of these fees vary based upon the nature or magnitude of the

insured risk or the amount of premium on a given policy.  Added service charges are not

_____

Erie, 2014 WL 546707, an administrative proceeding was conducted before the
Department, at the conclusion of which the Department found that "[t]he transactions
between Indemnity and Exchange in which Indemnity retained or received revenue from
installment and other service charges from Exchange subscribers complied with
applicable insurance laws and regulations" and that "Indemnity properly retained charges
paid by Exchange policyholders for certain installment premium payment plans,
dishonored payments, policy cancellations and policy reinstatements."  (*See* Ex. 3 at 85.)
Although vacated by the Pennsylvania Commonwealth Court on non-substantive,
jurisdictional grounds, the Department's Declaratory Opinion and Order remains
persuasive authority for this Court.  *See Wooding v. United States*, No. 05-1681, 2007
WL 2071674, at *4 (W.D. Pa. Jul. 13, 2007) (finding a vacated opinion "nevertheless . . .
persuasive"); *accord NASD Dispute Resolution, Inc. v. Jud. Council of State of Cal.*, 488
F.3d 1065, 1069 (9th Cir. 2007) (vacated district court opinion is "still . . . citable for its
persuasive weight"); *Nat'l Black Police Assn. v. Dist. of Columbia*, 108 F.3d 346, 354
(D.C. Cir. 1997) ("[S]ince the district court's opinion will remain 'on the books' even if
vacated, albeit without any preclusive effect, future courts will be able to consult its
reasoning.").  Indeed, the Commonwealth Court's decision is not binding on this Court
and does not affect the credence this Court should give to the Department's findings.

premiums but rather are payments triggered by a policyholder's actions which result in additional costs unrelated to the insurance coverage.").)

> ### 2. Indemnity's Provision Of Individual Non-Insurance Services Is Governed By Contracts Separate And Apart From The Subscriber's Agreement.

The subscribers who purchase the non-insurance services enter into separate contractual arrangements that govern the provision and the cost of those individual Special Services. Specifically, when subscribers fill out their policy applications, they are required to select a payment plan option. (*See, e.g.*, Ex. 2 ¶ 201.)  Some payment plans require that subscribers agree to pay Service Charges (a fact which is disclosed up front) and other payment plans do not. (*See, e.g.*, *id.* ¶ 202.)  If the subscriber selects a payment plan that incurs Service Charges, the subscriber agrees that those charges are "paid to Erie Indemnity."  (*See, e.g.*, *id.* ¶¶ 202, 205.) Indemnity's promise to provide the Special Services and the subscribers' promise to pay Service Charges over to Indemnity in return constitute the essential terms of those individual contracts.

The Department reviews and approves all of Exchange's policy applications, language, and notices, each of which include the terms and conditions of the Special Services contracts. All insurance policy applications must be filed with, reviewed, and approved by the Department. *See* 40 P.S. § 477b (making it unlawful to issue insurance "or use applications, riders, or endorsements, in connection therewith, until the forms of the same have been submitted to and approved by the Insurance Commissioner"); 31 Pa. Code §89b.3(a) (requiring filing of "[p]olicies, contracts, endorsements, riders, applications and related forms" with Department). (*See also* Ex. 2 ¶ 200.)  Since 2002, at the latest, each multi-page policy applications for new applicants for Erie lines of insurance specifically stated that, for certain payment plans, Service Charges were "applied and paid to Erie Indemnity."  (*Id.* ¶ 202.)  Thus, through the course of its

27

normal regulatory review, the Department received the terms of, reviewed, and approved of the Special Services contracts and the subscribers' payment of the Service Charges to Indemnity.

