# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

PATRICIA R. BELTZ, JOSEPH S. SULLIVAN, and
ANITA SULLIVAN, individually and on behalf of all
others similarly situated, and derivatively on behalf
of Nominal Defendant ERIE INSURANCE EXCHANGE,

                    Plaintiffs,

          v.

ERIE INDEMNITY COMPANY, ET AL.,

                    Defendants,

          and

ERIE INSURANCE EXCHANGE,

                Nominal Defendant.

Case No. 1:16-cv-179

Hon. Barbara Rothstein

## PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS OF
## <u>DEFENDANT ERIE INDEMNITY COMPANY</u>

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ..............................................................................................2

I.       HISTORY OF INDEMNITY AND EXCHANGE ...................................................2

          A.      FOUNDING PRINCIPLES ...............................................................2

          B.      TRANSITION OF INDEMNITY AND EXCHANGE AFTER THE
                 PASSING OF H.O. HIRT ...................................................................3

II.      SUBSCRIBER'S AGREEMENT ..........................................................................4

III.     INDEMNITY'S FIDUCIARY DUTIES AS ATTORNEY-IN-FACT TO
         EXCHANGE AND THE SUBSCRIBERS ...................................................5

IV.     INDEMNITY IMPROPERLY RETAINS SERVICE CHARGES BELONGING
         TO EXCHANGE ..............................................................................7

V.       IN ADDITION TO THE SERVICE CHARGES, INDEMNITY IMPROPERLY
         RETAINS ADDITIONAL FEE REVENUE BELONGING TO EXCHANGE .............8

VI.     INDEMNITY AND ITS CONTROLLING SHAREHOLDERS REAP
         SUBSTANTIAL FINANCIAL BENEFITS FROM UNLAWFULLY TAKING
         EXCHANGE'S SERVICE CHARGES AND ADDITIONAL FEES............................9

PROCEDURAL HISTORY...................................................................................................9

ARGUMENT ......................................................................................................................13

I.       STANDARD OF REVIEW ..................................................................................13

II.      PLAINTIFFS PLEAD FACTS SHOWING THE TIMELINESS OF THEIR
         CLAIMS ..............................................................................................14

          A.      PLAINTIFFS PLEAD FACTS SHOWING THE TIMELINESS OF THE
                 BREACH OF CONTRACT CLAIMS (COUNT I)............................................15

                 1.      Plaintiffs' Claims for Indemnity's Breaches of the Subscriber's
                       Agreements Occurring Within Four Years of the Filing of the
                       Complaint are Timely ............................................................15

                 2.      Plaintiffs' Initial State-Court Complaint Tolled the Statute of
                       Limitations for Indemnity's Breaches of the Subscriber's
                       Agreements Occurring Within Four Years of the Filing of that
                       Complaint............................................................................15

i

3.      Plaintiffs' Claims for Indemnity's Breaches of the Subscriber's Agreements Dating Back to 1997 are Timely Pursuant to the Continuing Contract Doctrine..................................................16

B.    PLAINTIFFS PLEAD FACTS SHOWING THE TIMELINESS OF THE BREACH OF FIDUCIARY DUTY CLAIMS DATING BACK TO 1997 (COUNTS II AND IV) .......................................................................18

1.      Indemnity's Breaches of Fiduciary Duty Occurring Two Years Prior to the Instant Complaint are Timely ...............................................18

2.      Plaintiffs' Initial State Court Complaint Tolled the Statute of Limitations for Indemnity's Breaches of Fiduciary Duty Arising Within Two Years of the Filing of the State Court Complaint...............19

3.      Plaintiffs' Claims for Indemnity's Breaches of Fiduciary Duty Dating Back to 1997 are Timely Pursuant to the Continuing Contract Doctrine..................................................................................19

C.    PLAINTIFFS' PLEAD TIMELY CONVERSION CLAIMS DATING BACK TO 1997 (COUNT III)...........................................................................20

III.   PLAINTIFFS STATE PLAUSIBLE CLAIMS FOR RELIEF AGAINST INDEMNITY ...........................................................................................................23

A.    PLAINTIFF STATE A PLAUSIBLE CLAIM FOR BREACH OF CONTRACT (COUNT I).......................................................................................24

1.      Plaintiffs Allegations Give Rise to a Reasonable Inference That Indemnity Breached the Subscriber's Agreement ...................................24

2.      Miscellaneous Policy Documents Cited by Indemnity Do Not Authorize Indemnity to Retain the Service Charges and Additional Fees .....................................................................................................31

3.      Plaintiffs Set Forth Allegations Giving Rise to a Reasonable Inference That the Subscribers were Damaged by Indemnity's Breach of the Subscriber's Agreement ...................................................33

B.    PLAINTIFFS STATE PLAUSIBLE CLAIMS FOR BREACHES OF FIDUCIARY DUTY (COUNTS II AND IV) ......................................................34

C.    PLAINTIFFS STATE A PLAUSIBLE CLAIM FOR CONVERSION (COUNT III) .........................................................................................................38

CONCLUSION.............................................................................................................39

ii

## <u>INTRODUCTION</u>

Since Erie Indemnity Company ("Indemnity") and Erie Insurance Exchange ("Exchange") were founded over ninety (90) years ago, Indemnity has served as the attorney-in-fact for Exchange.  In this role, Indemnity is a fiduciary to Exchange and its policyholders ("Subscribers") and trusted with the management of the business and affairs of Exchange.  Upon becoming a policyholder of Exchange, every Subscriber executes an identical Subscriber's Agreement, which, among other things, provides that as compensation for the services provided by Indemnity to Exchange, Indemnity may retain up to 25% of all premiums written or assumed by Exchange.

Indemnity long adhered to the terms of the Subscriber's Agreement, and as Exchange grew, Indemnity likewise reaped the benefits of increased management fees resulting from increased premiums.  Unfortunately, with the passing of the founder of Indemnity and Exchange, and with Indemnity becoming a publicly traded company listed on the NASDAQ Stock Market, Indemnity has become a company sullied by greed.  No longer content to adhere to the terms of the Subscriber's Agreement, or to put the interests of the Subscriber's above all else, Indemnity has been taking hundreds of millions of dollars in service charges and fees that belong to Exchange and are supposed to be used for the benefit of all Subscribers.

Plaintiffs bring this action on behalf of all Subscribers, and derivatively on behalf of the Exchange, to recoup what Indemnity has wrongfully taken.  Indemnity offers a contrived, post-hoc, interpretation of the Subscriber's Agreement to try to justify its actions and moves to dismiss all of Plaintiffs' claims.  For the reasons set forth below, Indemnity's arguments for dismissal should be rejected and Plaintiffs should be permitted to proceed with all of their claims.

## FACTUAL BACKGROUND[1]

## I.   HISTORY OF INDEMNITY AND EXCHANGE

### A.   FOUNDING PRINCIPLES

H.O. Hirt established Indemnity and Exchange in 1925.  *See* ECF No. 1, Plaintiffs' Verified Derivative and Class Action Complaint ("Compl.") ¶ 1.  He established Exchange to operate under the notion of "simple common sense, mixed with just plain decency."  *See* Compl. ¶ 43 (citing *History of Erie Insurance*, Erie Insurance, https://www.erieinsurance.com/about-us/companyprofile/history (last visited July 7, 2016)). Indeed, H.O. Hirt founded Exchange with the "guiding principle" of "[d]o unto others as you would have them do unto you" and with the "founding purpose" being to provide "[p]olicyholders with as near perfect protection, as near perfect service as is humanly possible and to do so *at the lowest possible cost*."[2]

In line with the above values, H.O. Hirt structured Exchange not as a conventional stock insurance company, but as a subscriber-owned reciprocal insurer wherein member-policyholders ("Subscribers") agreed to pool risk by acknowledging a reciprocal agreement of indemnity.  *See* Compl. ¶¶ 2, 43.  This kind of structure is "of interest to individuals wanting to participate in a *not-for-profit insurance environment* focused on the policyholder."  *See id.* at ¶ 2 (quoting Alex

---

[1] Plaintiffs do not object to Indemnity's reliance on the Joint Statement of Facts ("JSOF") stipulated to by the parties during the proceedings before the Pennsylvania Insurance Department ("Department").  *See* ECF No. 34-2, Joint Statement of Undisputed Facts ("JSOF"), *Erie Ins. Exch. v. Erie Indem. Co.*, NO. MS14-03-003 (Pa. Ins. Comm'r Sept. 3, 2014).  The Declaratory Opinion and Order issued by the Insurance Commissioner in connection with those proceedings is not precedential or persuasive authority, however, because the Commonwealth Court of Pennsylvania vacated the Insurance Commissioner's Opinion and Order in its entirety.

[2] *See* Compl. ¶¶ 43-44 (citing *History of Erie Insurance*, Erie Insurance, https://www.erieinsurance.com/about-us/companyprofile/history (last visited July 7, 2016) and *Above All Together: Erie Insurance Group Historic Timeline 1925-2015* at 3, Erie Insurance, https://www.erieinsurance.com/-/media/files/timeline.pdf (last visited July 7, 2016) (emphasis added)).

Burke, *What Is a Reciprocal Insurance Company?*, ZACKS, http://finance.zacks.com/reciprocal-insurance-company-7135.html (last visited July 7, 2016)(emphasis added)).

B.  TRANSITION OF INDEMNITY AND EXCHANGE AFTER THE PASSING OF H.O. HIRT

H.O. Hirt served as President and Chief Executive Officer of Indemnity until 1976 and, thereafter, remained on its Board until 1980.  Compl. ¶ 44.  When H.O. Hirt passed away in 1982, his controlling interest in Indemnity was distributed to his children F. William Hirt ("F.W. Hirt") and Susan Hirt Hagen pursuant to the H.O. Trusts he had created.  *Id.*  In the Trust agreements, H.O. Hirt reminded his son and daughter that Exchange "was organized and exists primarily *for the benefit of its subscribers* or policyholders and that therefore the interests of the people who put their trust in the Exchange for the protection of their personal business affairs must come first."  *Id.*  (citing *In re Trust of Hirt*, 832 A.2d at 441 (citing to Subparagraph 4.03(B) of the Hirt Trust Agreement) (emphasis added))).