These individually requested contracts deal with a subject separate and apart from the insurance-of-risk operations covered by the Subscriber's Agreement.  They represent a request— independent from any request for insurance—for special, non-insurance services (such as permitting subscribers to pay their premiums in installments).  The subscribers who brought this case would have the Court believe that these contracts (which were all executed by people who also executed the Subscriber's Agreement) mean nothing, even though each individual who executed these contracts did so after being advised that the Service Charges were to be paid to Indemnity.  These contracts mean something.  They mean the provision of Special Services and the Service Charges paid for those services are not covered by the Subscriber's Agreement.[13]

> **3.      Even If Charges Are Viewed As Premiums And The Challenged Conduct Is Governed By The Subscriber's Agreement, The Subscriber's Agreement Vests Indemnity With The Authority To Use Premiums For Purposes "To The Advantage Of The Subscribers."**

To the extent Plaintiffs seek to recast the Special Services program as services required by the Subscriber's Agreement and recast the "Service Charges" as "premiums," the Complaint

---

[13]      Moreover, even assuming *arguendo* that the Subscriber's Agreement somehow applies to Indemnity's retention of the Service Charges and provision of the Special Services, at a minimum, these separate, distinct contracts governing the Special Services constituted amendments of the Subscriber's Agreement in all relevant respects.  *See Roddy Realty, Inc. v. Cadillac Real Estate Co.*, 41 Pa. D. & C. 2d 622, 627 (Pa. Ct. Com. Pl. Luzerne Cnty. 1966) ("A contract between the same parties containing a term inconsistent with a term of an earlier contract is interpreted as including an agreement to rescind the inconsistent term in the earlier contract." (quoting *Wathen v. Brown*, 189 A.2d 900, 902 (Pa. Super. 1963))); *see also Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am., AFL-CIO*, 405 F. Supp. 370, 375 (M.D. Pa. 1975) ("When two parties or their privies make a new agreement that is inconsistent with terms of a previous one dealing with the same subject matter, the later agreement operates to rescind and to discharge by substitution the inconsistent parts of the earlier contract.").

should still be dismissed.  The Subscriber's Agreement explicitly grants Indemnity the sole

authority to use those premiums that are not taken as "compensation" for "purposes . . .

[Indemnity] decide[s] are to the advantage of the Subscribers."  (*See* Ex. 1.)  In particular, the

Subscriber's Agreement states that the "rest" of the premiums, after Indemnity takes its

compensation, are to be used for, *inter alia*, "losses, . . . legal expenses, . . . taxes, . . . and may be

used for dividends and ***other purposes we [i.e., Indemnity] decide are to the advantage of the***

***Subscribers***."  (*Id.* (emphasis added).)  Here, Indemnity "decided" that the creation and

operation of the Special Services program (and the imposition of Service Charges to defray the

expense of that program) would be to the "advantage of the Subscribers."  The Complaint makes

no attempt to even allege that Indemnity's provision of the Special Services program is not to the

advantage of the subscribers.[14]

---

[14]    Plaintiffs have also failed to plead a breach of the implied covenant of good faith and
faith dealing.  *First*, because Plaintiffs cannot plead a claim for breach of contract they
necessarily cannot plead a claim for breach of any implied covenant of good faith or fair
dealing.  *See Gessey*, 135 F. Supp. 3d at 346; *see also Hanaway v. Parkesburg Grp., LP*,
132 A.3d 461, 471 (Pa. Super. Ct. 2015) ("[A] breach of the covenant of good faith and
fair dealing is a breach of contract action, not an independent action for breach of a duty
of good faith.  The implied covenant of good faith and fair dealing attaches to *existing*
contractual obligations; it does not add new contractual duties."  (emphasis added)).
*Second*, Plaintiffs do not—and cannot—plead facts demonstrating Indemnity acted in bad
faith, since (a) Plaintiffs knowingly agreed to the pay the Service Charges to Indemnity;
(b) the Special Services contracts were approved by the Department; (c) Indemnity's
retention of the Service Charges was clearly and repeatedly disclosed to all subscribers;
(d) Indemnity's retention was repeatedly disclosed to the Department; (e) Indemnity's
retention was repeatedly disclosed to the SEC; and (f) the Department regularly examined
Indemnity and Exchange and specifically examined Indemnity's retention of the Service
Charges.  *See supra* at 10–14.  At all relevant times, Indemnity's conduct has been
performed in good faith—and Plaintiffs have stipulated to Indemnity's honesty and
transparency regarding its retention of Service Charges**.**  (See Ex. 2 ¶¶ 148–227.)