Indemnity was structured with two classes of common stock: Class A and Class B, the latter of which are the only voting shares.  Compl. ¶ 45.  Upon the death of H.O. Hirt, 50% of all Class A shares and 76.22% of the Class B shares passed to F.W. Hirt and Susan Hirt Hagen by way of the two H.O. Trusts.  *Id.*  At that point, Indemnity stock was not publicly traded.  *Id.*

In May 1994, Indemnity announced an initial public offering ("Indemnity's IPO"), filed a Form 10 with the Securities and Exchange Commission ("SEC"), and made shares of stock available for sale to the public.  Compl. ¶ 46 (citing *Above All Together: Erie Insurance Group Historic Timeline 1925-2015* at p. 14, Erie Insurance, https://www.erieinsurance.com/-/media/files/timeline.pdf (last visited July 7, 2016)).  Prior to such time, and consistent with the

ideals of a reciprocal insurance exchange, Exchange issued substantial dividends to Subscribers[3]
Compl. ¶ 47.   Notwithstanding the exponential growth of Exchange's premiums, which
amounted to nearly $6 billion in 2015, the Subscribers have not received any such dividends in
the wake of Indemnity's IPO.  *See id.*; *see also* JSOF ¶ 49.  Instead, Indemnity's focus has been
on its shareholders (namely, the insiders who control the company), rather than Exchange's
Subscribers, and since 1997, Indemnity and the other Defendants have funneled *more than $1.6
billion* from Exchange in the form of dividends to Indemnity's Class A and Class B shareholders.
Compl. ¶ 47.

## II.    SUBSCRIBER'S AGREEMENT

As a reciprocal insurer, Exchange is an unincorporated association without a board of
directors or employees of its own.  *See* Compl. ¶ 2.  For this reason, all Subscribers, including all
of the Plaintiffs, are required to execute a non-negotiable "Subscriber's Agreement" appointing
Indemnity as their attorney-in-fact.  *See* ECF No. 1-1 (a sample Subscriber's Agreement attached
as Exhibit A to Plaintiffs' Complaint) ("Subscriber's Agreement"); *see also* Compl. ¶¶ 2, 52.  As
Defendant acknowledges, each of the Subscriber's Agreements executed by the more than two
million Subscribers belonging to the class constitute "identical contract[s]."[4]  *See* ECF No. 34,
Memorandum in Support of Motion of Erie Indemnity Company to Dismiss the Complaint,
("Indemnity Mem.") at 7.  Defendant also concedes that the Subscriber's Agreements "executed
by policyholders are the sole agreements that govern Indemnity's duties to Exchange as attorney-

---

[3] In 1975, for instance, Exchange wrote $108 million in premiums and the Subscribers received
$10 million in dividends.  Compl. ¶ 47 (citing *Above All Together: Erie Insurance Group
Historic Timeline 1925-2015* at p. 11, Erie Insurance, https://www.erieinsurance.com/-
/media/files/timeline.pdf (last visited July 7, 2016)).

[4] "While the Subscriber's Agreement has been amended on occasion over time, the pertinent
language of the Subscriber's Agreement has remained fundamentally unchanged since 1975."
JSOF ¶ 63; *see* Compl. ¶ 52.

in-fact and the corresponding compensation provided to Indemnity for performing those duties." JSOF ¶ 62; *see* Compl. ¶ 57.  Likewise, Defendant admits that the "Subscriber's Agreement does not contain any express provision for policyholders to terminate Indemnity as attorney-in-fact." JSOF ¶ 61; *see* Subscriber's Agreement.

The Subscriber's Agreement provides for the appointment of Indemnity as "Attorney-in-Fact with the power to," among other things, "issue, change, nonrenew or cancel policies . . . collect premiums . . . [and] manage and conduct the business and affairs of [Exchange]."  *See id.* "[A]s compensation" for Indemnity, among other things, "becoming and acting as Attorney-as-Fact . . . managing the business and affairs of [Exchange] . . . paying general administrative expenses, including sales commissions, salaries and . . . supplies and data processing . . . [Indemnity] may retain up to 25% of all premiums written or assumed by [Exchange]."  *See id.* The Subscriber's Agreement states further that "this Agreement, including the power of attorney, shall have application to all insurance policies for which you apply at [Exchange], including changes in any of your coverages."  *See id.*

In all but six years since 1997 (and every year since 2007), Indemnity has retained the maximum percentage amount allowed by the Subscriber's Agreement: 25% of all premiums written or assumed by Exchange ("Management Fees").  Compl. ¶ 59.

## III.   INDEMNITY'S FIDUCIARY DUTIES AS ATTORNEY-IN-FACT TO EXCHANGE AND THE SUBSCRIBERS

Beyond the contractual obligations prescribed by the Subscriber's Agreement, Indemnity, acting through its Board, maintains a stand-alone role as a fiduciary to Exchange and the Subscribers.  *See* Compl. ¶¶ 3, 53, 60-61.  Indemnity's fiduciary obligations are memorialized in various corporate documents as well as in Indemnity's filings with the SEC.  *See id.* ¶ 61.  For example, in 2007, Indemnity adopted Corporate Governance Guidelines to "set forth a common

set of expectations as to how the Board should perform its functions."  Compl. ¶ 63 (citing

Indemnity *Corporate Governance Guidelines*: https://www.erieinsurance.com/aboutus/investor/

governance).   The Guidelines set forth the contours of the fiduciary relationship between

Indemnity and Exchange and its Subscribers:

> In discharging their duties, the Directors must also be mindful of the fact that
> [Indemnity] is appointed to act as the Attorney-in-Fact to [Exchange] . . . by the
> policyholders of the Exchange under the terms of the Subscriber's Agreement
> between each policyholder and [Indemnity] that provides generally for the
> relationship between policyholders and [Indemnity] . . . Directors should treat this
> responsibility of [Indemnity] as one that is fiduciary in nature and consistent with
> each Director's Acceptance of Trust, which recognizes the Director's fiduciary
> relationship to [Indemnity] in its own right and as Attorney-in-Fact for the
> Subscribers of [Exchange].   Consequently, to satisfy the obligations of
> [Indemnity], the Directors should cause [Indemnity] to act in a manner they
> reasonably believe is in the best interests of the Exchange and its policyholders,
> while also satisfying their obligations under applicable law to act in a manner they
> reasonably believe to be in the best interests of [Indemnity].

Compl.    ¶    63    (citing    Indemnity    *Corporate    Governance    Guidelines*:

https://www.erieinsurance.com/aboutus/investor/governance).   Likewise, Acceptances of Trust

executed by each of the Directors until at least 2006 evidence the Directors' role as Attorneys-in-

Fact for the Subscribers and, in doing so, note the role of Indemnity in "acting as Attorney-in-

Fact for the Subscribers at [Exchange]."   *See* ECF No. 1-2 (a sample Acceptance of Trust

attached as Exhibit B to Plaintiffs' Complaint) ("Acceptance of Trust").

Indemnity's filings with the SEC also confirm the fiduciary duties owed to Exchange and

the Subscribers.  For example, Indemnity admits:

- its "primary purpose is to manage the affairs at the Exchange for the
  benefit of the policyholders" *see* Annual Report on Form 10-K filed
  February 25, 2016.  Declaration of Peter A. Muhic ("Muhic Decl."), Ex.
  A. ("Indemnity's 2015 10-K"); *see also* Compl. ¶ 65;

- "Indemnity has the power to direct the activities of the Exchange that most
  significantly impact the Exchange's economic performance by acting as
  the common attorney-in-fact and decision maker for the subscribers

(policyholders) at the Exchange" *see* Quarterly Reports on Form 10-Q filed October 29, 2015, Muhic Decl., Ex. B ("Indemnity's 2015 Q3 10-Q").; *see also* Compl. ¶ 65.

Indemnity's corporate documents and SEC filings demonstrate not only the existence of Indemnity's fiduciary duties to Exchange and its Subscribers, but also confirm Indemnity's understanding of its duties.

## IV.   INDEMNITY IMPROPERLY RETAINS SERVICE CHARGES BELONGING TO EXCHANGE

For more than forty (40) years, Subscribers have been allowed to pay premiums for their insurance policies in multiple installments rather than in a lump sum.  Compl. ¶ 68.  In certain instances, when a Subscriber elects to pay in installments, a service charge is added to the amount owed ("Service Charges").  *Id.*  Up until 1997, all Service Charge revenue remained with Exchange to be used for the ultimate benefit of the Subscribers.  Compl. ¶ 70.  Indeed, when Service Charges are paid, the funds are deposited into an account belonging to Exchange. Compl. ¶ 69.  But, beginning September 1, 1997 (*i.e.*, just a few years after Indemnity became a publicly traded company listed on NASDAQ), Indemnity started taking a substantial portion of the Service Charges as additional compensation for the services it provided to Exchange and the Subscribers as their Attorney-in-Fact.  Compl. ¶¶ 71-72.  Just two years later, in 1999, Indemnity began taking *all* of the Service Charge revenue from Exchange.  *See* Compl. ¶ 74.

Indemnity is not permitted under the terms of the Subscriber's Agreement to retain the Service Charges over and above the premium based compensation it already receives.  *See* Subscriber's Agreement; *see also* Compl. ¶¶ 72, 74.  Nevertheless, Indemnity, through its Board, has continually approved the taking of that Service Charge revenue from Exchange, and it has done so without ever obtaining a fairness opinion or other opinion from an independent person, expert, or entity to protect Exchange's interest in the Service Charges.  *See* JSOF ¶ 89-90; *see*

*also* Compl. ¶¶ 73-75.  Indemnity has continued each year to take for itself all of the Service Charges that otherwise would have been retained by Exchange for the ultimate benefit of all Subscribers.  Compl. ¶ 76.

## V.   IN ADDITION TO THE SERVICE CHARGES, INDEMNITY IMPROPERLY RETAINS ADDITIONAL FEE REVENUE BELONGING TO EXCHANGE

Though Defendant largely ignores this issue in its Memorandum, beginning in or around 2008, in addition to the Service Charge revenue, Indemnity began taking all of the revenue generated by Exchange in the form of additional fees paid by Subscribers for:  checks or other payments returned unpaid; the issuing of cancellation notices due to non-payment of a policy; and reinstatements of policies following a lapse in coverage after non-payment cancellations (collectively "Additional Fees").  Compl. ¶ 77.  As with the Service Charges, when Additional Fees are paid by Subscribers, the funds are deposited into an account belonging to Exchange. Compl. ¶ 78.  But, beginning with the institution of the Additional Fees in 2008, and each year since then, Indemnity has taken from Exchange's accounts all of the Additional Fees paid by the Subscribers.  *Id.* ¶ 78.  And, as with the Service Charges, the Subscriber's Agreement does not authorize Indemnity to take any of these Additional Fees as compensation on top of the up to 25% of premiums it already takes.  *See* Subscriber's Agreement; *see also* Compl. ¶ 79.  If Indemnity did not take the Additional Fees, that revenue would be available for the ultimate benefit of Exchange and the Subscribers.  *See* Compl. ¶ 80.  As with the Service Charges, since 2008, the Directors have authorized and/or tacitly approved the taking of the Additional Fees each year without ever obtaining a fairness opinion or other opinion from an independent person, expert, or entity intended to protect Exchange's interest in the Additional Fees.  *Id.* ¶ 81.