**4.      Plaintiffs' Contractual Injury Theory Is Fatally Flawed.**

The crux of the Complaint is that Indemnity allegedly breached the Subscriber's Agreement by retaining the Service Charges and, thus, retained "compensation" in excess of the amount set by the Subscriber's Agreement.   In other words, Indemnity was obligated already to perform the Special Services in order to earn its premium-based compensation; and, thus, had no right to demand additional payments for providing the Special Services.   Accepting this theory, then, what necessarily follows is (a) no Service Charges should have been imposed on subscribers who requested and received the benefit of those services because they were supposedly paying for those services through their premiums; and (b) the Service Charges consequently should be returned directly to those subscribers who paid them.   But, Plaintiffs do not assert that claim, nor do they demand that the Service Charges be returned to the subscribers who paid them.

Plaintiffs affirmatively allege that the Service Charges "belong" not to the subscribers who paid them but to Exchange.   The Complaint charges that "Indemnity has unlawfully diverted hundreds of millions of dollars of ***revenue that belongs to Exchange***."   (Compl. ¶ 67 (emphasis added).)   In support of this narrative, the Complaint contains several sections detailing that "Indemnity unlawfully [took] service charges ***belonging to Exchange***"; that "Indemnity unlawfully [took] additional fees ***belonging to Exchange***"; and "service charges and additional fees are substantial and ***belong to Exchange***."   (Compl. ¶¶ 21–27 (emphasis added).)   But, under Plaintiffs' theory—that subscribers should not have had to pay for the Special Services—the Service Charges would belong to the subscribers, not Exchange.

The damages that Plaintiffs claim are owed to Exchange cannot flow from the payment of Service Charges that Plaintiffs insist subscribers should not have to pay.   Plaintiffs allege that "Indemnity has continued since 1999 to take for itself" the Service Charges "which otherwise

would have been retained by the Exchange for the ultimate benefit of all subscribers."  (Compl. ¶ 76.)  So, either (a) the subscribers should not have paid the Service Charges, and, hence, the subscribers are the ones who deserve the return of those monies; or (b) the subscribers should have paid the Service Charges for the Special Services because the Subscriber's Agreement does not govern and thus does not preclude charging them for the Special Services.  In neither event has Exchange suffered any injury.

### B.    Counts II And IV For Breach Of Fiduciary Duty Should Be Dismissed.

Plaintiffs allege in Count II that Indemnity breached a fiduciary duty to Plaintiffs; and, in Count IV, derivatively allege that Indemnity breached a fiduciary duty to Exchange.  The breach of fiduciary duty claims fail for multiple independent reasons.

*First*, the breach of fiduciary duty claims are based solely on Indemnity's alleged breach of the Subscriber's Agreement.  (*See, e.g.*, Compl. ¶ 129  (alleging that Indemnity "breached [its] fiduciary duties to Plaintiffs and the Class by authorizing, enabling and/or otherwise permitting Indemnity to retain the Service Charges and Additional Fees in addition to a percentage of premiums as prescribed in the Subscriber's Agreement").)  Thus, the breach of fiduciary duty claims necessarily fail for the same reasons that the breach of contract claim fails.  (*See supra* at 22–31.)  And, in any event, the breach of fiduciary duty claims' reliance on Indemnity's alleged breach of the Subscriber's Agreement, without more, fails to state a cognizable claim.  *See Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 644 (3d Cir. 1993) ("Breach of contract, without more, is not a tort."); *Kalumetals, Inc. v. Hitachi Magnetics Corp.*, 21 F. Supp. 2d 510, 518 (W.D. Pa. 1998) ("[A] tort claim may be dismissed if it merely states the same cause of action that is put forth in a related contract claim.").[15]

---

[15]    *Hill v. Best Med. Int'l, Inc.*, No. 07-1709, 2011 WL 5082208, at *31 (W.D. Pa. Oct. 25, 2011) (claim for breach of duty of loyalty barred because complaint identified only the

*Second*, to the extent Plaintiffs purport to rely on fiduciary duties beyond the mere contractual duties imposed by the Subscriber's Agreement, they do not plead what those precise duties are in this context.  For example, it is not clear whether Plaintiffs are contending that Indemnity breached a duty of care, a duty of loyalty, or a duty of disclosure.  What is more, the Complaint contains absolutely no factual allegations to support the supposed breach of any such duty (other than the Complaint's allegations regarding Indemnity purported breach of contractual duties).  Plaintiffs plead neither the particular fiduciary duty they believe applies here, nor the facts that would plausibly demonstrate a breach.