VI.   **INDEMNITY   AND   ITS   CONTROLLING   SHAREHOLDERS   REAP SUBSTANTIAL FINANCIAL BENEFITS FROM UNLAWFULLY TAKING EXCHANGE'S SERVICE CHARGES AND ADDITIONAL FEES**

From 1997 through the present, Indemnity has performed no services for Exchange other than those authorized by the Subscriber's Agreement.  Compl. ¶ 82.  Yet, in the same timeframe, Indemnity has taken from Exchange more than $400 million in revenue that it was not authorized to receive under the Subscriber's Agreement and that otherwise would have gone to the benefit of Exchange and the Subscribers.  *See id.* ¶¶ 83, 85-86.  This unlawful compensation is in addition to the significant percentage of premiums taken by Indemnity as management fees between 1997 and 2015, which amount to nearly $14 billion.  *See id.* ¶¶ 84-85.

All of the Service Charges, Additional Fees, and Management Fees taken by Indemnity from 1997 through the present have allowed Indemnity's stockholders, especially the Board insiders who are beneficiaries of the H.O. Trusts, to reap considerable profits through dividends paid by Indemnity.  *See id.* ¶ 86.  During the relevant timeframe, the insider beneficiaries (who own and/or control nearly all of the Class B voting shares and approximately 47.7% of the outstanding Class A shares of Indemnity, *see id* ¶¶ 45, 49-50, 86) have reaped hundreds of millions of dollars in dividends[5] funded in part by Service Charges and Additional Fee revenue which should have gone to the benefit of Exchange and its Policyholders.  *See id.* ¶ 86.

## PROCEDURAL HISTORY

Plaintiffs filed suit against Indemnity in the Pennsylvania Court of Common Pleas, Fayette County, on August 1, 2012.  *See Erie Ins. Exch, v. Erie Indem. Co.*, No. 1712 of 2012, G.D. (Pa. Ct. Cmmn. Pls., Fayette Cty) ("State Court Action").  In that action, Plaintiffs assert

---

[5] In addition to regular dividends, in 2012, the Board declared a special one-time cash dividend of $2.00 on each Class A share and $300.00 on each Class B share—totaling $95 million. Compl. ¶ 88.

derivative claims on behalf of Exchange against Indemnity for breaches of contract and fiduciary duty and seek equitable relief premised on the misconduct laid out above. *See id.*

Indemnity attempted to remove the State Court Action to the United States District Court for the Western District of Pennsylvania pursuant to the Class Action Fairness Act, 28 U.S.C. § 1711 *et seq*. *See Erie Ins. Exch., et al. v. Erie Indem. Co.,* No. 12-cv-01205, ECF No. 1 (W.D. Pa. Aug. 22, 2012). Indemnity's removal was rejected, *see id.* at ECF No. 26, and the remand to state court affirmed on appeal. *Erie Ins. Exch. v. Erie Indem. Co.,* 722 F.3d 154 (3d Cir. 2013).

In the midst of Indemnity's appeal of the District Court's remand order, on February 16, 2013, Plaintiffs filed a complaint serving as the genesis of this action in the Western District of Pennsylvania. *See generally Erie Insurance Exchange, et al. v. Stover, et al.*, No. 13-cv-37, ECF No. 1 (W.D. Pa.). Plaintiffs initially alleged class and derivative claims for breach of contract and breach of fiduciary duty against certain Indemnity Directors premised on the same facts asserted in the State Court Action. *See id.* Plaintiffs twice amended their complaint, *see generally id.* at ECF Nos. 32 and 49, and Indemnity intervened as a defendant, *see id.* at ECF No. 85 at p. 6.

Meanwhile, on remand to the Court of Common Pleas in the parallel State Court Action, Defendants filed preliminary objections arguing, among other things, for referral of the matter to the Department on the basis of primary jurisdiction. Indemnity argued that Plaintiffs' claims were nothing more than alleged violations of the Pennsylvania Insurance Holding Companies Act ("IHCA"), 40 Pa. Stat. §§ 991.1401, *et seq.*, and that intercompany transactions between affiliated insurance concerns may be reviewed only by the Department. The Court of Common Pleas granted this preliminary objection on December 19, 2013 and referred the matter to the Department. *See* ECF No. 41-5, Opinion and Order dated December 19, 2013. Following

referral by the state court, on December 19, 2013, the Western District of Pennsylvania likewise referred the federal case to the Department on the basis of primary jurisdiction and dismissed the matter without prejudice. *Erie Ins. Exch., et al. v. Stover, et al.*, No. 13-cv-37, ECF No. 85 at p. 6 (W.D. Pa. Feb. 10, 2014).

On January 6, 2015, the Department held a hearing on a stipulated paper record. *See generally* JSOF. Shortly thereafter, on April 29, 2015, the Acting Insurance Commissioner of the Commonwealth of Pennsylvania issued a Declaratory Opinion and Order holding that Indemnity's retention of revenue from Service Charges and Additional Fees did not violate the IHCA, but she went further and opined that the conduct did not constitute a breach of the Subscriber's Agreement or Indemnity's fiduciary duty to Plaintiffs. *See generally* ECF No. 41-7, Declaratory Opinion and Order.

Plaintiffs appealed the Department's ruling to the Commonwealth Court of Pennsylvania. After oral argument, on January 27, 2016, the Commonwealth Court issued a precedential opinion which found that the Department had no jurisdiction to hear the dispute, rejected the substantive conclusions reached by the Commissioner, vacated the Commissioner's decision in its entirety and remanded the matter back to the Court of Common Pleas for further proceedings.[6] *Erie Ins. Exch. ex rel. Sullivan v. Pa. Ins. Dep't*, 133 A.3d 102, 103 (Pa. Commw. Ct. 2016), *appeal denied*, (Pa. Aug. 10, 2016).

The Commonwealth Court recognized that the "focal point of the alleged impropriety in the breach of contract claims is the Subscriber's Agreement, which Petitioners contend limits the amount of compensation that Indemnity may receive for its attorney-in-fact services [and] . . . [t]he focal point of the … breach of fiduciary duty and unjust enrichment claims is Petitioners'

---

[6] On September 12, 2016, Plaintiffs moved for a stay of the state Court action. *See* Muhic Decl. ¶ 6.

theory that Indemnity had a duty to act in Exchange's best interest and not to maximize Indemnity's own profit." *See id.* at 112.   In light of this, the Commonwealth Court held, Plaintiffs' "allegations of impropriety relating to the Transactions do not fall within the Department's jurisdiction and are not so complex that they require the special competency of the Department." *See id.* at 113 (citing *Elkin v. The Bell Tel. Co. of Pa.*, 420 A.2d 371, 377 (Pa. 1980)).   The Commonwealth Court continued, "whether Indemnity breached the Compensation Provision of the Subscriber's Agreement is not a complex matter that requires the special expertise of the Department . . . [i]t is a matter of contract interpretation and fact finding, both of which are matters that fall within the competence of our trial courts." *See id.* at 112.   Further, regardless of whether any intercompany transactions were fair and reasonable under the IHCA, Indemnity, and the Director defendants may still be liable for breaching the terms of the Subscriber's Agreement or for breach of their fiduciary duties or for unjustly enriching themselves at the expense of Plaintiffs.  *See id.*

Thereafter, Indemnity filed with the Pennsylvania Supreme Court a Petition for Allowance of Appeal from the Order of the Commonwealth Court.  The Pennsylvania Supreme Court denied this Petition on August 10, 2016.  *See* Order Denying Petition for Allowance of Appeal (Pa. Aug, 10, 2016).  The State Court Action has again been remanded to the Court of Common Pleas, where Indemnity's amended preliminary objections are currently pending.

During Indemnity's appeal to the Pennsylvania Supreme Court, and in light of Defendant's longstanding argument that Plaintiffs' claims belong in federal court and should include claims on behalf of a class of policyholders of Exchange, Plaintiffs aggregated all of their claims in the Western District of Pennsylvania on July 8, 2016 by way of the Complaint at bar.

The Complaint includes four causes of action directed at Indemnity.  Count I contains a claim for breach of contract and the implied covenant of good faith and fair dealing premised on Indemnity's wrongful taking of compensation in the form of Service Charges and Additional Fees above and beyond the premium-based compensation provided for in the Subscriber's Agreement.  Compl. ¶¶ 114-21.  Counts II and IV include claims for Indemnity's breaches of its fiduciary duties as Attorney-in-Fact for Exchange and its Subscribers—namely, in enriching itself at the expense of Exchange and all policyholders by retaining Service Charges and Additional Fees that otherwise would have been available for the ultimate benefit of Plaintiffs. *See id.* ¶¶ 122-31, 136-40.  Lastly, in Count III, Plaintiffs assert a claim for conversion based on Indemnity's unlawful taking of the Service Charges and Additional Fees at issue.  *See id.* ¶¶ 132-35.

## ARGUMENT

### I.    STANDARD OF REVIEW

A complaint need only assert "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  To overcome a motion to dismiss made pursuant to Rule 12(b)(6), plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  In making this assessment, courts must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the favor of plaintiffs. *See Twombly*, 550 U.S. at 555-56.

Motions to dismiss based on statute-of-limitations defenses can only prevail where "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations."  *See Robinson v. Johnson,* 313 F.3d 128, 135 (3d Cir. 2002) (quoting *Hanna v. U.S. Veterans' Admin. Hosp.,* 514 F.2d 1092, 1094 (3d Cir. 1975)).  "If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)."  *Robinson,* 313 F.3d at 135 (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978)).