*Finally*, given the facts to which Plaintiffs have stipulated, it is impossible to imagine a plausible breach of fiduciary duty arising from Indemnity's retention of the Service Charges, because (a) Plaintiffs knowingly agreed to the pay the Service Charges to Indemnity; (b) the Special Services contracts were approved by the Department; (c) Indemnity's retention of the Service Charges was clearly and repeatedly disclosed to all subscribers; (d) Indemnity's retention was repeatedly disclosed to the Department; (e) Indemnity's retention of the Service Charges was repeatedly disclosed to the SEC; (f) the Department regularly examined Indemnity and Exchange and specifically examined Indemnity's retention of the Service Charges; and (g) other

---

"breach of the confidentiality provisions of the [parties'] employment agreement"); *AMG Nat'l Trust Bank v. Ries*, No. 06-4337, 2011 WL 6840586, at *5 (E.D. Pa. Dec. 29, 2011) (holding that claim for breach of fiduciary duty was barred because only example of misconduct was behavior forbidden by employment contract, the damages were "inextricably intertwined" with the damages alleged from the employee's breach of contract, and the plaintiff "fail[ed] to identify any duty owed by [defendant] that is not grounded in his contractual obligations"); *Belmont Holdings Corp. v. Unicare Life & Health Ins. Co.*, No. 98-2365, 1999 WL 124389, at *4 (E.D. Pa. Feb. 5, 1999) ("Accordingly, to the extent the relief requested in Belmont's Complaint is based on Unicare's failure to act in good faith under the insurance contract, the court will dismiss the breach of fiduciary duty claim as redundant of Belmont's claim for breach of contract.").

insurers in the industry impose similar charges on similar services in similar amounts.[16]  *See supra* at 10–14.  Moreover, the Department has specifically concluded that Indemnity's retention of the charges is "fair and reasonable" and complied with all applicable insurance laws and regulations.  *See supra* at 25–27 & n.12.  (*See also* Ex. 3 at 85.)

C.  **Count III For Conversion Should Be Dismissed.**

In Pennsylvania, "conversion constitutes 'the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification."  *Andrichyn v. TD Bank, N.A.*, 93 F. Supp. 3d 375, 389 (E.D. Pa. 2015); *see also Schulze v. Legg Mason Wood Walker, Inc.*, 865 F. Supp. 277, 284 (W.D. Pa. 1994) ("That a defendant acted without lawful justification is an element of a prima facie case of conversion, on which a plaintiff bears the burden of proof; it is not an affirmative defense.").

The conversion claim is barred by the gist of the action and economic loss doctrines. Under the gist of the action doctrine, where "the duty allegedly breached is one created by the parties in their contract, that is to say, from a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract, then the claim, no matter how styled, is one for a breach of contract."  *Executive Wings, Inc. v. Dolby*, 131 F. Supp. 3d 404, 415 (W.D. Pa. 2015) (citing *Bruno v. Erie Ins. Co.*, 160 A.3d 48, 68 (Pa. 2014)); *ClubCom, Inc. v. Captive Media, Inc.*, No. 07-1462, 2009 WL 249446, at *9 (W.D. Pa. Jan. 31, 2009) ("The gist of the action doctrine bars tort claims which arise solely from a contract between the parties." (citing cases)).  Similarly, the economic loss doctrine bars plaintiffs "from recovering in tort economic losses to which their entitlement flows only from a contract."

---

[16]       (*See* Ex. 2 ¶¶ 135–37.)

*Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 104 (3d Cir. 2001); *Executive Wings, Inc.*, 131 F. Supp. 3d at 417 (same).