## II.   PLAINTIFFS PLEAD FACTS SHOWING THE TIMELINESS OF THEIR CLAIMS

Indemnity mischaracterizes Plaintiffs' breach of contract claims to be based on single decisions by Indemnity in 1997, 1999 and 2008 to take the Service Charges and Additional Fees in violation of the Subscriber's Agreement.  Based on that mischaracterization, Indemnity contends that each of Plaintiffs' causes of action is untimely.  *See* Indemnity Mem. at 14-16. Further, Indemnity argues, Plaintiffs fail to plead any exception to the running of the statute of limitations.  *See id.* at 17-22.  As to this latter point, Indemnity focuses specifically on Plaintiffs' purported failure to plead facts warranting application of the discovery rule or continuing violation doctrine.  *See id.* at 17-20.  Indemnity, however, completely ignores the fact that not only does it commit a separate breach of the Subscriber's Agreement each and every year when it takes more compensation than it is allowed under the agreement (thus, making timely any claim for breach of contract brought within four years of the last breach), but it also fails to address the *continuing contract* doctrine, which allows Plaintiffs to recover not just for the last four years of breaches, but back to when the breaches first began and have continued since. Indemnity likewise mischaracterizes Plaintiffs' contentions regarding Indemnity's renewed and continuing breaches of its fiduciary duties every year.  Indeed, Indemnity reserves its most

14

thorough attack for a straw man: Plaintiffs' failure to plead the discovery rule, a doctrine on which Plaintiffs do not, and need not, rely.

### A.   PLAINTIFFS PLEAD FACTS SHOWING THE TIMELINESS OF THE BREACH OF CONTRACT CLAIMS (COUNT I)

#### 1.   Plaintiffs' Claims for Indemnity's Breaches of the Subscriber's Agreements Occurring Within Four Years of the Filing of the Complaint are Timely

In its Memorandum, Indemnity acknowledges that the statute of limitations for a cause of action sounding in breach of contract is four years.  *See* Indemnity Mem. at 15.  Here, Plaintiffs have pleaded that Indemnity is currently breaching the Subscriber's Agreement and has done so every year dating back to 1997. *See, e.g.*, Compl. ¶¶ 67, 75, 79, 81, 85, 116, 117.  Thus, prior to any consideration of tolling or the continuing contract doctrine, this Court should find at a minimum that Plaintiffs' contract claims arising from Indemnity's breach of the terms of the Subscriber's Agreement occurring on or after July 8, 2012 (four years before Plaintiffs filed the Complaint at bar), are undeniably timely.

#### 2.   Plaintiffs' Initial State-Court Complaint Tolled the Statute of Limitations for Indemnity's Breaches of the Subscriber's Agreements Occurring Within Four Years of the Filing of that Complaint

Plaintiffs' contract claims involving breaches occurring within four years of the filing of the initial State Court Complaint, on August 1, 2012, in the still-pending State Court Action are timely.  That complaint tolled the statute of limitations applicable to the substantively identical contract claims asserted there and here, and as a result, preserved Plaintiffs' right to pursue same in this case.[7]  *See Holmes v. Strawbridge & Clothier, Inc.*, No. 94-cv-1999, 1994 WL 649156, at *2-3 (E.D. Pa. Nov. 16, 1994) (ruling that complaint filed in state court tolled similar claims later

---

[7] Further tolling of the statute of limitations for the contract claims arises from the Plaintiffs' filing of their initial complaint in federal court on February 6, 2013. *Erie Ins. Exch., et al. v. Stover, et al.*, No. 13-cv-37, ECF No. 1 (W.D. Pa. Feb. 6, 2013).

brought in federal court action because state court claims were timely and still pending when plaintiff filed the subsequent federal lawsuit); *see also Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353 (1983) (holding that a complaint triggers the application of *American Pipe* tolling where it notifies defendants of the substantive claims being brought against them as well as the number and generic identities of the potential plaintiffs who may participate in any eventual judgment); *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) ("the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.").

> **3.** **Plaintiffs' Claims for Indemnity's Breaches of the Subscriber's Agreements Dating Back to 1997 are Timely Pursuant to the Continuing Contract Doctrine**

Indemnity argues that Plaintiffs' claims for Indemnity's breaches of the Subscriber's Agreements are untimely because "[c]ourts have consistently affirmed that breaches of contract, even if they have lasting effects, do not constitute continuing violations." Indemnity Mem. at 18-19. But this is just another red herring, as Plaintiffs do not rely on the *continuing violation* doctrine to capture within their contract claims Indemnity's breaches extending back to 1997; rather, Plaintiffs rely on the *continuing contract* doctrine. Where the subject contract is one for services with no definitive termination date, like the Subscriber's Agreement, this distinction is an important one.[8]

In Pennsylvania, "[i]f services are rendered under an agreement which does not fix any certain time for payment or for the termination of the services, the contract will be treated as continuous, and ***the statute of limitations does not begin to run until the termination of the***

---

[8] None of the cases Defendant cites in their misplaced discussion of the continuing violation doctrine includes contracts for services without a fixed termination date. *See* Indemnity Mem. at 22-23.

*contractual relationship* between the parties." *Thorpe v. Schoenbrun*, 195 A.2d 870, 872 (Pa.

Super. Ct. 1963) (emphasis added, citation omitted); *see Jodek Charitable Trust, R.A. v. Vertical

Net, Inc.*, 412 F. Supp. 2d 469, 475-77 & n. 12 (E.D. Pa. 2006) (holding that, under Pennsylvania

law, the statute of limitations runs on a continuing contract at the time the contractual

relationship terminates instead of the time of the breach); *Crispo v. Crispo*, 909 A.2d 308, 315

(Pa. Super. Ct. 2006) ("[I]n the case of continuing contracts  . . . where the duties of the parties

are ongoing, the statute of limitations generally does not run.") (quotation omitted); *see also* 31

WILLISTON ON CONTRACTS § 79:21 (4th ed. 2015) ("It is often said that the contract under

consideration was a continuing one, in support of decisions holding that the statutory period does

not begin to run until the time when the final performance was due under the contract.").

 "The question of whether a contract is continuing hinges on whether the contract fixes a

certain time for payment or the termination of services." *GAI Consultants, Inc. v. Homestead

Borough*, 120 A.3d 417, 424 (Pa. Cmwlth. 2015) (citing *Thorpe*, 195 A.2d at 872).   The

Pennsylvania Superior Court, in *Thorpe*, elaborated further on this analysis:

> The test of continuity, so as to take the case out of the operation of the statute of
> limitations, is to be determined by the answer to the question whether the services
> were performed under one continuous contract, whether express or implied, with
> no definite time fixed for payment, or were rendered under several separate
> contracts.

*Thorpe*, 195 A.2d at 872 (quotation omitted); *see also K.A.R. v. T.G.L.*, 107 A.3d 770, 775-76

(Pa. Super. Ct. 2014).   Generally, the concept of a continuing contract most often arises within

the context of professional service agreements.   *See GAI Consultants*, 120 A.3d at 425; *Thorpe*,

195 A.2d at 871-74.

 Defendant acknowledges that each of the Subscriber's Agreements executed by the more

than two million class members who have purchased Exchange policies between 1997 and the

present are "identical contract[s]," *see* Indemnity Mem. at 7, constituting the "sole agreements that govern Indemnity's duties to Exchange as attorney-in-fact and the corresponding compensation provided to Indemnity for performing those duties." *See* JSOF ¶ 62; *see also* Compl. ¶ 57. The Subscriber's Agreements, Defendant also admits, do "not contain any express provision for policyholders to terminate Indemnity as attorney-in-fact," *see* JSOF ¶ 61, nor do they fix a definitive time for payment. *See* Subscriber's Agreement. The Subscriber's Agreement must therefore be treated as a single continuous contract, and the statute of limitations for breach of that continuous contract does not run until the contract is terminated. The Subscriber's Agreement continues to govern Indemnity's relationship with Plaintiffs to this day, and therefore the statute of limitations on Plaintiffs' claims for Indemnity's breach of the Subscriber's Agreement has not run. Consequently, all of Plaintiffs' breach of contract claims extending back to 1997 are timely.

> **B.**    **PLAINTIFFS PLEAD FACTS SHOWING THE TIMELINESS OF THE BREACH OF FIDUCIARY DUTY CLAIMS DATING BACK TO 1997 (COUNTS II AND IV)**
>
> **1.**    **Indemnity's Breaches of Fiduciary Duty Occurring Two Years Prior to the Filing of the Instant Complaint are Timely**

Indemnity correctly notes that the statute of limitations for Plaintiffs' breach of fiduciary duty claims is two years. *See* Indemnity Mem. at 16. Here, Plaintiffs have pleaded that Indemnity is currently breaching its fiduciary duties and has done so every year dating back to 1997. *See, e.g.*, Compl. ¶¶ 67, 75, 76, 81, 85, 127, 129. Thus, prior to any consideration of tolling, this Court should find at a minimum that Plaintiffs' claims arising from Indemnity's breach of fiduciary duties occurring on or after July 8, 2014 (two years before Plaintiffs filed the Complaint at bar) are timely.

2.      **Plaintiffs' Initial State Court Complaint Tolled the Statute of Limitations for Indemnity's Breaches of Fiduciary Duty Arising Within Two Years of the Filing of the State Court Complaint**

Plaintiffs' fiduciary duty claims accruing within two years prior to the filing of their August 1, 2012 complaint in the still-pending State Court Action are timely as well.  As with the contract claims, the State Court complaint tolled the statute of limitations applicable to the substantively similar claims for breaches of fiduciary duty alleged there and, thus, preserved Plaintiffs' right to pursue same in the case at bar.  *See Holmes*, 1994 WL 649156 at *2-3; *see also Crown, Cork & Seal Co.*, 462 U.S. at 353; *American Pipe*, 414 U.S. at 554.

3.      **Plaintiffs' Claims for Indemnity's Breaches of Fiduciary Duty Dating Back to 1997 are Timely Pursuant to the Continuing Violation Doctrine**

While disagreeing with Indemnity's attempt to restrict its application in the instant case, Plaintiffs otherwise do not disagree with Indemnity's characterization of the continuous violation doctrine as being "occasioned by continual unlawful ***acts***, not continual ill ***effects*** from the original violation."  *See* Indemnity Mem. at 22 (emphasis in original).  Plaintiffs acknowledge that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred."  *Liberty Mut. Fire Ins. Co. v. Corry Indus., Inc.*, No. 97-cv-172, 2000 WL 34546492, at *3 (W.D. Pa. Mar. 30, 2000) (citing *Brenner v. Local 514, Int'l Bhd. of Carpenters*, 927 F.2d 1283, 1295 (3d Cir. 1991)).  The continuing violation doctrine applies when, like here, a defendant's conduct constitutes a continuing practice amounting to "more than the occurrence of isolated or sporadic acts."  *See Cowell v. Palmer Twp.,* 263 F.3d 286, 292 (3d Cir. 2001))

19

(internal citation omitted).  Indeed, the doctrine's focus "is on affirmative acts of the defendants." *See id.*

In an effort to mischaracterize Plaintiffs' allegations, Indemnity includes a screenshot in its Memorandum of paragraphs 72-74 of the Complaint to try to portray Plaintiffs' claims as focused exclusively on:  "(1) the decision in 1997 by Indemnity to begin retaining a portion of the Service Charges;  and (2) the decision in 1999 to begin retaining all of the Service Charges." *See* Indemnity's Mem. at 33-34.  Plaintiffs, however, make clear in their Complaint that their claims involve ongoing decisions and breaches by Indemnity of its fiduciary duties every year subsequent to 1997.  To be sure, Plaintiffs allege that Indemnity, acting through its Directors, actively decided, ***each and every year***, to unlawfully take and retain the Service Charges and Additional Fees collected that year, not once obtaining a fairness opinion or other opinion from an independent person, expert, or entity to protect Exchange's interests.  *See, e.g.*, Compl. ¶¶ 75, 79, 81, 84, 85, 86.  Neither isolated nor sporadic, these affirmative acts constitute a continuing, and still on-going, breach of Indemnity's fiduciary duties.  Hence, Plaintiffs' fiduciary duty claims for Indemnity's breaches occurring since 1997 are timely.