Here, Plaintiffs' claims "sound solely in contract" and are barred by both the gist of the action and economic loss doctrines. *See Executive Wings, Inc.*, 131 F. Supp. 3d at 417. The conversion claim is entirely dependent upon Plaintiffs' breach of contract claim. Specifically, the allegations that Indemnity took the Service Charges "without legal justification" cannot be separated from their contract claims. The alleged absence of legal justification is based on nothing else other than the claim that Indemnity's retention of the Service Charges constituted "additional compensation" and, therefore, breached the Subscriber's Agreement. (*See* Compl. ¶¶ 132–35.) Thus, because Plaintiffs' claim for recovery on their conversion claim "arise[s] solely from a contract" and its "economic loss . . . flows only from a contract," Count III is barred by both the gist of the action and economic loss doctrines. *See Executive Wings, Inc.*, 131 F. Supp. 3d at 417; *ClubCom, Inc*, No. 07-1462, 2009 WL 249446, at *9; *see also Freedom Med., Inc. v. Royal Bank of Canada*, No. 04-5626, 2005 WL 3597709, at *9 (E.D. Pa. Dec. 30, 2005) (conversion claim predicated upon claim that "Plaintiff actually paid a sum of money and then concluded it was not required to do so under the contract" was barred by gist of the action doctrine).[17]

---

[17]   What is more, Plaintiffs' claim for conversion fails since the Service Charges were paid willingly to Indemnity by those subscribers who elected to purchase the Special Services and agreed to pay Indemnity the Service Charges in return. *See supra* at 27–28. *See Andrichyn v. TD Bank, N.A.*, 93 F. Supp. 3d 375, 389 (E.D. Pa. 2015) ("Fatal here is the requirement in both states that the alleged conversion be 'unauthorized' or 'without the owner's consent.' As we have already discussed, the Account Agreement provided TD with the right to assess these fees. When Plaintiffs signed the contract, they consented to this assessment. Accordingly, they cannot state a plausible claim for conversion."); *Al Makaaseb Gen. Trading Co. v. U.S. Steel Int'l, Inc.*, 412 F. Supp. 2d 485, 501 (W.D. Pa. 2006) (dismissing conversion claim because defendant had "legal justification" for interference with plaintiff's property right); *Pioneer Comm. Funding Corp. v. Am. Fin.*

III.    **PLAINTIFFS LACK STANDING TO SUE ON BEHALF OF EXCHANGE.**

In addition to suing for themselves, Plaintiffs also seek to sue on behalf of Exchange. Counts III and IV purport to assert claims against Indemnity derivatively on behalf of Exchange. Under Pennsylvania law, however, individual subscribers lacks standing to sue on behalf of a reciprocal insurance exchange.  The derivative claims in the Complaint must therefore be dismissed.  The motion to dismiss to be filed on behalf of the independent directors of Indemnity addresses this issue at greater length and, to avoid duplication, Indemnity incorporates that discussion and argument by reference here.[18]

## **CONCLUSION**

For the foregoing reasons, Indemnity respectfully requests that this action be dismissed with prejudice.  In accordance with Section 2(c) of this Court's standing procedures, the undersigned hereby certify that they have met and conferred with counsel for Plaintiffs and have made a meaningful effort to reach an agreement regarding this Motion to Dismiss.

---

*Mortg. Corp.*, 855 A.2d 818, 827 (Pa. 2004) ("[A] claim of conversion cannot be sustained in the face of lawful justification on the part of the asserted tortfeasor.").

[18]    Indemnity also incorporates by reference the discussion and arguments to be advanced by all other defendants to the extent they pertain to Indemnity or require dismissal of Plaintiffs' claims asserted against Indemnity.

Dated:  September 23, 2016      Respectfully submitted,


             */s/ Steven B. Feirson*
             Steven B. Feirson (Pa. 21357)
             Michael L. Kichline (Pa. 62293)
             DECHERT LLP
             Cira Centre
             2929 Arch Street
             Philadelphia, PA 19104-2808
             (215) 994-4000

             *Counsel for Defendant Erie Indemnity*
             *Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of September, 2016, I caused a true and correct copy of the foregoing document to be served via the Court's CM/ECF system on to all counsel of record.


Dated:  September 23, 2016

*/s/ Steven Feirson*
Steven B. Feirson
   steven.feirson@dechert.com
Dechert LLP
Cira Center
2929 Arch Street
Philadelphia, PA 19104
Tel:  (215) 994-4000
Fax:  (215) 994-2222

*Attorney for Defendant Erie Indemnity Company*