## C.   PLAINTIFFS PLEAD TIMELY CONVERSION CLAIMS DATING BACK TO 1997 (COUNT III)

Plaintiffs acknowledge that the statute of limitations for a conversion claim is two years. 42 Pa. C.S. § 5524.  Plaintiffs do not dispute the accuracy of Indemnity's assertion that the "statute of limitations begins to run when 'the first significant event necessary to make the claim suable occurs.'"  Indemnity Mem. at 20.  However, "'[u]nder Pennsylvania law, a cause of action for conversion does not accrue **until there has been a demand for the goods and a refusal to deliver**.'"  *See Fenton v. Balick*, 821 F. Supp. 2d 755, 761 (E.D. Pa. 2011) (quoting *Serafini v. Mariani*, No. 08-cv-0469, 2010 WL 1342926, at *5 (M.D. Pa. Mar. 31, 2010))(emphasis added);

*see also Dranoff v. Merrill, Lynch, Pierce, Fenner & Smith*, No. 86-cv-3048, 1986 WL 15014, at

*2 (E.D. Pa. Dec. 31, 1986) ("Under Pennsylvania law a cause of action for conversion does not

accrue until there has been a demand for the goods and a refusal to deliver.") (citing *Norriton E.*

*Realty. Corp. v. Central-Penn. Nat. Bank*, 254 A.2d 637 (Pa. 1969)).

As such, Indemnity's suggestion that Plaintiffs' conversion claim accrued "when

Indemnity first 'took' the Service Charges" in 1997 is incorrect.  *See id.*  Indeed, prior to filing

the State Court Complaint, Plaintiffs had made no formal demand upon Indemnity to return the

Service Charges and Additional Fees wrongfully taken from Plaintiffs and Exchange. [9]   "[T]he

initiation of a law suit is an acceptable method for making a demand," and therefore Plaintiffs'

conversion claim accrued upon the commencement of the State Court Action (as has been tolled

since then).  *See Serafini*, 2010 WL 1342926, at *6 (citing *Beadling v. Moore*, 93 Pa. Super. 544,

1928 WL 4454, at *1 (Pa. Super. Ct. 1928)).

In *Serafini*, the defendant maintained that the plaintiffs' claims for conversion were

barred on account of the plaintiffs' failure to demand return of their property within two years of

its alleged conversion.  *See Serafini*, 2010 WL 1342926, at *5.  Rejecting this argument, the

Superior Court held that "the initiation of this lawsuit is sufficient to sustain a conversion claim."

*See id.,* at *6 (citing *Beadling*, 1928 WL 4454, at *1).  The court reasoned further that "while

demand and refusal are evidence of the conversion of property, the fact of conversion may be

proved by any evidence sufficient to support the inference, such as denial of title, or assertion

that title is in another."  *See Serafini*, 2010 WL 1342926, at *6 (citing *Beadling*, 1928 WL 4454,

at *1).  Thus, the Court stated, "'title may be asserted by bringing suit, for a suit or action,

---

[9] Alternatively, in the event Defendant argues that a demand for conversion was not included within the equitable demands in the State Court Action, this Court can find that there was no formal demand for conversion until the filing of the instant Complaint, thus, still rendering Plaintiffs' conversion claim timely.

according to its legal definition, is the lawful demand of one's right in a court of justice.'" *See Serafini*, 2010 WL 1342926, at *6 (citing *Beadling*, 1928 WL 4454, at *1).

The *Serafini* Court also rebuffed the defendant's argument that "a party asserting a cause of action is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period." *See Serafini*, 2010 WL 1342926, at *6.  While the court first recognized that "the statute of limitations begins to run as soon as the right to institute and maintain a suit arises [and that] lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations, even though a person may not discover his injury until it is too late to take advantage of the appropriate remedy," the court further noted that, "[i]n this case, however, it was the demand for the return of the stock that triggered the running of the statute of limitations . . . and the initiation of a law suit is an acceptable method for making a demand." *See Serafini*, 2010 WL 1342926, at *6 (citing *Dranoff*, 1986 WL 15014 at *2; *Beadling*, 1928 WL 4454, at *1).  On this basis, the Court found the plaintiffs' conversion to be "timely."  *See Serafini*, 2010 WL 1342926, at *6.

In line with *Serafini*, Plaintiffs' claim for conversion is timely as to Service Charges and Additional Fees unlawfully retained by Indemnity since 1997 (the year Indemnity first began taking them).  *See* Compl. ¶ 72.  Until the State Court Action was filed, no demand had been made for return of the converted Service Charges and Additional Fees, and therefore the statute of limitations for asserting a claim premised on Indemnity's conversion did not begin running until the filing of the State Court Action complaint.  *See Serafini*, 2010 WL 1342926, at *6.  As the State Court Action remains pending, Plaintiffs' claims for Indemnity's conversion of Service Charges and Additional Fees retained between 1997 are timely.

### III.   PLAINTIFFS   STATE   PLAUSIBLE   CLAIMS   FOR   RELIEF   AGAINST INDEMNITY

Indemnity argues that Plaintiffs fail to plead a breach of the Subscriber's Agreement, *see* Indemnity Mem. at 26-34, and any injury associated with same, *see id.* at 34-35.   To the contrary, Plaintiffs state facts showing that Indemnity may only receive premium-based compensation for duties performed under the Subscriber's Agreement and Indemnity's services performed in connection with Service Charges and Additional Fees fall within the scope of this contract.   Therefore, Indemnity has no authority to take the Service Charges and Additional Fees for itself.   On these bases, Plaintiffs' allegations give rise, at minimum, to a reasonable inference that Indemnity breached the Subscriber's Agreement.

Indemnity also contends that Plaintiffs fail to state claims for breaches of fiduciary duty because those claims are duplicative of Plaintiffs' contract claims, *see id.* at 35-36, and lack sufficiently specific allegations concerning the duties owed by Indemnity or its breaches of same, *see id.* at 36-37.   These arguments are unavailing as well.   Indeed, Indemnity's role as Attorney-in-Fact to Plaintiffs imposes upon it broader fiduciary responsibilities irrespective of its contractual obligations pursuant to the Subscriber's Agreement.   Likewise, Plaintiffs adequately allege Indemnity's duties of loyalty and care to Plaintiffs and its persistent breach of same through "irreconcilable conflicts of interests" and its repeated failure, year after year, to obtain independent opinions as to the propriety of its retention of the Service Charges and Additional Fees.

Lastly, as to Plaintiffs' conversion claim, Indemnity relies primarily on the gist of the action and/or economic loss doctrines in seeking its dismissal.   *See* Indemnity Mem. 37-38. This argument proves premature, however, as the Federal Rules of Civil Procedure expressly allow

the pleading of claims in the alternative—including parallel causes of action for breach of contract and conversion—at the motion-to-dismiss stage.

A.   **PLAINTIFFS STATE A PLAUSIBLE CLAIM FOR BREACH OF CONTRACT (COUNT I)**

1.   **Plaintiffs' Allegations Give Rise to a Reasonable Inference That Indemnity Breached the Subscriber's Agreement**

The terms of the Subscriber's Agreement expressly provide that as compensation for Indemnity, among other things, "**becoming and acting as Attorney-as-Fact** . . . **[and] managing the business and affairs of [Exchange]** . . . paying general administrative expenses, including sales commissions, salaries . . . and data processing . . . [Indemnity] may retain up to 25% of all *premiums* written or assumed by [Exchange]."   *See* Subscriber's Agreement (emphasis added).  This stated percentage of premiums is all the compensation that Indemnity is permitted to receive for its services.  Indeed, Indemnity has acknowledged in Form 10-Ks filed with the SEC that its contractual obligations as attorney-in-fact for the Exchange include, *inter alia*:  **policy issuance, policy exchange and cancellation**, and **processing of invoices for premiums** and that it "**is obligated to conduct these activities at its own expense**."  *See* Muhic Decl., Ex. C, Indemnity's Annual Report on Form 10-K/A March 30, 1999 ("Indemnity's 1998 10-K/A") at p. 17 (emphasis added); Muhic Decl., Ex. D, Indemnity's 1994 Annual Report on Form 10-K filed on March 30, 1995 ("Indemnity's 1994 10-K") at p. 20; *see* JSOF ¶ 65; *see also* Compl. ¶ 56.  These activities, which Indemnity has admitted are part of its duties as attorney-in-fact, are the very services for which Indemnity is now trying to justify taking the Service Charges and Additional Fees.  Accordingly, Plaintiffs have set forth a plausible claim in the

Complaint that Indemnity is breaching the Subscriber's Agreement by taking the Service Charges and Additional Fees as additional, unlawful compensation.[10]

Indemnity seeks to avoid liability by manufacturing ambiguity in the Subscriber's Agreement's clear language, and then having such ambiguity construed in its favor.[11]  *See id.* at 26-30.  Specifically, Indemnity argues that the Subscriber's Agreement addresses compensation only for "insurance services" and that the services performed in relation to the Service Charges and Additional Fees constitute "non-insurance services" for which it is entitled to separate compensation.  *See id.*  This *post hoc* interpretation of the Subscriber's Agreement is wholly contrived and frivolous.[12]

---

[10] Indemnity also further supports Plaintiffs' claims by way of the argument it asserts in its Memorandum regarding the NAIC Manual.  *See* ECF No. 34 at pp. 28-29.  Specifically, Indemnity quotes the Manual for the proposition that the Service Charges are "primarily intended to compensate the insurer for the **additional administrative costs** associated with **processing more frequent billings**."  *Id.* at 29 (emphasis added).  Because expenses associated with Indemnity's  "processing of invoices for premiums" and other general "administrative expenses" are specifically enumerated in the Subscriber's Agreement as expenses which Indemnity must bear and pay for out of the percentage of premiums it receives as an annual management fee, Indemnity cannot use such expenses as justification for taking the Service Charges from Exchange as additional compensation.  Indemnity's actions are in breach of the Subscriber's Agreement.

[11] At best, Indemnity would be creating an issue of fact with its argued-for ambiguity in the contract language.  Moreover, "[w]here the language of the contract is ambiguous, the provision is to be construed against the drafter."  *McWreath v. Range Res.—Appalachia, LLC*, 81 F. Supp. 3d 448, 461 (W.D. Pa. 2015), *aff'd sub nom. McWreath v. Range Res.-Appalachia, LLC*, 645 F. App'x 190 (3d Cir. 2016) (quoting *Keystone Dedicated Logistics, LLC v. JGB Enters., Inc.*, 77 A.3d 1, 6 (Pa. Super. Ct.2013) (quoting *State Farm Fire & Cas. Co. v. PECO*, 54 A.3d 921, 928 (Pa. Super. Ct. 2012))).

[12] Moreover, even if the Court were to lend any credence to Indemnity's interpretation, this would only create an issue of fact more appropriately reserved for summary judgment or trial.  *See e.g., Operative Bricklayer's Union No. 64 of Pa. Welfare Fund v. Bricklayer's Local Union No. 1 of Pa. Welfare Fund*, 45 F.R.D. 429, 431 (E.D. Pa. 1968) (stating that in the presence of ambiguous contractual provisions "it would be improper for this court to interpret the contract finally in ruling upon a motion to dismiss made pursuant to Rule 12(b)(6)"); *KDH Elec. Sys., Inc. v. Curtis Tech. Ltd.*, 826 F. Supp. 2d 782, 796 (E.D. Pa. 2011) ("the Court cannot dismiss the breach of contract claim against KDHE as a matter of law because the Teaming Agreement is

First, Indemnity's contorted analysis of the Subscriber's Agreement has no basis in the text of the agreement.  Indemnity strains to read an artificial distinction between "insurance services" and "non-insurance services" into a contract that makes absolutely no mention of this purported dichotomy, and in fact, does not even use any comparable language.  *See* Subscriber's Agreement.  Such a reading runs afoul of bedrock contract interpretation principles.

"Pennsylvania contract law begins with the 'firmly settled' point that 'the intent of the parties to a written contract is contained in the writing itself.'"  *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92 (3d Cir. 2001) (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. 1993) (citing *Steuart v. McChesney*, 444 A.2d 659 (Pa. 1982))).  "Where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as, perhaps, silently intended."  *G & T Conveyor Co. v. Allegheny Cty. Airport Auth.*, No. 11-cv-562, 2011 WL 5075353, at *4 (W.D. Pa. Oct. 25, 2011) (quoting *Bohler-Uddeholm*, 247 F.3d at 93) (emphasis in original).  "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract."  *Bohler-Uddeholm*, 247 F.3d at 93 (quoting *Krizovensky*, 624 A.2d at 642).

The terms of the Subscriber's Agreement are straightforward.  The  Subscriber's Agreement *does not* distinguish between "insurance services" and "non-insurance services," nor limit the agreement to only "insurance services," nor even use any terminology comparable to "insurance services" and "non-insurance services." *See* Subscriber's Agreement.  Instead, the Subscriber's Agreement requires that Indemnity, as Attorney-in-Fact, "**issue, change, nonrenew or cancel policies** . . . **collect premiums** . . . **[and] manage and conduct the business and affairs**

---

subject to more than one reasonable interpretation"); *Butters Living Trust v. SWEPI, LP*, No. 12-cv-02010, 2013 WL 3679533, at *5 (M.D. Pa. July 12, 2013) (denying motion to dismiss and stating that the dispute may be resolved "in the first instance only on summary judgment, where the court may consider undisputed matters outside the pleadings").

*of [Exchange] its affiliates and subsidiaries*," in exchange for "up to 25% of all ***premiums*** written or assumed by [Exchange]."  *See* Subscriber's *id.* (emphasis added).  Indemnity may not take from Exchange compensation beyond the premium-based compensation provided for by the Subscriber's Agreement (and to which Indemnity rightfully restricted itself from 1925 through 1997, before suddenly deciding it wanted more).  The so-called "special services" performed by Indemnity are merely tasks included within its obligations under the Subscriber's Agreement and as attorney-in-fact to process premium invoices (regardless of the number of invoices);  process checks or other payments returned unpaid;  issue cancellation notices as a result of non-payment of a policy; and reinstate policies following lapses in coverage after non-payment cancellations. Indemnity's retention of the Service Charges and Additional Fees therefore constitutes a straightforward breach of the Subscriber's Agreement.

Second, Indemnity cannot rely on parole evidence to create ambiguity in the Subscriber's Agreement's clear text.  "'Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence,' instead, the meaning of a clear and unequivocal written contract 'must be determined by its contents alone.'"  *Bohler-Uddeholm*, 247 F.3d at 92-93 (citing *Steuart*, 444 A.2d at 661) (quoting *E. Crossroads Ctr., Inc. v. Mellon–Stuart Co.*, 205 A.2d 865, 866 (Pa. 1965))).  Only where a contract's terms are ambiguous and "susceptible of more than one reasonable interpretation" can a court consider parole evidence to resolve the ambiguity.  *See Bohler-Uddeholm*, 247 F.3d at 93 (quoting *Krizovensky*, 624 A.2d at 642).  In determining whether an agreement is ambiguous, the Third Circuit provides clear guidance:

> A contract will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is

27

not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

*Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir.1995) (quoting *Samuel Rappaport Family P'ship v. Meridian Bank*, 657 A.2d 17, 21-22 (Pa. Super. Ct. 1995)).

While a party may use parole evidence to support a claim of latent ambiguity, "this evidence must show that some *specific term* or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract." *See Bohler-Uddeholm*, 247 F.3d at 93 (emphasis added). Put differently, a contract argument premised on "latent ambiguity must be based on a 'contractual hook': the proffered extrinsic evidence must support an alternative meaning of a specific term or terms contained in the contract, rather than simply support a general claim that the parties meant something other than what the contract says on its face." *See id.* at 96. Further, "the alternative meaning that a party seeks to ascribe to the specific term in the contract must be reasonable; courts must resist twisting the language of the contract beyond recognition." *See id.* at 93. Lastly, "a court can consider an alternative interpretation of a facially unambiguous contract term when the plain meaning interpretation of the contract would lead to an absurd and unreasonable outcome." *See id.* at 96.

In an attempt to conjure ambiguities in contravention of the Subscriber's Agreement's plain text, Indemnity relies on several pieces of extrinsic evidence, namely, accounting principles, *see* Indemnity Mem. at 28-29; submissions to the Department, *see id.* at 29; and the Declaratory Opinion and Order vacated by the Commonwealth Court, *see id.* at 29-31. The Court should not consider any of these extrinsic documents because Indemnity offers them only to argue that the Subscriber's Agreement means something entirely different than what it says. *See Bohler-Uddeholm*, 247 F.3d at 93. Absent the required "contractual hook," Indemnity posits

a wholesale revision of the Subscriber's Agreement to justify its unlawful retention of hundreds

of millions of dollars in Service Charges and Additional Fees.  *See id.* at 96.  Not only is this

alternative interpretation impermissible, it would lead to an "absurd and unreasonable outcome."

*See id.* at 93, 96.  For these reasons, the Court should disregard the parole evidence Indemnity

offers in support of its attempt to manufacture latent ambiguity in the facially unambiguous

Subscriber's Agreement.

Moreover, even if the Court were to look beyond the contract's clear language, extrinsic

evidence only demonstrates that the Subscriber's Agreement means precisely what it says.  As

Indemnity admits in its own SEC filings, the services it performs in connection with the Service

Charges and Additional Fees come within the purview of the Subscriber's Agreement:

> The activities performed by [Indemnity] as attorney-in-fact for the Exchange
> include insurance underwriting, ***policy issuance, policy exchange and
> cancellation, processing of invoices for premiums***, the establishing and
> monitoring of loss reserves, oversight of reinsurance transactions, payment of
> insurance commissions to insurance agents, compliance with rules and regulations
> of supervisory authorities and monitoring of legal affairs.

*See* Muhic Decl., Ex. C (Indemnity's 1998 10-K/A).  *See also* Muhic Decl., Ex. D (Indemnity's

1994 10-K); *see also* JSOF ¶ 65; Compl. ¶ 55.  "[P]olicy issuance, policy exchange and

cancellation, [and] processing of invoices for premiums" comprise the precise services for which

Indemnity claims entitlement to the Service Charges and Additional Fees.  *See* Compl. ¶¶ 68, 71-

72, 77.  Further, in those same SEC filings, Indemnity admits that, pursuant to the Subscriber's

Agreement, it "is obligated to conduct these activities . . . at its own expense."  *See* Muhic Decl.,

Ex. C (Indemnity's 1998 10-K); Muhic Decl., Ex. D (Indemnity's 1994 10-K); *see also* JSOF ¶

65.  Therefore, even if Indemnity were correct that the Subscriber's Agreement covers only so-

called "insurance services," Indemnity's own admissions make clear that the services performed in connection with the Service Charges and Additional Fees are "insurance services."[13]

In addition, any findings of the Department in its vacated Declaratory Opinion and Order are a nullity. *See O'Connor v. Donaldson*, 422 U.S. 563, 577 n. 12 (1975) (citing *United States v. Munsingwear*, 340 U.S. 36 (1950) ("Of necessity our decision vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect, leaving this Court's opinion and judgment as the sole law of the case."); *see also Hahn v. O'Donnell*, No. 93-cv-4440, 1994 WL 440226, at *2 (E.D. Pa. Aug. 12, 1994) ("A ruling which has been reversed or vacated is not final and is deprived of any preclusive effect.") (citation omitted). Though Indemnity cites to case law purportedly supporting the persuasive value of vacated opinions, *see* Indemnity Mem. at 25-26 n. 12, those decisions are distinguishable and non-binding. Those cases stand for nothing more than the proposition that the reasoning or analysis utilized in a vacated opinion may be informative in a separate case; they do not support the use of findings or conclusions from a vacated opinion in a subsequent proceeding in the same case. *See generally NASD Dispute Resolution, Inc. v. Jud. Council of State of Cal.*, 488 F.3d 1065 (9th Cir. 2007); *Nat'l Black Police Assn. v. Dist. of Columbia*, 108 F.3d 346 (D.C. Cir. 1997); *Wooding v. United States*, No. 05-1681, 2007 WL 2071674 (W.D. Pa. Jul. 13, 2007).

Indemnity also misleadingly suggests that the Commonwealth Court vacated the Declaratory Opinion and Order on narrow "non-substantive, jurisdictional grounds," *see* Indemnity Mem. at 25-26 n. 12, but that is simply not the case. As stated above, the

---

[13] The fact that a service charge may not be a "premium" does not lead to the conclusion that the collection of premiums is outside the scope of the Subscriber's Agreement. To the contrary, collection of premiums is expressly within the enumerated duties of Indemnity under the Subscriber's Agreement.

Commonwealth Court expressly rejected Indemnity's argument regarding the propriety of the Commissioner's consideration of Plaintiffs' civil contract and fiduciary duty claims in assessing the issues surrounding the appropriateness of Indemnity's retention of the Service Charges and Additional Fees under the IHCA.  *See generally Erie Ins. Exch. ex rel. Sullivan v. Pa. Ins. Dep't*, 133 A.3d at 109-110, 112-113, *appeal denied*, (Pa. Aug. 10, 2016).  The Commonwealth Court expressly recognized that different standards apply to these different analyses and specifically held that the legal analysis necessary to evaluate the viability of Plaintiffs' contract and tort claims comes within the purview of the courts, not a regulatory body.  *See id.* at 112-13.  As such, the Department's Declaratory Opinion and Order is entitled to no deference and holds no persuasive value.

> **2.    Miscellaneous Policy Documents Cited by Indemnity Do Not Authorize Indemnity to Retain the Service Charges and Additional Fees**

Indemnity next contends that various policy applications and notices sent to Subscribers provide it with the necessary contractual basis, separate from the Subscriber's Agreement, for retaining Service Charges and Additional Fees.   *See* Indemnity Mem. at 15-16, 31-32.  Specifically, Indemnity points to policy applications, adopted in 2000, stating that a "service charge is applied and paid to Erie Indemnity for the second and subsequent installments" on certain installment plans available to Subscribers.  Indemnity Mem. at 15, 32 (emphasis added).  Indemnity also relies on language in certain policy notices stating, beginning in 2000, that "[t]he service charge applied and paid to Erie Indemnity Company for payment plans has increased from $2.00 to $3.00" and, beginning in 2006, that "[t]he service charge applied and paid to Erie Indemnity Company" for certain payment plans would increase.  Indemnity Mem. 15-16, 32.

The plain text of these policy documents provides only that charges and payments are *paid to* Indemnity.  That is unremarkable, given that Indemnity is the attorney-in-fact and billing agent for Exchange and responsible for the collection of all premiums and other charges.  What the documents do not say is that Indemnity will *retain* the Service Charges and Additional Fees—much less that it would retain the Service Charges and Additional Fees as compensation in addition to the percentage of premiums it receives under the Subscriber's Agreement.

Significantly, Indemnity acknowledges that "[t]he Subscriber's Agreements executed by policyholders are the ***sole agreements*** that govern Indemnity's duties to Exchange as attorney-in-fact and the corresponding ***compensation*** provided to Indemnity for performing those duties."  *See* JSOF ¶ 62 (emphasis added).  The policy documents' clear language provides only for the *payment* of Service Charges and Additional Fees to Indemnity.[14]  *See* Indemnity Memo. 15-16, 31-32.  There is nothing in their text permitting Indemnity's *retention* of the amounts paid.  *See id.*

In sum, Plaintiffs plead facts showing that Indemnity may only receive premium-based compensation for duties performed under the Subscriber's Agreement.  Plaintiffs' allegations give rise to an inference, at minimum, that Indemnity's services performed in connection with

---

[14]  Curiously, Indemnity doubles back on its characterization of the Service Charges and Additional Fees as non-premiums, arguing that "even if charges are viewed as premiums and the challenged conduct is governed by the Subscriber's Agreement, the Subscriber's Agreement vests Indemnity with the authority to use premiums for purposes to the 'advantage of the Subscribers.'"  *See* Indemnity Mem. at 32-33 (capitalization omitted).  Indemnity contends that it "'decided' that the creation and operation of the Special Services program (and the imposition of Service Charges to defray the expense of that program) would be to the 'advantage of the Subscribers.'"  *See id.* at 33.  However, it is not to the "advantage of the Subscribers" for Exchange to pay Indemnity additional compensation to perform services already required of Indemnity under the Subscriber's Agreement.  Furthermore, if the Service Charges and Additional Fees were "viewed as premiums," then Indemnity would be entitled to retain at most 25% of those amounts, yet it has in fact retained nearly 100% of them over the last two decades.

Service Charges and Additional Fees fall within the scope of this contract and that Indemnity's

retention of Service Charges and Additional Fees constitutes a breach of the Subscriber's

Agreement.[15]

> ### 3.      Plaintiffs Set Forth Allegations Giving Rise to a Reasonable Inference That the Subscribers were Damaged by Indemnity's Breach of the Subscriber's Agreement

Indemnity's last-ditch effort at dismissal contends that Plaintiffs fail to allege facts as to

who, exactly, is entitled to the $400 million in Service Charges and Additional Fees that it

unlawfully retained.  *See* Indemnity Mem. at 34-35.  Simply put, however, both Exchange and its

Subscribers are entitled to those funds, as Exchange serves as merely a conduit for the

Subscribers' indemnification of one another via insurance policies.

Indemnity opens its argument with an appropriate characterization of the liability theory

that Plaintiffs espouse and it, apparently, opposes:

> The crux of the Complaint is that Indemnity allegedly breached the Subscriber's Agreement by retaining the Service Charges and, thus, retained "compensation" in excess of the amount set by the Subscriber's Agreement.

*See id.* at 34.  But, Indemnity follows shortly thereafter with a mischaracterization of Plaintiffs'

damages theory:

> Accepting this theory, then, what necessarily follows is (a) no Service Charges should have been imposed on subscribers who requested and received the benefit of those services because they were supposedly paying for those services through

---

[15] Indemnity argues that Plaintiffs also fail to plead a claim for breach of the implied convenant of good faith and fair dealing because (i) they fail to plead a breach of contract claim and (ii) Indemnity disclosed its retention of the Service Charges and Additional Fees in policy documents and regulatory submissions.  *See* Indemnity Mem. at n. 14.  The policy documents, SEC filings, and Department submissions cited by Indemnity could not have afforded Plaintiffs notice of Indemnity's misconduct.  The policy documents provided Plaintiffs only with notice that Indemnity would be collecting the Service Charges and Additional Fees, not that Indemnity would retain these amounts.  *See supra*.  With respect to the regulatory filings submitted to the SEC and Department, such documentation are directed to *Indemnity's shareholders* (most of whom are insiders of Indemnity), not the Subscribers of Exchange.

their premiums; and (b) the Service Charges consequently should be returned directly to those subscribers who paid them.

*See id.*

Indemnity miscasts Plaintiffs' Complaint as alleging that Subscribers paying Service Charges and Additional Fees, as required, should not have to pay them.  In actuality, Plaintiffs dot not contest the propriety of Subscribers paying Service Charges and Additional fees but allege only that Exchange—not Indemnity—is entitled to retain the Service Charges and Additional Fees for the ultimate benefit of *all* Subscribers.  *See generally* Compl.  "Exchange's surplus belongs to its policyholders," *see* JSOF ¶ 172,  and the Service Charges and Additional Fees belong in Exchange's surplus to be used for all Subscribers, not in Indemnity's coffers.

Indemnity is further mistaken in its suggestion that "either (a) the subscribers should not have paid the Service Charges, and, hence, the subscribers are the ones who deserve the return of those monies; or (b) the subscribers should have paid the Service Charges for the Special Services because the Subscriber's Agreement does not govern and thus does not preclude charging them for the Special Services."  Indemnity Mem. at 35.  The Complaint does not challenge that Subscribers can be charged the Service Charges and Additional Fees, only that Indemnity should not retain them, *see* Compl. ¶¶ 71-74, 76, 78-85, and alleges that the Subscriber's Agreement prohibits Indemnity from obtaining non-premium-based compensation. *See* Subscriber's Agreement.  Nothing more is required to state a claim for damages against Indemnity.

### B.   PLAINTIFFS STATE PLAUSIBLE CLAIMS FOR BREACHES OF FIDUCIARY DUTY (COUNTS II AND IV)

Indemnity does not dispute the existence of a fiduciary relationship between it and Exchange or its Subscribers, s*ee* Indemnity Mem. at 35-37, nor can it.  Instead, Indemnity argues

only that Plaintiffs' fiduciary duty claims fail because are they duplicative of their contract claims, *id.* at 35-36, and, also, because the Complaint does not state the at-issue duties or breaches with sufficient specificity, *id.* at 36-37.  Each of Indemnity's arguments lacks merit.

First, Plaintiffs do not simply recast their breach of contract claims as breach of fiduciary duty claims.  Indeed, Indemnity's role as Attorney-in-Fact imposes upon it broad fiduciary responsibilities irrespective of the Subscriber's Agreement.  *See In re Shahan*, 631 A.2d 1298, 1302-03 (Pa. Super. Ct. 1999) (noting attorney-in-fact, as agent of principal, was fiduciary with respect to principal); *see also In re St. Felix,* 436 B.R. 786, 789 (E.D. Pa. 2010) ("An attorney-in-fact is someone 'who is designated to transact business for another; a legal agent.'") (quoting BLACK'S LAW DICTIONARY at 1209 (8th ed. 2004)).  Indemnity acknowledges these obligations in its Corporate Governance Guidelines, *see* Compl. ¶¶ 63-64; Acceptance of Trust, *see id.* ¶¶ 62 and Doc. 1-2 (sample Acceptance of Trust); and various SEC filings, *see* Compl. at ¶¶ 61, 65 and Muhic Decl., Exs. A & B (Indemnity's 2015 10-K and Indemnity's 2015 Q3 10-Q); *see also* Compl. ¶¶ 3, 43-44, 60-61[16]  Simply because the parties entered into the Subscriber's Agreement memorializing certain, particular contractual obligations, does not mean that Indemnity may in turn disregard its larger responsibilities as a fiduciary to Plaintiffs.  *See, e.g.*, *First Sealord Sur. v. Durkin & Devries Ins. Agency*, 918 F. Supp. 2d 362, 389 (E.D. Pa. 2013) ("Merely because the

---

[16] "A fiduciary relationship may be established in one of two ways."  *Reginella Constr. Co., Ltd. v. Travelers Cas. & Sur. Co. of Am.*, 949 F. Supp. 2d 599, 611 (W.D. Pa. 2013).  "First, [a fiduciary relationship] may be shown by demonstrating the existence of a relationship ordinarily known to be fiduciary as a matter of law, such as that between a 'trustee and [beneficiary], guardian and ward, attorney and client, and principal and agent.'"  *Id.* (quoting *Leedom v. Palmer*, 117 A. 410, 412 (Pa. 1922)); *see also Basile v. H & R Block, Inc.*, 777 A.2d 95, 102 (Pa. Super. 2001).  "Second, [a fiduciary relationship] may be established as a matter 'of fact to be decided by evidence.'"  *Reginella*, 949 F. Supp. 2d at 611 (quoting *Leedom*, 117 A. at 412); *see also Basile*, 777 A.2d at 101-102.  In this regard, courts are mindful that the "fact-sensitive inquiry" into the existence of a fiduciary relationship is "not to be disposed rigidly as a matter of law."  *Yenchi v. Ameriprise Fin., Inc.*, 123 A.3d 1071, 1079 (Pa. Super. Ct. 2015).

terms of an agency relationship are spelled out in a written agreement does not mean that the agent does not also owe, as a matter of law, a duty of loyalty to the principal.") (citation omitted); *see also Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 685-86 (E.D. Pa. 2014) ("The Restatement of Agency, which governs a cause of action for breach of fiduciary duty, acknowledges that the mere fact '[t]hat a relationship of agency exists does not foreclose the possibility that it may be preceded by or followed by another type of legal relationship between the same parties, nor does it foreclose the possibility that another type of legal relationship may exist contemporaneously between the same parties.'") (quoting RESTATEMENT (THIRD) OF AGENCY § 8.01, cmt. C.).

Second, Plaintiffs sufficiently state Indemnity's fiduciary obligations in their Complaint. *See* Compl. ¶¶ 60-67 ("Indemnity and the Board Owe Fiduciary Duties to Exchange and the Subscribers"). While avoiding conclusory labels,[17] the Complaint spells out—with particularity—Indemnity's duties of loyalty and care. *See id.* ¶¶ 3, 5, 53, 60-67 (describing fiduciary duties); ¶¶ 107-113 (reiterating fiduciary obligations and how said obligations were breached); *see id.* ¶¶ 122-131 (same); *see also Anchel v. Shea*, 762 A.2d 346, 357 (Pa. Super. Ct. 2000) ("Our law prescribes that a fiduciary obligation includes both a duty of care and a duty of loyalty.") (citation omitted); *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 199-200 (3d Cir.

---

[17] Just as this Court should not give credence to "conclusory statements" for purposes of ruling on a motion to dismiss, *see*, *e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), the Court should not penalize Plaintiffs for failing to ascribe "conclusory" labels to the instances of breach of fiduciary duty alleged in the Complaint, *see id.* at 679 ("Determining whether a complaint states a plausible claim [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.") *Id.* at 664 (citation omitted). This consideration is especially forceful where, as here, Plaintiffs set forth ample allegations supporting multiple instances of fiduciary breaches by Indemnity to Exchange and its Subscribers. *See id.* at 664 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

2005) ("A fiduciary traditionally owes a duty of loyalty and a duty of care.") (citing *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 75 (1991)).

Finally, the Complaint adequately alleges that Indemnity breached its duties of loyalty and care.  With respect its duty of loyalty, Plaintiffs point to the "irreconcilable conflicts of interest" facing Indemnity as a result of its Board's pecuniary interest in appropriating monies from Plaintiffs to enhance dividends obtained by the Directors by virtue of their ownership of certain Indemnity stock, *see* Compl. at ¶¶ 17, 23-24, 39, 44-51, 85-88, 111-12, loyalties to the Hirt family, ¶ 48 n.11, and its concurrent fiduciary duties to act in the best interests of Indemnity stockholders, *see id.* at ¶¶ 66, 126.  Each and every year since 1997, decisions made by Indemnity—through its heavily conflicted Board—allowed it to retain over $400 million in Service Charges and Additional Fees revenue belonging to Exchange.  *See id.* ¶¶ 68-76 (discussing improper diversion of Service Charges); *see id.* ¶¶ 77-81 (discussing improper diversion of Additional Fees); *see id.* ¶¶ 82-85 (discussing how said Service Charges and Additional Fees belonged to Exchange).  Further, as to its duty of care, Indemnity, each and every year since 1997, has failed to "obtain[ ] a fairness opinion or other opinion from an independent person, expert or entity solely representing Exchange's interests regarding whether Indemnity could retain" the in Service Charges and Additional Fees.  *See id.* at ¶¶ 73, 81, 83; *see also* JSOF ¶¶ 89-90, 129-30, 133.

Plaintiffs' breach of contract claim premised on the Subscriber's Agreement cannot bar its breach of fiduciary duty claims stemming from duties or loyalty and care that supplement Indemnity's contractual obligations.  Accordingly, there is no basis to dismiss Plaintiff's claim for breach of fiduciary duty.

### C.     PLAINTIFFS STATE A PLAUSIBLE CLAIM FOR CONVERSION (COUNT III)

Indemnity does not—and cannot—dispute that Plaintiffs sufficiently state a claim for conversion. *See* Indemnity's Mem. at 33-34. Rather, Indemnity contends that Plaintiffs' claim for conversion is barred by the gist of action and/or economic loss doctrines.[18] *See id.* This position, however, is not well-taken. Under Federal Rule of Civil Procedure 8(d)(2), a party is entitled to plead alternative claims. *See* FED. R. CIV. P. 8(d)(2). Without discovery, it can be difficult to know whether a claim sounds in contract or tort, and for this reason, "caution should be exercised in determining the gist of an action at the motion to dismiss stage." *See Interwove Tech, Inc. v. Rockwell Automation*, Inc., No. 05-cv-398, 2005 WL 3605272, at *13 (E.D. Pa. Dec. 30, 2005) (citation omitted).

Courts in this Circuit regularly deny motions to dismiss parallel claims for breach of contract and conversion when premised on the gist of the action and/or economic loss doctrines. *See, e.g.*, *Kimberton Healthcare Consulting, Inc. v. Primary PhysicianCare, Inc.*, No. 11-cv-4568, 2011 WL 6046923, at *6-9 (E.D. Pa. Dec. 6, 2011); *Berger & Montague, P.C. v. Scott & Scott, LLC*, 153 F. Supp. 2d 750, 754 (E.D. Pa. 2001); *see also* 5 Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1282 (3d ed. rev. 2008) ("[I]n a complex legal environment flexible pleading [is] essential to a full presentation of all relevant facts and legal theories at trial and the final settlement of disputes on their merits. Consequently, under Rule 8(e)(2), a party may plead alternatively or hypothetically within a single count or defense, or

---

[18] Alternatively, Indemnity argues that Plaintiffs' conversion claim "fails since the Service Charges were paid willingly to Indemnity by those subscribers who elected to purchase the Special Services and agreed to pay Indemnity the Service Charges in return." *See* Indemnity Mem. at n. 17. To the extent that the policy documents evidence Subscribers' willingness to pay the Service Charges, it evidences only that: those Subscribers were willing to ***pay*** Indemnity the Service Charges; they did not consent to Indemnity's ***retention*** of the Service Charges. *See, supra* at 30.

assert separate claims or defenses in an alternative or multiple manner.") (citation omitted). Indeed, the *Berger* Court denied the defendant's motion to dismiss a conversion claim, "at this juncture," on the basis that Rule 8 allowed plaintiff "to plead two or more alternative claims . . . for either breach of contract or conversion, regardless of their consistency, and whether based on legal, equitable or other grounds" *See Berger*, 153 F. Supp. 2d at 754.  This Court should do likewise and deny Indemnity's motion to dismiss Plaintiffs' claim for conversion.

## **CONCLUSION**

For all the reasons set forth above, and those set forth in Plaintiffs' Combined Opposition to the Motions to Dismiss of Director Defendants Elizabeth H. Vorsheck, J. Ralph Borneman, Jr., Terrence W. Cavanaugh, C. Scott Hartz, Claude C. Lilly, III, Thomas W. Palmer, Martin P. Sheffield, Richard L. Stover, Robert C. Wilburn, Thomas B. Hagen, Jonathan Hirt Hagen, Lu Ann Datesh, And George R. Lucore,[19] Plaintiffs respectfully request that this Court deny the Motion of Erie Indemnity Company to Dismiss the Complaint, *see* ECF No. 33.

---

[19] Plaintiffs incorporate herein by reference the discussion and arguments advanced in their forthcoming Combined Opposition to the Motions to Dismiss of Director Defendants Elizabeth H. Vorsheck, J. Ralph Borneman, Jr., Terrence W. Cavanaugh, C. Scott Hartz, Claude C. Lilly, III, Thomas W. Palmer, Martin P. Sheffield, Richard L. Stover, Robert C. Wilburn, Thomas B. Hagen, Jonathan Hirt Hagen, Lu Ann Datesh, and George R. Lucore, to the extent that they pertain to any arguments made by Indemnity.  Among other things, Plaintiffs specifically incorporate their opposition to arguments raised in the Director Defendants' Motions to Dismiss regarding Plaintiffs' purported lack of standing to sue on behalf of Exchange, as Indemnity incorporates those arguments of the Directors by reference into its Memorandum.  *See* Indemnity. Mem. at 35 & n. 18.

Dated:  November 7, 2016

KESSLER TOPAZ
 MELTZER & CHECK, LLP

By: */s/ Peter A. Muhic* _____
Joseph H. Meltzer, Esquire
PA: 80136
Peter A. Muhic, Esquire
PA: 73501
Robin Winchester, Esquire
PA: 86590
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

RADCLIFFE & DEHAAS, L.L.P.
William M. Radcliffe, Esquire
PA: 18148
2 West Main Street, Suite 700
Uniontown, PA 15401
Telephone: (724) 439-3900
Facsimile:  (724) 439-3335


*Attorneys for Plaintiffs*

40

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of November, 2016, I caused the foregoing to be served by electronic means through the Court's transmission facilities upon all counsel of record.


*/s/ Peter A. Muhic*
Peter A. Muhic